**Case Nos. 23-2081, 23-2302, 23-2377**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC,

Petitioner - Cross-Respondent

v.

### NATIONAL LABOR RELATIONS BOARD,

Respondent - Cross-Petitioner

v.

### INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

Petitioner-Intervenor

---

ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
ENFORCEMENT OF DECISION OF THE NLRB

---

**OPENING BRIEF FOR PETITIONER/CROSS-RESPONDENT
CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC**

---

Ross M. Gardner
Alan M. Bayless Feldman
Ross.gardner@jacksonlewis.com
Alan.feldman@jacksonlewis.com
JACKSON LEWIS, P.C.
10050 Regency Circle, Suite 400
Omaha, Nebraska 68114
Telephone: 402.391.1991
Facsimile: 402.391.7363

*Attorneys for Petitioner/Cross-Respondent CEMEX Construction Materials Pacific, LLC*

Maurice Baskin, Esq.
mbaskin@littler.com
LITTLER MENDELSON, P.C.
815 Connecticut Ave., N.W., Suite 400
Washington, DC 20006
Telephone: 202.842.3400
Facsimile: 202.842.0011

John Harper III
ajharper@littler.com
LITTLER MENDELSON, P.C.
1301 McKinney St., Suite 1900
Houston, Texas 77010
Telephone: 713.951.9400

## CORPORATE DISCLOSURE STATEMENT

The undersigned certifies that Petitioner CEMEX Construction Materials Pacific, LLC (hereafter "CEMEX") a Delaware subsidiary of CEMEX, S.A.B. de CV, a multinational building materials company whose stock is publicly traded on the New York Stock Exchange under the symbol CX. No other publicly held corporation owns (directly or indirectly) more than 10% of Cemex stock.

*/s/Maurice Baskin*

*Attorney for CEMEX*

# TABLE OF CONTENTS

**PAGE**

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................1

RELEVANT STATUTORY AND REGULATORY SECTIONS .........................2

STATEMENT OF THE CASE ..............................................................2

SUMMARY OF ARGUMENT ..............................................................7

STANDARD OF REVIEW ....................................................................9

ARGUMENT ......................................................................................11

I.  THE BOARD'S ORDER MUST BE DENIED
    ENFORCEMENT BECAUSE THE ALJ WAS
    UNCONSTITUTIONALLY APPOINTED.......................................11

II. THE BOARD'S UNFAIR LABOR PRACTICE FINDINGS
    AND RULINGS ON OBJECTIONS ARE NOT SUPPORTED
    BY SUBSTANTIAL EVIDENCE OR ARE CONTRARY TO
    PRECEDENT. ............................................................................13

III. THE BOARD IMPROPERLY ISSUED A BARGAINING
     ORDER, AGAINST THE WISHES OF THE MAJORITY OF
     EMPLOYEES, AND CONTRARY TO THE SUPREME
     COURT'S *GISSEL* STANDARD. ................................................37

     A.  This is Not an "Exceptional," "Category One" Case
         under *Gissel*................................................................40

     B.  The Labor Practices Criticized by the Board, If They
         Occurred, Were Not So Serious or Pervasive as to
         Trigger a Bargaining Order Under Gissel................................40

     C.  The Board's Findings Regarding the Need for a
         Bargaining Order and the Insufficiency of Traditional
         Remedies are Insufficient to Support a Bargaining Order.......44

i

# TABLE OF CONTENTS
(CONTINUED)

PAGE

D.     Unlike the ALJ, the Board Failed to Consider Key Mitigating Factors in this Case. .................................................45

IV.   THE BOARD IMPROPERLY ANNOUNCED AND RETROACTIVELY APPLIED A NEW, UNLAWFUL STANDARD FOR IMPOSING PETITION REQUIREMENTS AND BARGAINING ORDERS ON EMPLOYERS RESPONDING TO UNION DEMANDS FOR RECOGNITION.................................................................49

A.     The Board Materially Erred by Issuing a New Legal Standard Unauthorized by the NLRA and Contrary to the Major Questions Doctrine. ......................................................50

B.     The Board Materially Erred by Engaging in Rulemaking Under the Guise of Adjudication. ...........................................52

C.     The Board Materially Erred in its Analysis of Precedent in *Gissel, Linden Lumber*, and *Joy Silk*. ..................................54

D.     The Board Materially Erred by Placing the Burden on the Employer to File an RM Petition, as This Burden Placement Conflicts with the Supreme Court's Holding in Linden Lumber.....................................................................55

E.     The Board Materially Erred in Concluding That a Bargaining Order is a Remedy of First Resort if it Determines an Employer Has Committed Any Unfair Labor Practice During an Election Period, in Violation of Gissel and Other Longstanding Precedent...............................58

F.     The Board Erred in Retroactively Applying its New Standard to CEMEX. ...............................................................61

V.   THE BOARD IMPROPERLY IMPOSED A NEW, UNLAWFUL REMEDY OF COMPENSATORY DAMAGES FOR THE SINGLE EMPLOYEE WHO IT FOUND TO HAVE BEEN UNLAWFULLY DISCHARGED.........................................62

## TABLE OF CONTENTS
(CONTINUED)

PAGE

CONCLUSION ......................................................................................64

CERTIFICATES OF COMPLIANCE.................................................65

STATUTORY ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Disposal Servs. East v. NLRB,*
   820 F.3d 592 (3d Cir. 2016) ...................................................................12

*Alabama Assn. of Realtors v. Dept. of Health and Human Servs.,*
   141 S.Ct. 2485 (2021) (*per curiam*) ...................................................51

*Atlantic Forest Products,*
   282 NLRB 855 (1987) ...............................................................18, 22

*Austal USA, LLC,*
   349 NLRB 561 (2007) ...............................................................29, 30

*Beneli v. NLRB,*
   873 F.3d 1094 (9th Cir. 2017) ................................................................62

*Beverly California Corp.,*
   326 NLRB 232 (1998) ...............................................................29, 30

*CAB Associates,*
   340 NLRB 1391 (2003) ................................................................23

*Charlotte Amphitheater Corp. v. NLRB,*
   82 F.3d 1074 (D.C.Cir. 1996) ...............................................................46

*Cooper Hand Tools,*
   328 NLRB 145 (1999), *aff'd sub nom United Steelworkers of*
   *America, AFL-CIO, CLC v. NLRB*, 8 Fed. Appx. 610 (9th Cir.
   2001) ........................................................................................47

*Donn Products, Inc. v. NLRB,*
   613 F.2d 162 (6th Cir. 1980) ................................................................44

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ................................................................................51

*First Lakewood Assn. v. NLRB,*
   582 F.2d 416 (7th Cir. 1976) ................................................................44

4

*Ford Motor Co. v. F.T.C.*,
673 F.2d 1008 (9th Cir. 1981) .............................................................53

*Free Enterprise Fund v. PCAOB*,
561 U.S. 477 (2010)...............................................................11, 12

*Gardner Mech. Servs., Inc. v. NLRB*,
115 F.3d 636 (9th Cir. 1997) ...................................................9, 38, 55

*Garvey Marine, Inc.*,
328 NLRB 991 (1999), *enfd.* 245 F.3d 819 (D.C. Cir. 2001) .....................41, 43

*Healthcare Emps. Union, Local 399, v. NLRB*,
463 F.3d 909 (9th Cir. 2006) ...............................................................34

*Int'l Longshore and Warehouse Union v. NLRB*,
978 F.3d 625 (9th Cir. 2020) .................................................................8

*Int'l Org. of Masters v. NLRB*,
61 F.4th 169 (D.C. Cir. 2023)...................................................9, 57, 59

*Int'l Union v. NLRB*,
834 F.2d 816 (9th Cir. 1987) ...............................................................45

*J.J. Newberry Co. v. NLRB*,
645 F.2d 148 (2d Cir. 1981) ...............................................................43

*Jarkesy v. SEC*,
34 F.4th 446, appeal pending (U.S.).....................................................11, 12, 64

*Jerkesy v. SEC*,
Docket No.22-859 (oral argument held Nov. 29, 2023).......................................7

*L'Eggs Products, Inc. v. NLRB*,
619 F.2d 1337 (9th Cir. 1980) .............................................................40

*Lamar Advertising of Hartford*,
343 NLRB 261 (2004) .......................................................................25

*Leggett & Platt, Inc. v. NLRB*,
988 F.3d 487 (D.C. Cir. 2021)...................................................57, 61

*Linden Lumber Div., Summer & Co. v. NLRB*,
  419 U.S. 301 (1974).......................................................................*passim*

*Linden Lumber Div., Sumner & Co.*,
  190 NLRB 718 (1971) ..................................................................58

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) .....................................................50

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018)..................................................................11

*Luck Cab Co.*,
  360 NLRB 290 (2014) ...................................................................37

*Manhattan Crowne Plaza*,
  341 NLRB 619 (2004) ...................................................................17

*Mayes v. Biden*,
  67 F.4th 921, 934-35 (9th Cir. 2023)............................................52

*Medieval Knights LLC*,
  350 NLRB 194 (2007) ...................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
  463 U.S. 29 (1983).........................................................................9

*N.L.R.B. v. Bighorn Beverage*,
  614 F.2d 1238 (9th Cir.1980) .......................................................48

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  142 S. Ct. 661 (2022)..............................................................10, 51

*Natural Gas Pipeline Co. v. Federal Energy Regulatory Com.*,
  590 F.2d 664 (7th Cir. 1979) ........................................................53

*NLRB v. A.J. Tower Co.*,
  329 U.S. 324 (1990).......................................................................58

*NLRB v. Bakers of Paris, Inc.*,
  929 F.2d 1427 (9th Cir. 1991) ......................................................46

*NLRB v. Bell Aerospace Co.*,
416 U.S. 267 (1974) .................................................................52, 53

*NLRB v. Cell Agricultural Mfg. Co.*,
41 F.3d 389 (8th Cir. 1994) ...............................................46

*NLRB v. Chatfield-Anderson Co., Inc.*,
606 F.2d 266 (9th Cir. 1979) .........................................38, 40

*NLRB v. Davis*,
642 F.2d 350 (9th Cir. 1981) .........................................43, 44

*NLRB v. Frederick's Foodland, Inc.*,
655 F.2d 88 (6th Cir. 1981) ...............................................46

*NLRB v. Gissel Packing Co.*,
395 U.S. 575 (1969)..................................................*passim*

*NLRB v. Great W. Produce, Inc.*,
839 F.2d 555 (9th Cir. 1988) .................................................9

*NLRB v. Jamaica Towing, Inc.*,
632 F.2d 208 (2d Cir. 1980) .........................................43, 44

*NLRB v. Knogo Corp.*,
727 F.2d 55 (2d Cir. 1984) ...............................................46

*NLRB v. Pacific Southwest Airlines*,
550 F.2d 1148 (9th Cir. 1977) .......................................44, 48

*NLRB v. Peninsula Ass'n for Retarded Children and Adults*,
627 F.2d 202 (9th Cir. 1980) ...............................38, 45, 47, 55

*Scott ex rel. NLRB v. Stephen Dunn & Assocs.*,
241 F.3d 652 (9th Cir. 2001), *abrogated on other grounds,*
*McDermott v. Ampersand Pub., LLC*, 593 F.3d 950 (9th Cir. 2010)................38

*NLRB v. USPS*,
689 F.2d 835 (9th Cir. 1982) ...............................................32

*NLRB v. Village IX, Inc.*,
723 F.2d 1360 (7th Cir. 1983) ...............................................46

7

*Noel Canning v. NLRB*,
705 F.3d 490 (D.C. Cir. 2013), *aff'd* 134 S. Ct. 2550 (2014) ............................12

*Overnite Transportation*,
254 NLRB 132 (1981) ............................................................................36

*Patel v. Immigration Naturalization Service*,
638 F.2d 1199 (9th Cir. 1980) ..............................................................53

*Peoples Gas System, Inc. v. NLRB*,
629 F.2d 35 (D.C. Cir. 1980) ...............................................................61

*Pergament United Sales*,
296 NLRB 333 (1989), *enfd*. 902 F.2d 130 (2d Cir. 1990) ..............................26

*Piggly Wiggly Midwest, LLC*,
357 NLRB 2344 (2012) ..........................................................................26

*Planned Building Services*,
330 NLRB 791 (2000) ............................................................................26

*Quest International*,
338 NLRB 856 (2003) .............................................................27, 29, 30

*Rubin v. Vista Del Sol Health Servs., Inc.*,
80 F.Supp.3d 1058 (C.D. Cal. 2015) ...................................................48

*Seattle-First Nat. Bank v. NLRB*,
892 F.2d 792 (9th Cir. 1989), *cert. denied*, 496 U.S. 925 (1990) ....................46

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ..............................................................................53

*SEC v. Jarkesy*,
No. 22-859 (argued Nov. 29, 2023) ...............................................10, 12

*Sever v. NLRB*,
231 F.3d 1156 (9th Cir. 2000) ............................................................8, 9

*Shattuck Denn Mining Corp., Iron King Branch v. NLRB*,
362 F.2d 466 (9th Cir. 1966) ...............................................................36

*St. Clair Memorial Hospital*,
309 NLRB 738 (1992) ................................................................ 36

*Standard Products Co.*,
281 NLRB 141 (1986) ................................................................ 17

*Supervalu, Inc.*,
347 NLRB 404 (2006) ................................................................ 20

*Texas Petrochemicals Corp. v. NLRB*,
923 F.2d 398 (5th Cir. 1991) ..................................................... 47

*Thryv, Inc.*
372 NLRB No. 22 (2023), *petition for review pending*, No. 23-
60132 (5th Cir. Oral arg. set for Feb. 6, 2024) ................... 12, 63

*Thryv, Inc. v. NLRB*,
*petition for review pending*, No. 23-60132 (5th Cir. oral arg. Feb.
6, 2024) ..................................................................................... 64

*Trump Marina Assocs.*,
353 NLRB 921 (2009) ................................................................ 37

*UAW-CIO v. Russell*,
356 U.S. 634 (1958) ................................................................... 64

*United Dairy Farmers Cooperative Assn.*,
257 NLRB 772 (1981) ................................................................ 40

*United States v. Burke*,
504 U.S. 229 (1992) ................................................................... 64

*United Steel v. NLRB*,
482 F.3d 1112 (9th Cir. 2007) .......................................... 9, 38, 45, 48

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) .......................................................... 10, 51

*World Color (USA) Corp. v. NLRB*,
776 F.3d 17 (D.C. Cir. 2015) ..................................................... 55

*Zarda Brothers Dairy*,
234 NLRB 93 (1978) .................................................................. 37

**Statutes**

Administrative Procedure Act, 5 U.S.C. § 551, et seq ...............................................7

National Labor Relations Act, 29 U.S.C. § 151 et q…………………………*passim*

5 U.S.C. § 7521(a) ...................................................................................................11

U.S. Constitution, Seventh Amendment ...........................................................63, 64

## JURISDICTIONAL STATEMENT

The National Labor Relations Board ("Board") had subject-matter jurisdiction over the unfair labor practice ("ULP") allegations and objections against CEMEX, and this Court has jurisdiction to review the Board's orders, pursuant to 29 U.S.C. §§160(e) and (f). The Board issued its Decision and Order reported at 372 NLRB No. 130 on Aug. 25, 2023 in Case Nos. 28-CA-230115, et al. (1-ER-8). CEMEX timely filed a Petition for Review in the D.C. Circuit, while the Union filed its Petition in this Circuit. The case was transferred to this Court by the multi-district panel, following which the Board applied for the enforcement of its order. CEMEX also timely filed a motion for reconsideration with the Board, which was denied on November 13, 2023. (1-ER-2). This Court consolidated all cases on Oct. 25, 2023.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the Board's order must be denied enforcement because the ALJ was unconstitutionally appointed.

2. Whether the Board's multiple unfair labor practice findings and rulings on objections setting aside the election were supported by substantial evidence or are contrary to precedent.

3. Whether the Board improperly issued a bargaining order, against the wishes of the majority of employees, and contrary to the Supreme Court's *Gissel* standard.

4. Whether the Board improperly announced and retroactively applied a new, unlawful standard for imposing petition requirements and bargaining orders on employers responding to union demands for recognition.

5. Whether the Board improperly imposed a new, unlawful remedy of compensatory damages for the employee found to have been unlawfully discharged.

1

## RELEVANT STATUTORY AND REGULATORY SECTIONS

Relevant sections of the National Labor Relations Act, 29 U.S.C. 151, *et seq*, are reproduced in the Addendum to this Brief.

## STATEMENT OF THE CASE

CEMEX Construction Materials Pacific, LLC ("CEMEX", "Company", or "Petitioner") operates 23 ready-mix concrete plants in Southern California, from San Diego to Santa Barbara, and two plants in Las Vegas, Nevada. CEMEX batches (i.e., manufactures) ready-mix concrete at its various plants according to the precise specifications of customers' construction projects. After the ready-mix trucks are loaded with concrete, the drivers transport the product to the customer's jobsite where it is immediately poured. CEMEX services its customers from the ready-mix plant that is located closest to the jobsite, as ready-mix concrete is a perishable product that must be poured at the construction site shortly after it is loaded into the truck. (1-ER-93, 2-ER-132, 268-269).

On December 3, 2018, the International Brotherhood of Teamsters (the "Union") filed a representation petition with the National Labor Relations Board (NLRB) in Case 28-RC-232059, requesting an election involving the CEMEX ready-mix drivers at the 23 plants in Southern California and the two plants in Las Vegas in a single bargaining unit. The Union did <u>not</u> submit a request for voluntary recognition to CEMEX prior to filing the representation petition, and the

2

Union plainly acknowledged that fact in section 7 of the petition. (3-ER-442). Additionally, the Union never informed CEMEX that a majority of the employees in the petitioned for unit signed authorization cards indicating a desire to be represented by the Union.[1]

On February 20, 2019, following a representation hearing, Region 28 issued a Decision and Direction of Election which established a single bargaining unit including all the ready-mix drivers from the 23 CEMEX plants in Southern California and two plants in Las Vegas. (3-ER-592). The unit was comprised of 373 total drivers, 40 of whom were based in Las Vegas, with the remaining 333 drivers dispersed among the 23 plants in Southern California. (1-ER-94). A manual ballot election was conducted on March 7, 2019 at 12 different CEMEX plants in Southern California and Las Vegas. (3-ER-621).

The ballots were counted on March 13, 2019. A total of 361 ballots were cast. CEMEX won the election by a margin of 179 to 166 with 16 challenged ballots, 14 of which were challenged by the Union. (3-ER-381-390, 3-ER-627). The Union refused to withdraw any of their 14 challenges, and chose to accept the original tally

---

[1] The Board cites Joint Ex. 3 in the hearing record in support of the Union's "claim to represent the employees described in the petition. (1-ER-19-20; Board Dec.). But the stipulation does not state that the Union actually represented a majority of the employees nor that the Union ever sought voluntary recognition from CEMEX based on such a claim. (3-ER-543).

3

of ballots, which confirmed they had lost the election. The Union filed a series of ULP charges, the majority of which were filed after the tally was completed. (3-ER-366). The Union also filed nine Objections to the Election on March 19, 2019. (3-ER-381-390).

On April 30, 2020, the Region issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing against Respondent in Cases 28-CA-230115, 28-CA-235666, 31-CA-237882, 31-CA-237894, 31-CA-238240, 31-CA-238239, 31-CA-238094, and 28-CA-249413, which sought only traditional remedies. (3-ER-407-422).

On September 29, 2020, an Order Directing Hearing on Challenged Ballots and Objections and Notice of Hearing was issued in Case 28-RC-232059. (3-ER-381-390). Also on September 29, 2020, the Region issued an Order Consolidating Cases and Notice of Hearing (3-ER-392-393). On October 21, 2020—12 days before the hearing was scheduled to begin—the General Counsel filed a Notice of Intent to Amend Consolidated Complaint that unexpectedly announced a desire to seek a *Gissel* bargaining order along with other heightened remedies. (3-ER-392-393).

The hearing in the matter was conducted via videoconference over the course of 24 days between November 9, 2020 and February 19, 2021 before Administrative Law Judge John T. Giannopoulos ("ALJ" or "Judge"). On December 3, 2020, the

General Counsel filed a Motion to Further Amend Consolidated Complaint after the hearing had been in progress for several weeks. (3-ER-458). The Consolidated Complaint, as amended (hereafter "Complaint"), alleged that CEMEX Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("Act" or "NLRA") by interfering with, restraining, and coercing employees in the exercise of their Section 7 rights. (3-ER-407-419). The only 8(a)(3) allegations in the Complaint pertain to the disciplinary suspension and subsequent discharge of a single employee, Diana Ornelas, that occurred six months after the election was held.

The ALJ issued a decision on December 16, 2021, ruling that CEMEX violated Sections 8(a)(1) and 8(a)(3) of the Act and setting aside the election, while also dismissing several other allegations in the Complaint. Notably, the ALJ refused to issue a *Gissel* bargaining order, consistent with applicable law. Specifically, the ALJ found 49 drivers in San Diego County and 58 drivers in Orange County were not impacted by CEMEX's allegedly unlawful conduct at all; while it was unclear how many of the 39 Inglewood drivers were impacted by the lone instance of unlawful surveillance that occurred for under 30 minutes on one day during the campaign. The ALJ further concluded there was no evidence the 63 drivers working in the other Los Angeles County plants were aware of that lone allegation of surveillance in Inglewood. (1-ER-122). The ALJ also acknowledged that "[o]ther than security guards patrolling the plants, the vast majority of the 40 Las Vegas

drivers were not impacted by CEMEX's unfair labor practices . . ." (1-ER-122). Thus, as many as 240 drivers of the 373 drivers in the unit (64%) were not impacted or exposed to any unfair labor practices before, during or after the critical period. The ALJ found the remaining unfair labor practices not to be severe or pervasive enough to justify a bargaining order. (*Id*.).

CEMEX and the General Counsel filed exceptions to the ALJ's decision. The Board issued a divided decision on August 25, 2023 affirming the ALJ's rulings relating to the vast majority of the ULP charges. However, the Board overruled the ALJ with respect to the *Gissel* bargaining order and instead required CEMEX to recognize and bargain with the Union. (1-ER-19-26).

The Board's decision also announced an unprecedented new standard concerning union recognition and the duty to bargain – a standard that was not advocated or discussed by any party to the case. (1-ER-27-43; Board Dec.). The new standard created by the Board majority, which was met with a vigorous dissent by Board member Kaplan, radically changed longstanding labor law principles without adequate explanation or engaging in rulemaking procedures and was applied to CEMEX retroactively. (1-ER-36-37, 47-61).

CEMEX filed a Motion for Reconsideration with the Board on September 21, 2023 urging the Board to rescind its decision's radical departures from U.S. Supreme Court and NLRB precedent, and specifically to revoke the new standard concerning

6

union recognition and the duty to bargain that violated the NLRA, the Administrative Procedure Act, and CEMEX's due process rights. The Board denied CEMEX's Motion for Reconsideration on November 13, 2023, concluding that the Company's arguments did not identify material error or extraordinary circumstances warranting reconsideration. (1-ER-2). Member Kaplan once again refused to join the Board majority and authored another scathing dissent.

## SUMMARY OF ARGUMENT

As an initial matter, this case involves a decision initially made by an ALJ whose appointment was constitutionally suspect. Because the Supreme Court is currently considering the constitutionality of the appointment of inferior executive officers (such as the ALJ involved here), this Court should await the Supreme Court's decision before deciding this appeal. *See Jerkesy v. SEC*, Docket No.22-859 (oral argument held Nov. 29, 2023).

Turning to the merits, the Board's actions here are not supported by substantial evidence. Most if not all of the actions the Board describes as ULPs were, in fact, lawful, but in any event the ALJ properly found the ULPs during the critical period were neither severe nor pervasive enough to justify a bargaining order under the Supreme Court's *Gissel* standard. Moreover, as the ALJ correctly determined, traditional remedies are more than sufficient to remedy any alleged ULPs here, as opposed to a bargaining order. Finally, the Board failed to take into consideration

7

significant mitigating factors that militate against setting aside the election and issuing a bargaining order.

Because the Board could not properly establish the requirements for a *Gissel* order, it instead devised a "new" standard under which bargaining orders could issue, a standard which dramatically departs from longstanding labor law principles and binding Supreme Court precedent. The Board's new standard wreaks a radical change in labor law and clearly extends beyond the Board's legitimate reach under the major questions doctrine, the NLRA, and the APA.

The Board's decision to apply its unlawful new standard retroactively, following adjudication, is also error, given the severe consequences of the Board's actions and CEMEX's reliance on decades of contrary authority. While the Board could and should have engaged in the rulemaking process to enact this new standard, it refused to do so. As such, the Board's bargaining order should be denied enforcement, and its decision should be vacated.

Finally, the Board further erred in adopting another new remedy that violates the Act and longstanding precedent, by requiring CEMEX to pay "compensatory" damages beyond the equitable relief (backpay) authorized by Section 10 of the Act. The case in which that remedy was first announced in 2023 is being challenged in the Fifth Circuit, and for the same reasons has been improperly adopted here.

8

## STANDARD OF REVIEW

This Court will grant a petition for enforcement of a Board order only if the Board correctly applies the law and substantial evidence supports the Board's factual findings. *Int'l Longshore and Warehouse Union v. NLRB*, 978 F.3d 625, 633 (9th Cir. 2020); *Sever v. NLRB*, 231 F.3d 1156, 1164 (9th Cir. 2000). The Board must adhere to its own precedent when it purports to follow established policy. *Id., see also NLRB v. Great W. Produce, Inc.*, 839 F.2d 555, 557 (9th Cir. 1988). "[The] Board must … apply in fact the clearly understood legal standards that it enunciates in principle." *Allentown Mack Sales & Service, Inc.*, 522 U.S. 359, 376 (1998).

Where the Board overrules its precedents, it is required to provide reasoned justification for doing so, consistent with the APA and the NLRA. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983); *See also Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 178 (D.C. Cir. 2023) ("A Board's decision will be set aside when it departs from established precedent without reasoned justification….").

Because in this case the Board has overturned the results of an election and issued a bargaining order, the Board's decision must be reviewed under standards established by the U.S. Supreme Court, further discussed below, which the Board is not authorized to overrule. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969); *Linden Lumber Div., Summer & Co. v. NLRB*, 419 U.S. 301, 306-09 (1974).

Applying the Supreme Court's standards, this Court has reaffirmed that a bargaining order is an "extreme remedy," authorized only "where an employer's conduct during an election campaign is so disruptive as to taint any 're-run' election." *Gardner Mech. Servs., Inc. v. NLRB*, 115 F.3d 636, 642 (9th Cir. 1997) (citing *NLRB v. Anchorage Times Pub. Co.*, 637 F.2d 1359, 1368 (9th Cir. 1981)); *see also United Steel v. NLRB*, 482 F.3d 1112, 1117 (9th Cir. 2007) ("Elections are the preferred method for ascertaining employee sentiment.").

Moreover, where the Board as here purports to adopt a new policy that deviates from many decades of precedent under a longstanding statute, it raises a major question of Constitutional delegation, requiring the agency to "point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *Utility Air Group v. EPA*, 573 U.S. 302, 324 (2014)); *see also Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 663, 666 (2022); and more such cases cited below. The Board has failed to meet the standards of review set forth above and elsewhere in this brief, and its decision should be denied enforcement, as further discussed below.

## ARGUMENT

I.  **THE BOARD'S ORDER MUST BE DENIED ENFORCEMENT BECAUSE THE ALJ WAS UNCONSTITUTIONALLY APPOINTED.**

Before reaching the merits of this appeal, a threshold issue must be addressed. Specifically, in *SEC v. Jarkesy*, No. 22-859 (argued Nov. 29, 2023), the Supreme Court is considering the constitutionality of multilayer removal protections for ALJs of the SEC, in the context of an enforcement action. Because this case presents fundamentally the same question with regard to ALJs of the NLRB, this Court should await the Supreme Court's decision in *Jarkesy* before deciding this appeal.

Under Article II of the Constitution, the President must ensure that inferior executive officers are properly executing the law. Under the Supreme Court's decision in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 562 (2010), "multilayer tenure protections" for inferior executive officers are unconstitutional. In the subsequent case of *Lucia v. SEC*, 138 S. Ct. 2044, 2051 n.3 (2018), the Supreme Court determined SEC ALJs (who are indistinguishable from NLRB ALJs in this regard) were in fact inferior executive officers.

The Fifth Circuit in *Jarkesy v. SEC* held that removal protections for SEC ALJs (similar to the ALJ here) unconstitutionally undermine the President's "ability to take care that the laws are faithfully executed." 34 F.4th 446, 463-64 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023). Because independent SEC

Commissioners could remove ALJs only after filing a meritorious complaint with the MSPB, the President could not exercise his constitutionally guaranteed power to "remove ALJs based on the[ir] exercise of discretion." *Id.* at 463-65. NLRB ALJs' removal protections present the same problem. They are likewise removable only for cause, as are the NLRB members who are solely responsible for initiating their removal. 29 U.S.C. §153(a); 5 U.S.C. § 7521(a).[2]

But such insulations were found unconstitutional under *Free Enter. Fund*, 561 U.S. at 496. The Supreme Court may soon so hold, based on its grant of *certiorari* and holding oral argument. For this reason alone, this Court should hold in abeyance its decision in this case, pending the Supreme Court's ruling in *Jarkesy v. SEC*.[3]

CEMEX was not required to challenge the ALJ's constitutionality before the NLRB, prior to raising the issue in this Court. Under the NLRA's exhaustion provision, 29 U.S.C. § 160(e), parties may raise new issues in court if "extraordinary circumstances" excuse any failure to exhaust in agency proceedings, and courts have

---

[2] So are the Merit Systems Protection Board (MSPB) members who adjudicate removals. 5 U.S.C. §7521.

[3] The *Jarkesy* constitutionality issue is further implicated by the Board's decision in the present case to impose the constitutionally suspect remedy of "compensatory" (consequential) damages for the single discharged employee, citing another case that is being reviewed by the Fifth Circuit, as discussed below. *Thryv, Inc.* 372 NLRB No. 22 (2023), *petition for review pending*, No. 23-60132 (5th Cir. Oral arg. set for Feb. 6, 2024).

held the "extraordinary circumstances" exception encompasses challenges which "go to the very power of the Board to act and implicate fundamental separation of powers concerns." *Advanced Disposal Servs. East v. NLRB*, 820 F.3d 592, 598 (3d Cir. 2016); *Noel Canning v. NLRB*, 705 F.3d 490, 496 (D.C. Cir. 2013), *aff'd* 134 S. Ct. 2550 (2014). The extraordinary circumstance doctrine should apply to this appeal, requiring this Court to apply the Supreme Court's *Jarkesy* holding here, once it issues.

### II. THE BOARD'S UNFAIR LABOR PRACTICE FINDINGS AND RULINGS ON OBJECTIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR ARE CONTRARY TO PRECEDENT.

**Las Vegas, Nevada, Nine ULPs—August 2018 and January 2019**

The Board affirmed the ALJ's conclusion that CEMEX supervisor Estevan Dickson ("Dickson") committed five 8(a)(1) violations in Las Vegas in August 2018. (1-ER-10). Those alleged ULPs occurred four months before the election petition was filed in December 2018, and they impacted only three employees from a single plant in Las Vegas. (1-ER-10). To summarize, Dickson allegedly told three Las Vegas employees not to wear union stickers on their hard hats in August 2018. (1-ER-10). However, there is no evidence those alleged violations were

13

disseminated to any employees at the 23 plants in Southern California, or even to other Las Vegas drivers.

Numerous drivers from plants throughout the unit, including Las Vegas drivers, wore stickers on their hard hats throughout the critical period leading up to the election without any discipline or threat thereof. (2-ER-147-148, 152, 155, 156-157, 171-174, 313, 314-315).   One driver testified that no other employees were present during the conversations he had with Dickson regarding union stickers (2-ER-154-155), and Dickson specifically denied making the unlawful statements. (2-ER-286, 287-290).   The ALJ explicitly acknowledged the remaining unit drivers from the Las Vegas plants "were not impacted" by Dickson's August 2018 unfair labor practices. (1-ER-122). Ultimately, the nine 8(a)(1) violations that Dickson allegedly committed in August 2018 and January 2019 impacted a total of four out of 373 employees.

### Perris, California, One ULP—January 2019

The Board affirmed the ALJ's conclusion that CEMEX violated 8(a)(1) based on one conversation between Area Manager Ryan Turner and an employee in January 2019, in which Turner allegedly asked the driver why he was not wearing a "Vote No" sticker. (1-ER-11). The driver testified that no other unit employees were present during his conversation with Turner (2-ER-137), and Turner specifically denied making the alleged unlawful statements. (2-ER-141, 292-293).   There is no

14

evidence that this allegedly unlawful question was disseminated to any other employee. At most, Turner's alleged ULP impacted a single employee.

### Inglewood, California, Two ULPs—January 28, 2019

The Board also affirmed the ALJ's ruling that CEMEX engaged in surveillance and created the impression of surveillance on January 28, 2019, when Plant Foreman Lorenzo Ponce and Superintendent Robert Nunez lingered near the entrance to the Inglewood plant for less than 30 minutes and waved to drivers who were entering and exiting while Union organizers were standing near the gate entrance engaging in organizing activities. (1-ER-11, 78). Notably, the unit here included 25 different plants, and the critical period lasted 89 days, from December 3, 2018 until March 7, 2019. During this time, Union organizers were stationed outside the Company's plants engaging in organizing activities on a regular basis. Yet the lone instance of alleged surveillance occurred at a single plant, 38 days before the election took place. Furthermore, the alleged surveillance on that occasion lasted a maximum of 30 minutes and impacted, at most, a small handful of drivers. (1-ER-78, 122).

### Oxnard, California, Six ULPs—January 29, 2019

The Board affirmed the ALJ's ruling, based entirely on the testimony of a single former employee, that the VP/GM of CEMEX's Southern California and Nevada ready-mix operations at the time, Bryan Forgey ("Forgey"), violated Section

15

8(a)(1) in discussing the possibility of converting a plant to "satellite status." This allegedly occurred during a meeting with drivers at the facility in Oxnard, California on January 29, 2019. (1-ER-11-14, 80; 2-ER-187). Significantly, the ALJ did not conclude Forgey's statements constituted a threat of plant closure; but only conveyed the impression that union representation would be futile. (1-ER-83). However, the Board, despite not hearing any testimony, contradicted the ALJ on this issue, baselessly averring that "employees would have reasonably understood Forgey's comments as a threat to close individual plants rather than as a threat to unilaterally transfer work." (1-ER-13).

While the Board conclusively stated CEMEX made admissions to this effect, it identifies no such admissions, nor can any be located in the record. Even the Board readily acknowledged that "[r]ecord evidence on this point is sparse . . ." (1-ER-13). The Board attempts to side-step this obvious lack of evidence by contending "[t]here is no indication in the record that drivers previously based at a plant that was converted to satellite status would be maintained in employment, such as by being reassigned to another facility." (1-ER-13). But there is no evidence that CEMEX has ever converted any plant operated on a full-time basis to a satellite plant, nor did CEMEX ever state as much in any briefing. Ultimately, the Board conjured up a scenario that never occurred, and then required CEMEX to present evidence proving the negative of the Board's unproven hypothetical.

16

Even if there was evidence indicating that any full-time plants were converted to satellite status (and there is not), the burden would be on the General Counsel to prove that CEMEX violated the Act by creating the impression that drivers would not be maintained under those circumstances. The General Counsel failed to meet that burden, as no witness testified that they felt threatened (or even concerned) about their full-time plant being transitioned into a satellite plant, or that they feared being discharged if that scenario occurred.[4] Accordingly, the Board's ruling that Forgey threatened to close individual plants is contrary to the ALJ's findings, devoid of any support from the record, and it should be overruled.

The Board also concluded that Forgey violated Section 8(a)(1) by implying that wage increases could be delayed for years if employees unionized. (1-ER-12). Member Kaplan disagreed with this finding, citing the ALJ's factual findings that Forgey had explained to the employees "that everything was negotiable," that "things could get better, worse, or stay the same," and that bargaining could take days, weeks, months, or years. (1-ER-12, 83).

The Board's ruling that Forgey violated the Act by making these comments is not supported by the record evidence. To the contrary, as Member Kaplan noted, Forgey's statements regarding the bargaining process were "accurate and lawful."

---

[4] See also Member Kaplan's discussion of the complete lack of evidence supporting the Board majority's ruling on this point. (1-ER-13).

(1-ER-12) *See Medieval Knights LLC*, 350 NLRB 194 (2007) (an employer's explanation to employees that bargaining process could be extensive was not objectionable because the employer has a right to lawfully point out the potential pitfalls of unionization); *see also Standard Products Co*., 281 NLRB 141, 163 (1986); *Manhattan Crowne Plaza,* 341 NLRB 619, 620 (2004).

The Board also ruled that Forgey violated Section 8(a)(1) by telling employees that if they unionized and participated in a strike, their return to work would be contingent on the company's operations and their level of seniority, which the Board determined implied that reinstatement of striking employees with low seniority would be indefinitely delayed. (1-ER-12). As discussed below, despite contrary evidence, the Board concluded that "drivers would have understood Forgey's comments as a threat of permanent job loss if employees selected the union." (1-ER-12).

However, the record does not support this conclusion. Instead, as the ALJ correctly found, Forgey's testimony on this specific issue was a lawful discussion of his personal experience related to a strike he encountered earlier in his career working for a different employer. (1-ER-83, 2-ER-270). Forgey's statements regarding his personal experience enduring a strike did not violate the Act. *See Atlantic Forest Products*, 282 NLRB 855, 861 (1987) (Section 8(c) permits employers to truthfully describe their union experience, provided the

18

communications "do not contain a 'threat of reprisal or force or promise of benefit.'") (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969)).

The Board also suggests that Forgey's failure to clarify the difference between the reinstatement rights for economic strikers versus unfair labor practice strikers meant his statements were unlawful. (1-ER-12). The Board erroneously found that "[CEMEX] communicated its unlawful misrepresentation of striker reinstatement rights far more broadly than to the drivers present at Forgey's January 29 meeting at Oxnard." (1-ER-12). The evidence directly contradicts this conclusion.

In October 2018, before the election petition was filed, the Company held meetings with all hourly employees at the plants included in the unit to educate them about their rights under the National Labor Relations Act. (2-ER-263-267, 331-341). The PowerPoint deck used for each meeting included a slide that was devoted to strikes, which both differentiated between economic and ULP strikers and clarified that "[e]conomic strikers can be permanently replaced (not fired)[,]" an accurate recitation of the law. (3-ER-496). Furthermore, all employees who attended the meeting were also given a copy of the "Basic Guide to the National Labor Relations Act," a document published by the NLRB explaining the protections of the Act, in English or Spanish. (2-ER-336-341, 356-363, 3-ER-500). That document also explains the difference between economic and ULP strikers. (3-ER-500). CEMEX encouraged employees to take the document home and read it. (2-ER-338, 361).

19

The Company also sent a letter to all employees in the bargaining unit between late February and early March 2019—approximately one week before the election—discussing several aspects of union representation, including strikes. (2-ER-279-282, 3-ER-473). That explanation discussed the process for hiring permanent replacements during an economic strike and then returning strikers back to work following an economic strike, all of which was lawful. *Supervalu, Inc.*, 347 NLRB 404, 405 (2006) (citing *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379 (1967)).[5] The letter also accurately discussed the number of strikes called by the Teamsters in the previous five years, which negates any inference that Cemex embellished the Union's strike record or exaggerated the possibility of strike. Moreover, the portion of the letter discussing strikes concluded with the following statements:

> "We are not saying a strike would happen here. In fact, we hope we never have a strike. However, strikes are always a possibility when employees are represented by the Teamsters."

(3-ER-474).

To summarize, there is no support in the record for the Board's claim that "[CEMEX] communicated its unlawful misrepresentation of striker reinstatement

---

[5] The Basic Guide to the National Labor Relations Act includes an excerpt defining the rights of economic strikers, which plainly shows that CEMEX's explanation was lawful. (3-ER-500).

20

rights far more broadly than to the drivers present at Forgey's January 29 meeting at Oxnard." (1-ER-12-13). Nor is there any evidence in the record to support the Board's claim that Forgey made statements to employees at other plants similar to the unlawful statement he allegedly made during the above meeting.

Specifically, the Board contended that Forgey "presented at a large number of similar consultant small-group meetings throughout the unit," (1-ER-11), then assumed, without citing evidence, that Forgey made similar unlawful statements in other meetings. To the contrary, at least 21 drivers who were employed in the unit at the time of the election testified during the hearing—19 of whom were called by the Union or General Counsel—yet former employee Ornelas was the only employee who accused Forgey of making any unlawful statements during the three-month critical period. Fellow Ventura County drivers William Lucero and Jesus Lira testified they attended a campaign meeting where Forgey addressed the drivers, but neither individual testified Forgey made any unlawful or threatening statements. (2-ER-179, 255-256). Accordingly, the Board's conclusions regarding Forgey's comments during the January 29 meeting in Oxnard are not supported by the record evidence or extant Board law and must be overruled.

### Oxnard, California, One ULP—February 21, 2019

The Board affirmed the ALJ's conclusion that Plant Superintendent Jason Faulkner ("Faulkner") violated Section 8(a)(1) on February 21, 2019 when he told

three employees that he may lose the ability to teach drivers to batch concrete or drive a loader if the employees became unionized because, in his experience, the Union utilizes a job classification system. (1-ER-14). There is no contention Faulkner's statement was a "hallmark violation," nor is there record evidence that his comment was disseminated to anyone outside the three employees who attended the conversation. More substantively, as member Kaplan discussed in his dissent, Faulkner's statement did not violate the Act because he was simply explaining one potential scenario that "might" occur based on his personal experience working in a union environment. (1-ER-14; Board Dec., citing *Didlake, Inc.*, 367 NLRB No. 125, slip op. at 3 (2019) and *Atlantic Forest Products*, 282 NLRB 855, 861 (1987)). The Board's ruling on this issue is inconsistent with precedent and should be overruled.

### Oxnard, California, Two ULPs 2 ULPs—February 25, 2019

The Board affirmed the ALJ's conclusion that Faulkner and Director of Plant and Fleet Maintenance, Daryl Charlson ("Charlson"), violated Section 8(a)(1) on February 25, 2019 by promulgating an allegedly overbroad directive to Ornelas that she could not talk to union representatives on "company time," and issuing a verbal warning to Ornelas for walking outside the plant to speak with Union organizers while her truck was being loaded with concrete. (1-ER-14-15). However, these allegations, in paragraphs 5(m)(2) and 5(m)(3) of the Complaint (3-ER-414), are untimely and must be dismissed, as neither was asserted within the Act's six-month

22

statute of limitations. The General Counsel did not raise these claims until the original Consolidated Complaint and Notice of Hearing was issued on April 30, 2020—more than 14 months after the meeting on February 25, 2019 when the new directive was allegedly promulgated. Thus, the ALJ and the Board erred by failing to dismiss these allegations on timeliness grounds, and they should both be dismissed. *See CAB Associates*, 340 NLRB 1391 (2003).

Turning to the merits, despite contrary testimony from managers Faulkner and Charlson, the ALJ erroneously concluded, and the Board incorrectly affirmed, that Faulkner told Ornelas it was against company policy to speak with union organizers during "company time." (1-ER-14; 2-ER-143, 303-306, 310). The Board further concluded that "[CEMEX's] unlawful instruction to Ornelas not to talk with organizers on company time was not merely a one-time instruction to one employee, but a generally promulgated rule, broadly communicated to unit drivers by managers and LRI consultants." (1-ER-14). However, as member Kaplan correctly noted, there is no evidence in the record indicating that Faulkner made a statement of this nature to any employee other than Ornelas. (1-ER-15).

The Board's theory of widespread dissemination was not based on testimony from unit employees, nor was it supported by the ALJ's findings. Instead, it was based on the testimony of Charlson and supervisor Juan Torres ("Torres")— testimony the ALJ did not credit. As member Kaplan discussed in his dissent, the

Board's reliance on testimony that the ALJ clearly considered but failed to credit is inconsistent with extant law and must be rejected. (1-ER-14-15). Moreover, 21 individuals who were employed in the unit during the critical period testified during the hearing, and other than Ornelas, none of them testified about any alleged rule prohibiting them from speaking with union organizers during company time. Instead, numerous witnesses called by the Union and the General Counsel clearly testified they were allowed to engage in organizing activity during working time, without interference or reprimand. (2-ER-162-165, 168-169, 172, 224-225, 233, 234, 237-247, 253). Thus, the Board's unsubstantiated conclusion that CEMEX broadly promulgated a new work rule prohibiting interactions with union organizers during company time is not supported by any evidence and must be overruled.

### Perris and Corona, California—Three ULPs

The Board affirmed the ALJ's conclusion that Area Manager Ryan Turner ("Turner") violated Section 8(a)(1) during individual conversations with three employees between late February and early March 2019. Turner denied making the unlawful statements in question, and none of them constituted "hallmark violations." Furthermore, no evidence indicates other unit employees heard the allegedly unlawful statements, nor does the record indicate they were disseminated to other employees.

**CEMEX's Decision to Hire Security Guards Did Not Violate the Act; Nor Did It Constitute Objectionable Conduct**

The Board affirmed the ALJ's conclusion that CEMEX violated Section 8(a)(1) by utilizing security guards at plants for two weeks prior to the election, including plants where polling occurred on election day. (1-ER-16). The General Counsel failed to satisfy its due process requirements on this issue, as a critical review of the numerous versions of the Complaint reveals no allegations asserting the Company violated the Act simply by maintaining security guards at its plants during the critical period. (3-ER-377, 392-393, 407-422, 458; GCX). *Lamar Advertising of Hartford*, 343 NLRB 261, 265 (2004) (quoting *Yellow Freight System, Inc. v. Martin* 954 F.3d 353, 357 (6th Cir. 1992)).

Allegations 5(t) and 5(u) assert that CEMEX violated the Act by using security guards on the day of the election to allegedly block or prevent voters from entering the Inglewood and Santa Paula plants. (2-ER-416) The ALJ dismissed the portion of allegation 5(t) asserting that employees were blocked from entering the Inglewood plant. (1-ER-96). The ALJ also dismissed allegation 5(u) related to the Santa Paula plant in its entirety. (1-ER-97-98). The ALJ also completely dismissed allegation 5(v), which asserted a security guard engaged in "surveillance" at the Oxnard plant by walking into the main building where the polling room was located for a few minutes on election day. (1-ER-99). As such, any conclusion by the ALJ or the Board majority regarding CEMEX's use of security guards prior to the

25

election date, or at any plants other than Inglewood, Santa Paula or Oxnard is meritless.

The Board attempted to excuse the General Counsel's failure to plead any specific allegations related to the mere maintenance of security guards at several plants prior to the election by stating the "Board may find and remedy a violation even in the absence of a specific allegation in the complaint if the issue is closely connected to the subject matter of the complaint and has been fully litigated." *Pergament United Sales*, 296 NLRB 333, 334 (1989), *enfd*. 902 F.2d 130 (2d Cir. 1990). However, as member Kaplan correctly noted, neither of those *Pergament* requirements are met here. (1-ER-16).

First, the General Counsel did not add any allegation to the complaint regarding use of security guards prior to the election itself, and it is well-settled that a charging party cannot expand the scope of the complaint without the consent of the General Counsel. *Planned Building Services*, 330 NLRB 791, 793, fn. 13 (2000). (1-ER-16-17). Thus, the claim that CEMEX was given the opportunity to fully litigate the unrelated security guard issue because the Union filed an election objection related to it contradicts clear precedent. *See Piggly Wiggly Midwest, LLC*, 357 NLRB 2344, 2345 (2012) ("It is the opportunity to present argument under the new theory of violation, which must be supplied.") (quoting *NLRB v. Quality C.A.T.V., Inc*. 824 F.2d 542, 548 (7th Cir. 1987)

If the General Counsel intended to pursue a ULP impacting almost every employee in the unit, she was required to amend the Complaint to include a specific allegation to this effect. The Complaint was amended on two occasions after commencement of the hearing in this matter, but the General Counsel chose not to include any allegation in the Complaint that CEMEX's use of security guards during the critical period prior to the election violated the Act. Consequently, this finding must be dismissed based on due process grounds.

The security guard issue should also be dismissed on the merits, as the record demonstrates that CEMEX used its security guards in an entirely lawful manner. No binding authority *per se* precludes an employer from hiring security guards—even for the first time—in the lead up to a representation election. To the contrary, the Board has certified election results, over union objections, under strikingly similar circumstances. *See Quest International*, 338 NLRB 856 (2003) (certifying an election where an employer hired and posted security guards 10 days before the election and discontinued the practice the day after the election).

CEMEX here had legitimate, non-pretextual concerns that warranted the decision to retain security guards, to which Nunez, Faulkner, and Forgey all testified, without contradiction. (2-ER-271-276, 301-302, 319-327). Consequently, the ALJ's conclusion that CEMEX "did not show that there was any type of demonstrated need" to retain security guards is not supported by substantial evidence.

The ALJ concluded that CEMEX "wanted the guards present at the facility as a show of force" (1-ER-123-124), but the record does not support this claim. As the record shows, CEMEX's security presence was minimal, with no more than two guards present at any facility at one time. The guards were not armed and were not accompanied by security dogs; they did not conduct "roving patrols"[6] of the facilities or drive branded security vehicles; they did not require employees to show identification to access the plants; and they did not otherwise interact with employees in a coercive or intimidating manner. (2-ER-133, 149-151, 166, 176, 177, 180, 188, 215, 216-217, 220-221, 228, 235, 248-249, 257, 258, 259, 277-278, 328, 329, 345-346). Instead, they spent much of their time in or near their personal vehicles, parked to the side of the entrance to the plant. (2-ER 149-151, 211, 219, 222).

Thus, the finding by the ALJ and the Board majority that CEMEX violated the Act simply by having security guards present is inconsistent with Board precedent. The ALJ cited two cases in support of his finding that unlawful intimidation occurred—*Austal USA, LLC*, 349 NLRB 561 (2007) and *Beverly California Corp.*, 326 NLRB 232 (1998)—neither of which support the ALJ's result.

---

[6] The ALJ states on several occasions in his decision that CEMEX's guards were utilized to "patrol" the plants or conduct "roving patrols." (1-ER-96-97, 122). However, substantial evidence does not support the conclusion that the security guards conducted patrols of any kind.

In *Austal*, the employer's security guards wore military-style uniforms, were armed, and were authorized to use force. 349 NLRB at 576. It is undisputed that none of these factors were present here. Moreover, in *Austal*, the employer conceded the guards were unnecessary, whereas here, CEMEX articulated a legitimate reason to hire the security guards. *Id.*

In *Beverly*, as here, the employer initially hired guards after receiving employee complaints about safety issues and experiencing several incidents in which its operations were significantly disrupted. 326 NLRB at 258-59. As here, the employer's guards in *Beverly* initially remained in their vehicles to monitor the parking lot and did not interact with employees, which the Board found acceptable. *Id.* at 259. However, in *Beverly*, unlike this case, the employer crossed the line, stationing security guards outside polling rooms and using them to control access to the plant by checking employee identification. *Id.* at 261. There is no evidence here that CEMEX (or security guards it hired) engaged in similar misconduct.

More instructive is *Quest International*, 338 NLRB 856 (2003), in which the employer retained a security service for the final week of an election campaign and on election day, to which the union filed an objection. The Board concluded that "the Union failed to carry its burden of establishing that the employer's implementation of the security measures had a reasonable tendency to interfere with the employees' free and uncoerced choice in the election." *Quest*, 338 NLRB at 857.

As member Kaplan noted in his dissent, CEMEX's use of security guards was appropriate, similar to the conclusion in *Quest* and clearly distinguishable from *Austal* and *Beverly*. (1-ER-16-17). Thus, if the circumstances in *Quest* did not amount to objectionable conduct, neither did the far more benign aspects of CEMEX's security presence.

Ultimately, the ALJ's finding that CEMEX violated the Act and engaged in objectionable conduct by maintaining security guards during the two-week period preceding the election, which was affirmed by the Board, is not supported by sufficient evidence or precedent and should be dismissed.

**The March 2019 Election Should Not Have Been Set Aside**.

Summarizing the Board and ALJ's unfair labor practice and objection findings, they were not supported by substantial evidence, were contrary to settled law, and did not affect the outcome of the election. The election should not have been set aside, because the burden of justifying such action is a "heavy one," and the secret ballots are presumed to reflect the true desires of the employees." *Luck Cab Co*., 360 NLRB 290 (2014); *Trump Marina Assocs*., 353 NLRB 921, 927 (2009).

**CEMEX Did Not Violate the Act by Suspending Diana Ornelas in July 2019.**

There were no allegations of unlawful discipline during the 13-week critical period spanning from the date the petition was filed on December 3, 2018 through

30

the election on March 7, 2019. The only 8(a)(3) charges in this entire case, unsupported by substantial evidence, pertain to the disciplinary suspension and subsequent discharge of Diana Ornelas, both of which occurred several months *after* the election was concluded. (1-ER-17).

It is undisputed that Ornelas, a former CEMEX driver, was involved in a serious incident at a construction jobsite managed by a customer on July 9, 2019, where Ornelas repeatedly refused to comply with the customer's requests to demonstrate that the rear lights and backup alarm on her truck were working properly. (2-ER-195-200). She further refused to follow her supervisor's direct instructions to avoid a dispute with the customer. (2-ER-197, 311, 3-ER-443, 455, 3-ER-480). Neither the ALJ nor the Board majority disputed that Ornelas engaged in misconduct in July 2019, nor did they claim that her suspension was a departure from CEMEX's progressive discipline process.

The ALJ tried to excuse Ornelas's misconduct at the customer's jobsite on July 9 by insinuating she was unaware that the individual who made the request to her was a jobsite safety representative. (1-ER-111). However, the written statement Ornelas submitted immediately after the incident plainly stated she knew he was "in charge of safety at this site." (3-ER-455). Moreover, Ornelas testified that when the customer returned to ask her to comply a second time, he was accompanied by another person she assumed was in charge of the entire jobsite. (2-ER-198-200). Yet

31

she still refused to comply with the customer's safety-related requests. (2-ER-200, 201). The ALJ also tried to minimize Ornelas's misconduct by reasoning that the reason CEMEX investigated the incident was because a union representative was also present at the jobsite. (1-ER-111). But it was quite common for Union organizers to be present at customer jobsites when CEMEX's drivers were pouring concrete. (2-ER-165, 168-169, 172, 224-225, 227, 233, 234, 247-248, 253).

The ALJ also erred by concluding that CEMEX initiated an investigation into Ornelas because she engaged in protected activity in summoning a union representative to the jobsite to represent her. (1-ER-111-112). To the contrary, the primary reason CEMEX investigated Ornelas's conduct on July 9 was because she refused a legitimate request from a customer safety representative, creating a serious customer issue, and then behaved in an inappropriate manner towards the customer and then her manager, which warranted discipline under settled law. *NLRB v. USPS*, 689 F.2d 835 (9th Cir. 1982).

Finally, the ALJ erred by concluding CEMEX "provided different reasons for Ornelas's suspension, which further supports a finding of pretext." (1-ER-111). The ALJ erroneously stated that Ornelas's failure "to comply with the 'jobsite safety inspector' is not mentioned" in the disciplinary action that was issued as part of her suspension. (1-ER-111). But that senior managers Faulkner and Plascencia did not recite all the details of a suspension they played no direct role in is irrelevant, given

that the email summaries of the immediate managers provided all the necessary details. (3-ER-480, 542). Thus, the reasons CEMEX articulated for suspending Ornelas were consistent throughout, and the ALJ erred by concluding that CEMEX suspended Ornelas for reasons other than the undisputed misconduct analyzed above. Moreover, General Counsel Exhibit 10 explicitly states that "*refusing to cooperate with jobsite safety representatives or customers will not be tolerated.*" (3-ER-446).

The Board affirmed the ALJ's decision that the suspension was unlawful because CEMEX allegedly relied on an unlawful verbal warning previously given to Ornelas, "[b]ecause CEMEX does not contend that it would have issued the same discipline [in July] to Ornelas absent the prior unlawful warning . . ." (1-ER-17). However, that conversation with Ornelas, which was not presented on CEMEX's standard Employee Disciplinary Action Form, was not a formal disciplinary action. (Compare 3-ER-445 to 3-ER-446, 448, 468, and 541). Furthermore, the February 25 conversation was characterized as a "MEMO to FILE", not a formal disciplinary action, in the written summary maintained in Ornelas' personnel file. (2-ER-183-185, 305-306, 3-ER-454). Nor does the record indicate that CEMEX relied on that February 25 verbal warning in any respect when issuing Ornelas the disciplinary suspension for her actions on July 9-10; the suspension document itself contains no mention of the February 25 conversation. (3-ER-446).

33

Additionally, the Board ignored evidence that Ornelas repeatedly engaged in other misconduct in the relevant time period that warranted a suspension following her actions on July 9-10. (3-ER-464, 465, 476, 477, 541), documenting previous misconduct). Thus, there is no basis to claim CEMEX was retaliating against Ornelas for protected activities on July 9-10 when the evidence demonstrates that CEMEX repeatedly exercised leniency and attempted to improve Ornelas' behavior through non-disciplinary coaching before progressing her to the suspension phase of the disciplinary process. This evidence demonstrates CEMEX met its rebuttal burden to show that it would have suspended Ornelas regardless of her union activities. *Healthcare Emps. Union, Local 399, v. NLRB*, 463 F.3d 909, 919 (9th Cir. 2006) (citing *Wright Line*, 251 NLRB 1083, 1089 (1980). Consequently, the 8(a)(3) violation related to Ornelas' suspension should dismissed.

**CEMEX Did Not Violate the Act by Discharging Ornelas**

After Ornelas was suspended on July 9-10, 2019, the next step in CEMEX's progressive disciplinary policy was discharge. (3-ER-539). On Friday, August 16, 2019, less than a month after Ornelas returned from suspension, she backed her mixer truck into the Oxnard batch office as she was trying to park her vehicle at the end of the day. (2-ER-202, 3-ER-469). A Property Damage/Near Miss Investigation Report was completed. (2-ER-203-204, 3-ER-469). The report concluded that Ornelas' inattention and failure to stop constituted unsafe acts that caused the

34

accident. (3-ER-469). Ornelas admitted during her testimony that she collided with the Oxnard batch office on that day, and she also signed the Property Damage/Near-Miss Investigation Report. (2-ER-203-205, 3-ER-469). However, rather than discharging Ornelas for negligently backing her mixer truck into the side of the Oxnard batch office on August 16, CEMEX again chose leniency, providing Ornelas with training instead, (2-ER-205, 349-350), actions the ALJ inexplicably concluded were evidence of pretext.

Then, approximately two weeks later, early on the morning of August 31, 2019, Ornelas clocked in early at the wrong plant, took a truck from that plant, and drove it to another plant, all in defiance of a local ordinance prohibiting truck operations before 6:00 am. (2-ER-190, 194, 206-207, 295, 296-297, 351, 352, 3-ER-462, 3-ER-472). Ornelas admitted that she did not have permission to engage in these activities (2-ER-207-209), and there was no legitimate reason for her to report to the wrong plant or take a mixer truck from that plant without permission. Ornelas conceded that the decision to clock in early at the wrong plant and drive a Company mixer truck from that facility without permission was part of an intentional "plan" she concocted to communicate her displeasure over having to drive her personal vehicle to a different facility. (2-ER-189). Pursuant to Company policy and following investigation, Ornelas was discharged for this misconduct, which

constituted "good cause" under Section 8(a)(3) of the Act, on September 6, 2019. (3-ER-447).

The ALJ erroneously concluded that discipline either was not warranted for these incidents and/or that the discipline issued was unlawful. However, prohibiting an employer from issuing legitimate discipline to employees simply because they are union supporters is inconsistent with the Act. *Shattuck Denn Mining Corp., Iron King Branch v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966) (quoting *NLRB v. Ace Comb Co.*, 342 F.2d 841, 847 (8th Cir. 1966) ("[I]f the discharge is actually motivated by a lawful reason, the fact that the employee is engaged in Union activities at the time will not tie the employer's hands and prevent him from the exercise of his business judgment to discharge an employee for cause.").

As the record demonstrates, Ornelas committed a series of infractions that warranted progressive discipline, up to and including discharge. CEMEX's decision to suspend Ornelas following her actions on July 9-10, 2019 was justified under the circumstances, as was CEMEX's decision to discharge Ornelas following her acts of insubordination on August 31, 2019. *See St. Clair Memorial Hospital,* 309 NLRB 738, 741 (1992) (holding the employer did not violate the Act when it discharged a cook who was an ardent union supporter for refusing a direct order from his supervisor); *see also Overnite Transportation*, 254 NLRB 132, 153-154 (1981)

36

(holding the employer did not violate the Act when it discharged a long-term union supporter for insubordination).

Moreover, Ornelas' union activity in support of the March 7, 2019 representation election occurred six months before her discharge on September 6, 2019 and, therefore, is simply too far removed to form the basis of a retaliatory termination. *See Zarda Brothers Dairy*, 234 NLRB 93, 97 (1978) (termination of pro-union employee six weeks after organizing activity had ended and during time when "organizational efforts were in virtual dormancy" was not unlawfully motivated). The ALJ and the Board erred by concluding that the manner in which CEMEX handled Ornelas's disciplinary actions was unlawful. As the evidence makes clear, CEMEX's decision to discharge Ornelas was warranted under the circumstances and the Board's finding related to her discharge should therefore be denied enforcement.

### III. THE BOARD IMPROPERLY ISSUED A BARGAINING ORDER, AGAINST THE WISHES OF THE MAJORITY OF EMPLOYEES, AND CONTRARY TO THE SUPREME COURT'S *GISSEL* STANDARD.

Even if the Board was correct that CEMEX committed sufficient unfair labor practices to set aside the election, that finding alone did not warrant a bargaining order. As this Court has repeatedly held, a bargaining order is an "extreme remedy," authorized only "where an employer's conduct during an election campaign is so disruptive as to taint any 're-run' election." *Gardner Mech. Servs., Inc. v. NLRB*,

37

115 F.3d 636, 642 (9th Cir. 1997) (citing *NLRB v. Anchorage Times Pub. Co.*, 637 F.2d 1359, 1368 (9th Cir. 1981)); *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 664 (9th Cir. 2001) (Bargaining orders are "extraordinary and disfavored remed[ies] for violations of the NLRA."), *abrogated on other grounds*, *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 957 (9th Cir. 2010). By contrast, "elections are the preferred method for ascertaining employee sentiment." *United Steel v. NLRB*, 482 F.3d 1112, 1117 (9th Cir. 2007) (citing *Gardner Mech. Servs.*, 115 F.3d at 642).

While the Board has discretion to issue a bargaining order in proper cases, the Supreme Court "did not intend that this discretion be unbounded[.]" *NLRB v. Peninsula Ass'n for Retarded Children and Adults*, 627 F.2d 202, 204 (9th Cir. 1980); *NLRB v. Chatfield-Anderson Co., Inc.*, 606 F.2d 266, 268 (9th Cir. 1979) (A reviewing court is not a "mere 'rubber stamp' for the Board's decisions"). Instead, as this Court has noted, the situations in which bargaining orders are appropriate are "unusual." *United Steel v. NLRB*, 482 F.3d 1112, 1117 (9th Cir. 2007) (citing *Gardner Mech Servs.*, 115 F.3d at 642). In *Gissel*, the Supreme Court set out two situations in which bargaining orders were warranted: in "exceptional cases marked by outrageous and pervasive unfair labor practices," and in "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to

undermine majority strength and impede the election processes."[7]  *Gissel*, 395 U.S. at 613-14 (internal quotations omitted).

Here the ALJ properly applied the *Gissel* standard and determined that a bargaining order was unwarranted in this case for a variety of reasons, finding instead that traditional remedies, including a cease-and-desist order, posting requirements, and a re-run election, would sufficiently "dissipate the lingering coercive effects created by CEMEX's unfair labor practices" and "aid in creating an atmosphere free of restraint and coercion so that we will be able to conduct a new election in which we can place some confidence." (1-ER-122-123).  The Board rejected the ALJ's findings, instead ordering CEMEX to bargain with the Union.

As discussed next below, the Board's bargaining order determination was plainly wrong: this is not an "exceptional" case of employer misconduct and does not involve serious or pervasive unfair labor practices; to the extent any ULPs occurred, the Board failed to make findings required by this Court; and the Board ignored significant mitigating circumstances in its review.  As such, the Board's bargaining order is improper under *Gissel* and must be vacated.

---

[7]  Section IV of this brief below addresses the Board's unprecedented (and baseless) claim that it is not bound by the Supreme Court's holding in *Gissel* and is free to order bargaining that involves even "minor or less extensive unfair labor practices" under an "alternative" standard.

39

### A. This is Not an "Exceptional," "Category One" Case under *Gissel*.

This case does not fall under *Gissel*'s first category because it is not an "exceptional" case involving "outrageous and pervasive unfair labor practices." *See Gissel*, 395 U.S. at 613; *Chatfield-Anderson Co., Inc.*, 606 F.2d at 268. In such cases, the Board must make clear findings that the employer's conduct "<u>completely</u> foreclose[s] the possibility of a fair election." *See United Dairy Farmers Cooperative Assn.*, 257 NLRB 772, 775 (1981) (emph. added). Here, both the Board and the ALJ approached this case as one arising under *Gissel*'s second category, given the repeated references to the union's apparent card majority prior to the election throughout the respective opinions.[8]

### B. The Labor Practices Criticized by the Board, If They Occurred, Were Not So Serious or Pervasive as to Trigger a Bargaining Order Under *Gissel*.

As a "category two" case, the Board's bargaining order should only be enforced if (a) the union had majority support at one time, and (b) the "possibility of erasing the effects of past practices and of ensuring a fair election … by the use of traditional remedies, though present, is slight," and "employee sentiment once expressed through cards would, on balance, be better protected by a bargaining

---

[8] *See* 1-ER-9-10, 19-20, 23-24, 12-122. A focus on the card majority indicates an agreement that the case belongs under *Gissel's* second category. *See L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337, 1347 (9th Cir. 1980).

order." *Gissel*, 395 U.S. at 614. In assessing a bargaining order, the Board was required to examine "the seriousness of the violations and the pervasive nature of the conduct, considering such factors as the number of employees directly affected by the violations, the size of the unit, the extent of dissemination among employees, and the identity and position of the individuals committing the unfair labor practices." *See Garvey Marine, Inc.*, 328 NLRB 991, 993 (1999), *enfd.* 245 F.3d 819 (D.C. Cir. 2001). While the Board's decision repeatedly refers in broad, conclusory terms to the "seriousness" of CEMEX's alleged unfair labor practices and "their pervasive nature," the Court is under no obligation to accept those perfunctory conclusions as true. *See Western Drug*, 600 F.2d at 1325.

The record discussed above demonstrates clearly that any ULPs that actually occurred were limited in number, nature, and scope, falling well short of the standard previously recognized by the Board and this Court. As the ALJ found and Member Kaplan noted in his dissent, the majority of the alleged ULPs here primarily involved statements made to a small handful of employees in isolated CEMEX facilities, as well as one instance each of surveillance of union activities (or creating an impression of surveillance), posting unarmed, non-patrolling security guards, and blaming the union for the withholding of a wage increase. (1-ER-47) While CEMEX disputes its conduct violated the Act (*see* Section II above) these ULPs were not serious enough to warrant a bargaining order. *See Western Drug*, 600 F.2d at 1325

41

(bargaining order inappropriate even where unfair labor practices included "docking wages, reducing working hours, and requiring two employees to take compensatory time off, all by reason of the employees' union activities, and by responding to those activities with interrogations, threats, solicitation of grievances, and promises of benefits.").

But even if the above-referenced labor practices were sufficiently serious, as the ALJ correctly noted, there is no evidence from which it could be concluded they were pervasive. First, the alleged ULPs did not affect a substantial percentage of CEMEX's workforce:

> Other than the security guards patrolling the plants, the vast majority of the 40 Las Vegas drivers were not impacted by [CEMEX's] unfair labor practices, which consisted of Dickson's statements to a handful of drivers. The same is true regarding the approximately 49 drivers working in San Diego County and the 58 drivers in Orange County, who do not appear to have been substantially impacted by CEMEX's unlawful conduct. And, while surveillance occurred at the Inglewood plant on one occasion, it is unclear exactly how many of Inglewood's 39 drivers were directly affected, and no evidence that this violation was widely disseminated to the approximately 63 drivers working in the other Los Angeles County plants.

> 1-ER-122.

Further, there was no evidence that any alleged "threats" made by the CEMEX employees discussed above were ever disseminated to employees outside of Ventura County or the Inland Empire, two of the six districts at issue. *Id*.

In addition to these objectively less serious labor practices, the Board also held that months *after* the election, CEMEX suspended and ultimately discharged a single employee, Ornelas, who only worked in one region. As discussed above, the Board clearly erred in finding Ornelas' suspension and discharge to be unlawful, given her undisputed gross insubordination and violations of government, customer, and employer rules and policies. But regardless of those findings, this Court and others have held that the discharge of an employee, absent evidence that such alleged misconduct was pervasive, does not warrant a bargaining order. *See*, *e.g.*, *NLRB v. Davis*, 642 F.2d 350, 354 (9th Cir. 1981) (The "commission of an unfair labor practice does not automatically result in an order to bargain."); *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 213 (2d Cir. 1980) (denying bargaining order, even after a hallmark violation, where discharge of an employee was unknown to most of the other employees).

The Board here wrongly focused on the single discharge and the few allegations of unlawful threats in its decision, without adequately addressing their clear lack of pervasiveness. *See J.J. Newberry Co. v. NLRB*, 645 F.2d 148, 153 (2d Cir. 1981) ("Rather than react in knee jerk fashion to the presence of a hallmark violation, the Board must still analyze the nature of the misconduct and the surrounding and succeeding events in each case in an effort to assess the potential for a free and uncoerced election under current conditions."); *First Lakewood Assn.*

*v. NLRB*, 582 F.2d 416 (7th Cir. 1976); *Donn Products, Inc. v. NLRB*, 613 F.2d 162 (6th Cir. 1980). The approach of these other circuit courts is consistent with this Court's own holding in *Davis* that the commission of an unfair labor practice does not by itself warrant a bargaining order. *See* 642 F.2d 354. Instead, violations must be "likely to destroy the union's majority and seriously impede the election" to justify a bargaining order. *Gissel*, 395 U.S. at 600.

Here again, the Board discarded the ALJ's findings of non-pervasiveness, substituting conclusions and speculation about the "likely" extent of the alleged misconduct. (1-ER-23; Board Dec.). These are precisely the kind of unfounded, perfunctory conclusions that cannot support a bargaining order. *See NLRB v. Pacific Southwest Airlines*, 550 F.2d 1148, 1152 (9th Cir. 1977) ("In no case should orders and findings of fact be perfunctory or 'boiler-plate[.]'"). Without substantial evidence that CEMEX's alleged practices were pervasive—that they affected a large portion of the workforce or that they were widely disseminated—there is simply no basis to enforce the Board's bargaining order. *See Jamaica Towing,* 632 F.2d at 213.

### C. The Board's Findings Regarding the Need for a Bargaining Order and the Insufficiency of Traditional Remedies are Insufficient to Support a Bargaining Order.

Additionally, the Board failed to clearly explain why a bargaining order is required, as opposed to the traditional remedies ordered by the ALJ. As this Court has held: "Because of the extreme nature of a *Gissel* order, courts depart from the

usual deference given to the Board's choice of remedy and <u>require</u> that the Board <u>clearly articulate</u> why a bargaining order is warranted and why other remedies are insufficient.") *United Steel*, 482 F.3d at 1117 (emph. added); *Peninsula*, 627 F.2d at 204. Here, the ALJ determined that traditional remedies (including a rerun election) would cleanse the workplace of any alleged violation by CEMEX. (1-ER-122-123). This conclusion is consistent with longstanding, binding authority that "elections are the preferred method for ascertaining employee sentiment." *Western Drug*, 600 F.2d at 1326; *see also Gissel*, 395 U.S. at 602. However, the Board deviated wildly, without any explanation as to why the more extreme remedy was appropriate. This disagreement is itself grounds for a more thorough review of the Board's decision. *See Int'l Union v. NLRB*, 834 F.2d 816, 819 (9th Cir. 1987) (When the Board disagrees with an ALJ's findings, those findings become part of the record for review to be weighed against the evidence supporting the agency.").

## D. Unlike the ALJ, the Board Failed to Consider Key Mitigating Factors in this Case.

The Board's bargaining order should also not be enforced because the Board improperly refused to consider any mitigating factors in this case, including those discussed at length by the ALJ. While this Court does not always consider changed circumstances such as the passage of time or employee turnover, in the context of reviewing a bargaining order, the Court's holdings have been motivated by a desire

to "prevent[] employers from intentionally prolonging Board proceedings in order to frustrate the issuance of bargaining orders." *NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1448 (9th Cir. 1991); *see also Seattle-First Nat. Bank v. NLRB*, 892 F.2d 792, 795 (9th Cir. 1989), *cert. denied*, 496 U.S. 925 (1990). [9] However, that this Court has refused to reward <u>intentional</u> employer conduct resulting in delay, *see Bakers of Paris*, 929 F.2d at 1448, does not mean that it will consider <u>no</u> changed circumstances, and this Court has frequently considered certain changed circumstances that are present here.

First, CEMEX was not responsible for  any of the delays in this case; to the contrary, the gaps in time in this case were caused by, respectively, the COVID-19 pandemic and the Board itself, which took nearly two years from the date the ALJ issued his decision to finalize its final order and decision, which included its unlawful new post-*Gissel* standard (a standard which no party asked the Board to adopt). *See Cooper Hand Tools*, 328 NLRB 145, 146 (1999) ("Given the long and

---

[9] Nearly every other circuit court, by contrast, does consider these types of changed circumstances when evaluating the propriety of a bargaining order. *See*, *e.g.*, *NLRB v. Cell Agricultural Mfg. Co.*, 41 F.3d 389, 398 (8th Cir. 1994) (citing cases in the 1st, 3rd, 4th, 5th, 6th, 7th, 11th, and D.C. Circuits finding that considering changed circumstances, "such as the passage of time or turnover in the workforce, are relevant to the Board's decision to issue a bargaining order."); *Charlotte Amphitheater Corp. v. NLRB*, 82 F.3d 1074, 1078 (D.C.Cir. 1996); *NLRB v. Knogo Corp.*, 727 F.2d 55 (2d Cir. 1984); *NLRB v. Village IX, Inc.*, 723 F.2d 1360 (7th Cir. 1983); *NLRB v. Frederick's Foodland, Inc.*, 655 F.2d 88 (6th Cir. 1981).

unjustified delay of the case here at the Board, we recognize [a bargaining order] would likely be unenforceable."), *aff'd sub nom United Steelworkers of America, AFL-CIO, CLC v. NLRB*, 8 Fed. Appx. 610 (9th Cir. 2001); *see also Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398, 404-06 (5th Cir. 1991).

Further, as this Court has held, the departure of a manager responsible for ULPs is a changed circumstance and mitigating factor that should be considered when reviewing a bargaining order. *See Peninsula*, 627 F.2d at 204 ("The residual nature of (the supervisor's) conduct is, therefore, lessened by his departure and that of the other employees, as is the likelihood of the recurrence of his conduct.") (quoting *NLRB v. Pilgrim Foods, Inc.*, 591 F.2d 110, 120 (1st Cir. 1978)). Here, the Board concedes that the key management employees it contends committed ULPs have since moved away from the facilities in question or left CEMEX altogether.[10] The Board's only response is that "many other managers" who were "directly involved in [CEMEX's] unlawful conduct apparently remain in place" at CEMEX. But the Board neither identifies any of these individuals nor specifies their alleged direct involvement in the conduct at issue here. Again, such unsupported and

---

[10] *See* 1-ER-25 (acknowledging the departures of Forgey and Dickson, along with the hiring of 197 new employees comprising half the bargaining unit who were not employed at the time of the election).

conclusory statements will not support a bargaining order.  *Pacific Southwest Airlines*, 550 F.2d at 1152; *United Steel*, 482 F.3d at 1117.

Moreover, even assuming the discipline and discharge of Ornelas were a "hallmark violation" of the Act (though such cannot be the case when the discharge occurred months *after* the election), there still must be evidence of pervasiveness. Illustrative of this point, courts within this Circuit have enforced bargaining orders only in situations far more severe than what allegedly happened here, in situations where the purported misconduct affected large swathes of the bargaining unit.  *See N.L.R.B. v. Bighorn Beverage*, 614 F.2d 1238, 1243 (9th Cir.1980) (enforcing bargaining order where the discharge of one employee "resulted in the termination of 25 percent of the employees in the particular bargaining unit"); *Rubin v. Vista Del Sol Health Servs., Inc.*, 80 F.Supp.3d 1058, 1098 (C.D. Cal. 2015) (bargaining order appropriate where employer terminated "seven of eight housekeeping employees, six of whom had signed the union petition").  As the ALJ held (and the Board cannot seriously contest), to the extent any employees were allegedly disciplined or terminated for pro-union sentiment, the fact that only one person, out of 373, was so affected, weighs strongly against a bargaining order here.

48

**IV.    THE BOARD IMPROPERLY ANNOUNCED AND RETROACTIVELY APPLIED A NEW, UNLAWFUL STANDARD FOR IMPOSING PETITION REQUIREMENTS AND BARGAINING ORDERS ON EMPLOYERS RESPONDING TO UNION DEMANDS FOR RECOGNITION.**

Having failed to justify its improper bargaining order under the longstanding *Gissell* standard, as long enforced by this Court (and by the Board itself), the Board "doubled down", choosing to use this case as a vehicle to create a new legal standard for union recognition and imposing bargaining orders on employers and employees. There is no dispute in this case that by requiring the union to file an RC petition without risking a bargaining order for doing so, CEMEX followed long-established processes in effect during the relevant time period.[11] The Board failed to demonstrate any legal basis for adopting a new legal standard in this case, let alone imposing it retroactively. (*See* 1-ER-47; Dissent). However, inasmuch as the Board asserts its holding was not dicta but was instead an "alternative remedy" to longstanding precedent, the new standard must be denied enforcement as well. (1-ER-21-26).

---

[11] As discussed below, the Board's attempt to retroactively apply the new standard is based on the false premise that the Union properly notified CEMEX that it claimed to represent a majority of the employees in the requested unit. (1-ER-19-20). In fact, there is no record evidence that the Union ever made a request to CEMEX for voluntary recognition based on a claim of majority status.

49

### A. The Board Materially Erred by Issuing a New Legal Standard Unauthorized by the NLRA and Contrary to the Major Questions Doctrine.

The Board's new legal standard dramatically departs from longstanding labor law principles. Specifically, the Board has for the first time held in this case that: (1) employers who receive a union demand for recognition must either capitulate or request a secret ballot election themselves, rather than waiting for the union to request an election; and (2) in any election case where an employer commits any unfair labor practice that could result in the election being set aside, the election "will be dismissed, and the employer will be subject to a remedial bargaining order."(1-ER-33). This new standard represents a clear and extreme deviation from decades of past practice, the text of the NLRA, and binding Supreme Court authority.

"[T]he major questions doctrine has been described as a skepticism of agency interpretations" that "would bring about an enormous and transformative expansion in . . . regulatory authority without clear congressional authorization." *See Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022). The doctrine requires an agency to "point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quoting *Utility Air Group v. EPA*, 573 U.S. 302, 324 (2014)). Where an agency lacks historical precedent and it asserts a wide breadth of authority, that "is a telling indication that the mandate extends beyond the agency's legitimate reach." *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 663, 666

50

(2022); *Alabama Assn. of Realtors v. Dept. of Health and Human Servs.*, 141 S.Ct. 2485, 2489 (2021) (*per curiam*) (The Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance."); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).

In the present case, the Board has upset over fifty years of well-established and Supreme Court-approved procedures and rules governing how a union obtains representative status, and the circumstances under which bargaining orders may issue. The Board's new decision fundamentally changes one of the most basic relationships under the NLRA, namely the circumstances under which an employer legally must bargain with a union on behalf of its employees, a shift impacting millions of private sector employers and employees throughout the country. It must also be noted that both *Linden Lumber* and *Gissel* were the law of the land at the time Congress last amended the NLRA in 1974, and Congress's failure to legislatively overrule those cases is strong evidence that the Supreme Court's holdings remain consistent with congressional intent under the NLRA. *See NLRB v. Bell Aerospace Co*., 416 U.S. 267, 274-75 (1974) (courts place great weight on longstanding interpretations placed on a statute by an agency charged with its administration, especially where Congress has re-enacted the statute without

51

pertinent change). Accordingly, the Board has materially erred in announcing a new legal standard without statutory authorization.[12]

### B. The Board Materially Erred by Engaging in Rulemaking Under the Guise of Adjudication.

Even if the Board had the statutory authority to announce a new election/bargaining standard, the Board has wrongly issued its new legal standard through adjudication rather than rulemaking.

The Supreme Court has clearly and consistently held that an agency's function of carrying out statutory directives "should be performed, as much as possible, through th[e] quasi-legislative promulgation of rules to be applied in the future." *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947). While an agency may announce new principles through administrative adjudication, "there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act." *See Bell Aerospace*, 416 U.S. at 294. Such situations include

---

[12] In denying CEMEX's motion for reconsideration, the Board argued that it is somehow not bound by the major questions doctrine, relying on this Court's inapposite decision in *Mayes v. Biden*, 67 F.4th 921, 934-35 (9th Cir. 2023). That case dealt only with a "an exercise of proprietary authority" unlike the Board's regulatory action here. The Court also acknowledged the Supreme Court doctrine's application to "transformative expansion" of agency authority, which the Board's new standard plainly has brought about. In any event, as the Dissent pointed out in the present case, the Board's view of the major questions doctrine here "is entitled to zero deference in the courts of appeals[.]" *Id.* at *6.

those where the agency's decision has "severe" consequences, and the affected party relied on prior, contrary decisions. *See Natural Gas Pipeline Co. v. Federal Energy Regulatory Com.*, 590 F.2d 664 (7th Cir. 1979); *Patel v. Immigration Naturalization Service*, 638 F.2d 1199, 1204 (9th Cir. 1980) (where an agency retroactively adopts new law or where the parties have relied on existing precedents, the agency should use rulemaking procedures and not adjudication) (citation omitted); *Ford Motor Co. v. F.T.C.*, 673 F.2d 1008, 1009 (9th Cir. 1981) ("[A]n agency must proceed by rulemaking if it seeks to change the law and establish rules of widespread application.").

Regarding its decision to no longer look to binding Supreme Court authority (namely, *Gissel*), the Board contends that its "decades of experience in administering the *Gissel* standard have persuaded us that *Gissel* bargaining orders are insufficient to accomplish the twin aims of effectuating ascertainable employee free choice' and 'deterring employer misbehavior' that the Supreme Court identified in that case[.]" (1-ER-34). However, the Board lacks any authority, statutory or otherwise, to overrule binding Supreme Court precedent, and the Board has not actually identified any facts in this or any other case to support the baseless claim that *Gissel* is "insufficient." Similarly, while the Board asserts that the new standard is "in response to the criticism of reviewing courts and our recognition of relevant

intervening changes in Board law….", the Board has failed to identify even one such instance of criticism or compelling changes. (1-ER-36).

Other broad statements of policy included in the Board's Decision further demonstrate that this topic is more appropriately handled through rulemaking, rather than adjudication. For example, the Board asserts an unqualified belief that, because "the current scheme for remedying unlawful failures to recognize and bargain with employees' designated bargaining representatives is inadequate to safeguard the fundamental rights to organize and bargain collectively that our statute enshrines, we hereby overrule *Linden Lumber*, supra." (Board Decision at 25). However, the Board identifies no record evidence in support of this contention either, nor does it make an express finding to support this sweeping policy change.

### C. The Board Materially Erred in its Analysis of Precedent in *Gissel*, *Linden Lumber*, and *Joy Silk*.

In developing this new standard, the Board plainly erred in its analysis of the relevant statutory framework for union recognition, the duty to bargain, and the imposition of bargaining orders. Specifically, the analysis of prior Supreme Court cases, including *Gissel*, *Linden Lumber*, and *Joy Silk,* that appears on pages 20 through 25 of the Board's Decision is simply wrong. (*See* 1-ER-27-32). The Board errs when it proceeds from such a "faulty premise." *See World Color (USA) Corp. v. NLRB*, 776 F.3d 17, 18-19 (D.C. Cir. 2015).

54

Certainly the Board erred by issuing a new legal standard that favors card checks over elections. As the Dissent notes, the Board's new standard "will predictably result in many more card-based bargaining orders and far fewer representation elections." (*See* 1-ER-49). This outcome is contrary to the NLRA's purpose of allowing employees to exercise the fullest freedom in selecting their representatives. (*See id.*); *Gissel*, 395 U.S. at 602-03 (describing representation elections as "the most satisfactory—indeed, the preferred—method of ascertaining whether a union has majority support," compared to "admittedly inferior" authorization cards). Indeed, this Circuit has recognized that "only an election guarantees employees their choice of representative." *NLRB v. Peninsula Ass'n for Retarded Children and Adults*, 627 F.2d 202, 205 (9th Cir. 1980). Accordingly, the Board materially erred in issuing a new legal standard that favors card checks and the "extreme" remedy of bargaining orders over secret ballot elections. *See Gardner Mech. Servs., Inc.*, 115 F.3d at 642.

### D. The Board Materially Erred by Placing the Burden on the Employer to File an RM Petition, as This Burden Placement Conflicts with the Supreme Court's Holding in *Linden Lumber*.

The Board has further overturned settled principles of labor law by placing the burden of "promptly" filing an RM petition on the employer when a union demands recognition based on authorization cards. (*See* 1-ER-32). Both the Taft-Hartley Act and the Supreme Court's decision in *Linden Lumber* preclude such

Board action. As the Dissent notes, the Supreme Court upheld the Board's decision in *Linden Lumber* "over the contrary decision of the District of Columbia Circuit, in which the circuit court held—as [the Board] purport[s] to hold today—that an employer that refuses a request for recognition from a card-majority union must file an RM petition." (*See* 1-ER- 51). Likewise, in *Linden Lumber*, the Supreme Court also considered the Board minority's view in *Linden Lumber* and rejected it. (*See id.*).

Further, the Supreme Court expressly held in its review of *Linden Lumber* that "the history of [Section 9(c)(1)(B)] indicates it was aimed at eliminating the discrimination against employers which had previously existed under the Board's prior rules, permitting employers to petition for an election only when confronted with claims by two or more unions. There is no suggestion that Congress wanted to place the burden of getting a secret election on the employer." *See Linden Lumber Div., Summer & Co. v. NLRB*, 419 U.S. at 306-09 (emph. added). Further supporting this conclusion is the fact that *Linden Lumber* was the law at the time Congress last amended the NLRA in 1974, and Congress did not overrule it. The Board cannot simply ignore the Supreme Court's analysis of the NLRA's legislative history and its holdings on these subjects.

"When the Board fails to explain...its deviation from established precedent," the Court may properly vacate the Board's decision as arbitrary and capricious. *See*

*Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 178 (D.C. Cir. 2023). Here, the Board failed to present a reasoned explanation for its decision to overrule *Linden Lumber* and place the burden on the employer to file an RM petition after a union demands recognition based on a card majority. Indeed, the Board has not identified any data or record evidence in support of its assertions that *Linden Lumber* should be overruled, instead relying on its bare contention that it has broad remedial powers. (*See* 1-ER-32). But the fact that the Board possesses remedial powers does not free it from its obligation to justify its change in longstanding policy. Rather, courts routinely conclude that the Board goes beyond its remedial powers when it issues remedies without sufficient explanation, particularly in the context of bargaining orders. *See, e.g.*, *Leggett & Platt, Inc. v. NLRB*, 988 F.3d 487, 494 (D.C. Cir. 2021); *Vincent Indus. Plastics, Inc.*, 209 F.3d 727, 738 (D.C. Cir. 2000); (*see also* 1-ER-43).[13] The Board also contends that it maintains broad discretion to determine the procedure for selecting a bargaining representative, but the case to which the Board majority cites, *NLRB v. A.J. Tower Co.*, 329 U.S. 324 (1990) is inapposite, as that case deals with the Board's discretion to set <u>election</u> procedures, in contrast to here,

---

[13] This is of particular importance in a case like this where, on frequent occasions, the Board's decision explicitly rests on suggestions or inferences, rather than clear record evidence. *See*, *e.g.* 1-ER-19-20, 23, 26.

where the Board majority contends that its discretion allows it to dispense with elections altogether. (*See* 1-ER-53).

Further, overruling *Linden Lumber* is not a wholly remedial issue; rather, the Board's decision converts conduct that *Linden Lumber* did not prohibit into a violation of the NLRA. (*See* 1-ER-52); *compare Linden Lumber Div., Sumner & Co.*, 190 NLRB 718, 721 (1971). Indeed, as the Dissent notes, placing the burden on the employer to seek an election only makes sense under a good faith doubt standard, which the Board majority has not reinstated. (*See* 1-ER-52). Accordingly, the Board has erred in overruling its decision in *Linden Lumber* without sufficient explanation under the APA.

> **E. The Board Materially Erred in Concluding That a Bargaining Order is a Remedy of First Resort if it Determines an Employer Has Committed Any Unfair Labor Practice During an Election Period, in Violation of *Gissel* and Other Longstanding Precedent.**

The Board has further erred in concluding that a bargaining order is appropriate in any case where the Board determines an employer commits an unfair labor practice that would require setting aside an election (*see* 1-ER-32) The Supreme Court's decision in *Gissel* precludes such Board action, as previously discussed throughout this Brief. *See also* 1-ER-54 (collecting cases). The Board majority has thus dramatically lowered the threshold for issuing an affirmative bargaining order below what the Supreme Court requires.

Although *Gissel* specifically concluded that "minor or less extensive unfair labor practices...will not sustain a bargaining order," *see Gissel*, 395 U.S. at 615, the Board has held to the contrary that any such unfair labor practice would suffice to set aside an election. (*See* 1-ER-55, citing cases). The Board cannot ignore or overrule *Gissel*, but that is precisely what it attempts to do here, and it provides no rationale for this dramatic deviation from decades of precedent. *See Int'l Org. of Masters*, 61 F.4th at 178 ("A Board's decision will be set aside when it departs from established precedent without reasoned justification….").

The Board majority's contention that "bargaining orders under the new standard rest upon a fundamentally different rationale than those under *Gissel*" (1-ER-41) does not salvage its reasoning, and is disingenuous. In *Gissel*, the Supreme Court did not limit its holding that certain unfair labor practices will not justify a bargaining order only to bargaining orders issued under certain rationales. Rather, the Supreme Court explicitly held that some types of unfair labor practices would not justify a bargaining order under *any* circumstances. *See Gissel*, 395 U.S. at 615 ("[M]inor or less extensive unfair labor practices … will not sustain a bargaining order."). Thus, the *Gissel* standard and the Board's new standard are in direct conflict. (*See* 1-ER-55). In sum, the Board has materially erred by departing from longstanding Supreme Court precedent in concluding that any unfair labor practice that warrants setting aside an election also warrants a bargaining order.

Additionally, the Board's position that traditional remedies and rerun elections are generally inadequate to respond to unfair labor practices is contrary not only to longstanding authority but also to evidence indicating that unions frequently win rerun elections. (*See* 1-ER-57); *see also Windsor Redding Care Ctr., LLC*, 944 F.3d 294, 300 (D.C. Cir. 2019) (the Board errs when its analysis ignores important points that a dissenting member has raised). The Board's position that traditional remedies and rerun elections are inadequate is also contrary to the reality that the Board can seek injunctive relief under Section 10(j) of the NLRA when a swift response to ULPs is needed. (*See* 1-ER-57). Indeed, as the Dissent notes, Section 10(j) relief can and frequently does allow a rerun election to succeed. (*See* 1-ER-57).

Finally, the Board majority's deterrence justification does not save its decision. If deterrence by itself were an appropriate justification for a Board remedy, the Board could issue any remedy it wanted to. But instead Congress deliberately restrained the Board in enacting the NLRA; and the Board is required to operate within, not outside of the Act's boundaries. *See, e.g., Leggett & Platt, Inc.*, 988 F.3d at 494; *Vincent Indus. Plastics, Inc.*, 209 F.3d at 738. The deterrence justification is further inappropriate given that the Board's new standard allows the Board to use a bargaining order to remedy even minimal unfair labor practices, in contravention of *Gissel*. Indeed, "[t]he potential deterrent effect of a bargaining

60

order is lessened in a case in which the initial violation was marginal and apparently committed in good faith." *See Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 50 (D.C. Cir. 1980); (*see also* 1-ER-58).

### F. The Board Erred in Retroactively Applying its New Standard to CEMEX.

The Board has materially erred in retroactively applying its new standard in the present case. The sole basis for doing so is the Board's incorrect assertion that the Union claimed to represent a majority of the unit employees and sought voluntary recognition after notifying CEMEX of that claim. (1-ER-19-20). However, there is no evidence in the record that the Union ever notified CEMEX that a "majority" of its employees had signed cards, and the Union did not request voluntary recognition at all.[14] In any event, under the five-part test adopted by this Court for analysis of retroactive applications of new Board standards, the sweeping new Board standard must be applied only prospectively if at all. *See Beneli v. NLRB*, 873 F.3d 1094 (9th Cir. 2017), citing *Oil, Chem. & Atomic Workers Int'l Union Local I-547 v. NLRB*, 842 F. 2d 1141, 1145 (9th Cir. 1988).[15] This is a case of first

---

[14] As noted above, the Board cites only Joint Ex. 3 in the hearing record, a stipulation that "Petitioner claims to represent the employees described in the petition…." (3-ER-543). The stipulation does not state that the Union actually represented a majority of the employees nor that the Union ever sought voluntary recognition from CEMEX based on such a claim.

[15] Under the above-cited cases, this Court considers: (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure

61

impression; the new rule abruptly departs from established Board practice; CEMEX relied on and complied with existing law; the new standard imposes huge burdens on employers; and there is no statutory interest in imposing the new rule, which is itself unlawful.

Further, the Board's manifest injustice analysis is flawed as to CEMEX specifically. The Board majority found there was no manifest injustice toward CEMEX because it would have issued a *Gissel* bargaining order anyway. (*See* 1-ER-37). But the facts here do not warrant a *Gissel* bargaining order. Moreover, if the *Gissel* bargaining order is set aside, CEMEX would still be saddled with a bargaining order under the Board's new standard. Accordingly, the Board has materially erred in retroactively applying its new standard.

## V. THE BOARD IMPROPERLY IMPOSED A NEW, UNLAWFUL REMEDY OF COMPENSATORY DAMAGES FOR THE SINGLE EMPLOYEE WHO IT FOUND WAS UNLAWFULLY DISCHARGED.

As noted above, in finding against the weight of substantial evidence that CEMEX unlawfully discharged Diana Ornelas months after the election, the Board

---

from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

ordered a new remedy awarding her "all direct or foreseeable pecuniary harms." (1-ER-46). This remedy again departs from decades of precedent in which the Board and numerous courts previously held that such a remedial order violates Section 10(c) of the NLRA, and the Constitution's Seventh Amendment. This new remedy was adopted by the Board for the first time only a year ago and has already been challenged in another court of appeals in *Thryv, Inc.*, 372 NLRB No. 22 (2023), *petition for review pending*, No. 23-60132 (5th Cir. oral arg. Feb. 6, 2024).

Section 10(c) of the Act has long been understood to authorize only equitable relief, as the Supreme Court has held. "Congress did not establish a general scheme authorizing the Board to award full compensatory damages for injuries caused by wrongful conduct." *UAW-CIO v. Russell*, 356 U.S. 634, 643 (1958). Section 10(c)'s sole example of an order commanding "affirmative action" is "reinstatement of employees with or without backpay." 29 U.S.C. § 160(c). The Board's remedial order of non-equitable damages again violates the major case doctrine for the reasons described above. When Congress wants to authorize compensatory damages, it does so directly as in the Labor Management Relations Act, 29 U.S.C. § 187(b). And when Congress has not authorized compensatory damages, as in the original Section 706(g) of Title VII of the Civil Rights Act, the Supreme Court respected that decision in *United States v. Burke*, 504 U.S. 229, 238 (1992), citing Section 10(c) of the

63

NLRA as "guidance," and citing also constitutional provisions requiring courts and juries to decide damage claims.

For the same reasons, the Board's imposition of compensatory damages here implicates the Constitutional rights to have damage claims adjudicated by an Article III court and to have a trial by jury as required by the Seventh Amendment. *See also Thryv, Inc. v. NLRB, petition for review pending*, No. 23-60132 (5th Cir. oral arg. Feb. 6, 2024) (multiple briefs filed highlighting both the constitutional and statutory violations by the Board); *Jarkesy v. SEC*, 34 F.4th 446, appeal pending, (U.S.).

## CONCLUSION

For the reasons set forth above, separately and together, the Board's order should be denied enforcement and vacated.

Respectfully submitted,

Ross M. Gardner
Alan M. Bayless Feldman
Ross.gardner@jacksonlewis.com
Alan.feldman@jacksonlewis.com
JACKSON LEWIS, P.C.
10050 Regency Circle, Suite 400
Omaha, Nebraska 68114
Telephone: 402.391.1991
Facsimile: 402.391.7363

*Attorneys for Petitioner/Cross-Respondent CEMEX Construction Materials Pacific, LLC*

*/s/Maurice Baskin*
Maurice Baskin
mbaskin@littler.com
LITTLER MENDELSON, P.C.
815 Connecticut Ave., N.W., Suite 400
Washington, DC 20006
Telephone: 202.842.3400
Facsimile: 202.842.0011

John Harper III
ajharper@littler.com
LITTLER MENDELSON, P.C.
1301 McKinney St., Suite 1900
Houston, Texas 77010
Telephone: 713.951.9400

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2081, 23-2302, 23-2377

I am the attorney or self-represented party.

**This brief contains** | 14,950 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

⬤ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Maurice Baskin | **Date** | 02/1/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**       *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-2081, 23-2302, 23-2377

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Maurice Baskin    **Date** | Feb 1, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**        *New 12/01/2018*

**CERTIFICATE OF COMPLIANCE**

Pursuant to FRSP 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that Court's Form 8 is being submitted reflecting that the attached Petitioner's opening brief is proportionately spaced, has a typeface of 14 points, and contains 14,952 words, excluding the parts exempted by FRAP 32(f), which is based upon the word count of the word processing system used to prepare this brief.

*/s/Maurice Baskin*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court of the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on Feb. 2, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated this 2nd day of February, 2024.

*/s/Maurice Baskin*

# STATUTORY ADDENDUM
# TABLE OF CONTENTS

**STATUTE**                                                                 **PAGE**

29 U.S.C. § 153 ................................................................................ A-2

29 U.S.C. § 157 ................................................................................ A-2

29 U.S.C. § 158 ................................................................................ A-2

29 US.C. § 159………………………………………………………..A-3

29 U.S.C. § 160 ................................................................................ A-4

5 U.S.C. § 7521……………………………………………………….A-6

**29 US.C. § 153(a) Creation, composition, appointment, and tenure; Chairman; removal of members**

The National Labor Relations Board (hereinafter called the "Board") created by this Act [subchapter] prior to its amendment by the Labor Management Relations Act, 1947 [29 U.S.C. § 141 et seq.], is continued as an agency of the United States, except that the Board shall consist of five instead of three members, appointed by the President by and with the advice and consent of the Senate. Of the two additional members so provided for, one shall be appointed for a term of five years and the other for a term of two years. Their successors, and the successors of the other members, shall be appointed for terms of five years each, excepting that any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed. The President shall designate one member to serve as Chairman of the Board. Any member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause.

**29 U.S.C. § 157. Right of employees as to organization, collective bargaining**

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

**29 U.S.C. § 158** (a) [Unfair labor practices by employer] It shall be an unfair labor practice for an employer--

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title];

 (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6 [section 156 of this title], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor

organization: Provided, That nothing in this Act [subchapter], or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act [in this subsection] as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a) [section 159(a) of this title], in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) [section 159(e) of this title] within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this Act [subchapter];

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [section 159(a) of this title].

## 29 U.S.C. § 159 Representatives and Elections

(a) [Exclusive representatives; employees' adjustment of grievances directly with employer] Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective- bargaining contract or agreement then

in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment. ***

 (c) [Hearings on questions affecting commerce; rules and regulations] (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board--

 (A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in section 9(a) [subsection (a) of this section], or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in section 9(a) [subsection (a) of this section]; or

 (B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9(a) [subsection (a) of this section]; the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof. ***

 (e) [Secret ballot; limitation of elections] (1) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and labor organization made pursuant to section 8(a)(3) [section 158(a)(3) of this title], of a petition alleging they desire that such authorization be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

## 29 U.S.C. § 160. Prevention of unfair labor practices
### (a) Powers of Board generally
The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title)

affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

**(b) Complaint and notice of hearing; answer; court rules of evidence inapplicable**

Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint: *Provided*, That no complaint shall issue based upon any unfair labor practice occurring more than six months prior to

the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made, unless the person aggrieved thereby was prevented from filing such charge by reason of service in the armed forces, in which event the six-month period shall be computed from the day of his discharge. Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States, adopted by the Supreme Court of the United States pursuant to section 2072 of title 28.

**(c) Reduction of testimony to writing; findings and orders of Board**

The testimony taken by such member, agent, or agency or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion,

the Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: *Provided*, That where an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: *And provided further*, That in determining whether a complaint shall issue alleging a violation of subsection (a)(1) or (a)(2) of section 158 of this title, and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

**(d) Modification of findings or orders prior to filing record in court**
Until the record in a case shall have been filed in a court, as hereinafter provided, the Board may at any time upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it.

**(e) Petition to court for enforcement of order; proceedings; review of judgment**
The Board shall have power to petition any court of appeals of the

United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

**(f) Review of final order of Board on petition to court**

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the

District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board;….

## 5 U.S.C. §7521 Actions against administrative law judges

(a) An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.