**Nos. 23-2081, 23-2302 & 23-2377**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC**
                                    **Petitioner/Cross-Respondent**
**and**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**
                          **Petitioner**
**v.**

**NATIONAL LABOR RELATIONS BOARD**
                                    **Respondent/Cross-Petitioner**
**and**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**
                          **Intervenor**
_____

**ON PETITIONS FOR REVIEW AND**
**CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF**
**THE NATIONAL LABOR RELATIONS BOARD**
_____

**BRIEF FOR**
**THE NATIONAL LABOR RELATIONS BOARD**
_____

                                      **KIRA DELLINGER VOL**
                                      *Supervisory Attorney*

                                      **ERIC WEITZ**
                                      *Attorney*

                                      **National Labor Relations Board**
                                      **1015 Half Street SE**
                                      **Washington, D.C. 20570**
                                      **(202) 273-0656**
                                      **(202) 273-3757**

**JENNIFER A. ABRUZZO**
        *General Counsel*
**PETER SUNG OHR**
        *Deputy General Counsel*
**RUTH E. BURDICK**
        *Deputy Associate General Counsel*
**DAVID HABENSTREIT**
        *Assistant General Counsel*

**National Labor Relations Board**

## <u>TABLE OF CONTENTS</u>

**Headings**                                                                                 **Page(s)**

Statement of jurisdiction ................................................................................1

Statement of the issues ................................................................................2

Statutory addendum ....................................................................................3

Statement of the case...................................................................................3

    I.   The Board's findings of fact...............................................................3

        A.   The Union begins organizing Cemex's drivers ........................ 3

        B.   The Union secures majority support and files for an election................. 5

        C.   Cemex accelerates its response to the union campaign........................... 5

        D.   Cemex issues a disciplinary warning to Ornelas for talking with union organizers....................................................................... 8

        E.   Cemex hires uniformed guards in the runup to the election.................... 9

        F.   The Union narrowly loses the election ................................................. 10

        G.   Cemex suspends and discharges Ornelas ............................................. 10

    II.   Procedural history ........................................................................12

    III.  The Board's conclusions and Order........................................... 12

Summary of argument...............................................................................13

Argument...................................................................................................15

    I.   The Court lacks jurisdiction to entertain Cemex's meritless challenge to the Board's administrative law judges.....................................15

# TABLE OF CONTENTS

**Headings – cont'd**                                                    **Page(s)**

II.   Substantial evidence supports the Board's findings that Cemex
      committed dozens of unfair labor practices interfering with its
      drivers' statutory right to organize ................................................17

   A.   Cemex repeatedly violated Section 8(a)(1) prior to the election
        as part of a coordinated anti-union campaign ........................................ 17

      1.   Cemex threatened drivers with job loss and warned
           them not to show support for the Union ............................................ 19

      2.   Cemex threatened to close its doors and again warned
           against showing support for the Union ............................................... 20

      3.   Cemex coercively interrogated a driver about the Union ................. 20

      4.   Cemex surveilled union campaigning and created the
           impression it was monitoring drivers' union activities...................... 21

      5.   Cemex threatened drivers with lost benefits and lost
           work during meetings with union-avoidance consultants.................. 21

      6.   Cemex threatened drivers with lost work opportunities ................... 25

      7.   Cemex promulgated an overbroad rule against talking
           with organizers and disciplined Ornelas for violating it................... 25

      8.   Cemex coerced drivers into voting against the Union....................... 27

      9.   Cemex intimidated drivers by hiring uniformed guards
           to patrol its facilities during the runup to the election ...................... 28

   B.   After organizing resumed, Cemex violated Section 8(a)(3) and
        (1) by discriminatorily suspending and discharging Ornelas................. 30

      1.   Cemex discriminatorily suspended Ornelas and made
           coercive statements .............................................................................. 31

# **TABLE OF CONTENTS**

**Headings – cont'd**                                                                    **Page(s)**

      2.  Cemex discriminatorily discharged Ornelas ..................................... 34

III.  The Board rationally dismissed or declined to address four
additional unfair-labor-practice allegations .................................................37

IV.  Cemex violated Section 8(a)(5) and (1) of the Act by refusing to
bargain with the Union as the drivers' majority representative prior
to an election invalidated by Cemex's unlawful conduct, and the
Board did not abuse its discretion by issuing a bargaining order ...............39

  A.  The Board's historical approaches......................................................... 41

  B.  The Board rationally adopted a new framework governing the
issuance of remedial bargaining orders, which it applied here
to find that Cemex's conduct warrants a bargaining order ................... 44

     1.  The Board's new framework will better effectuate the
policies of the Act ................................................................. 44

     2.  Cemex has not shown the Board's new framework is
irrational or inconsistent with the Act................................... 49

     3.  The Board reasonably determined that retroactive
application of its new framework is warranted.................................. 58

     4.  A bargaining order is warranted in the present case
under the Board's new framework...................................................... 60

        a.  Substantial evidence supports the Board's finding
that the Union possessed majority support ................................... 60

        b.  The Board did not abuse its discretion in
determining the election must be set aside ................................... 62

  C.  The Board acted within its discretion by determining that a
*Gissel* bargaining order would also be warranted here........................... 63

# **TABLE OF CONTENTS**

**Headings – cont'd**                                                      **Page(s)**

V.  The Board did not abuse its discretion by ordering Cemex to make
Ornelas whole for direct or foreseeable pecuniary harms ...........................68

VI. The Board did not abuse its discretion by declining to order
additional remedies ........................................................................................70

Conclusion .............................................................................................................71

Statement of related cases .........................................................................................72

iv

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Atlas Roofing Co. v. OSHRC*,
430 U.S. 442 (1977)......................................................................70

*Babcock & Wilcox Co.*,
77 NLRB 577 (1948) ...................................................................38

*Beneli v. NLRB*,
873 F.3d 1094 (9th Cir. 2017) ....................................................58

*Beverly Cal. Corp.*,
326 NLRB 232 (1998), *enforced in part*,
227 F.3d 817 (7th Cir. 2000) ......................................................28

*Bon Appétit Mgmt. Co.*,
334 NLRB 1042 (2001) ...............................................................62

*Cal. Acrylic Indus., Inc. v. NLRB*,
150 F.3d 1095 (9th Cir. 1998) ....................................................21

*Coffman v. Queen of Valley Med. Ctr.*,
895 F.3d 717 (9th Cir. 2018) ......................................................59

*Collins v. Yellen*,
141 S. Ct. 1761 (2021).................................................................16

*CFPB v. CashCall, Inc.*,
35 F.4th 734 (9th Cir. 2022) .......................................................16

*Cooper Indus., Inc.*,
328 NLRB 145 (1999), *affirmed*,
8 F. App'x 610 (9th Cir. 2001) ...................................................47

*Decker Coal Co. v. Pehringer*,
8 F.4th 1123 (9th Cir 2021) .................................................. 16-17

*Delta Sandblasting Co. v. NLRB*,
969 F.3d 957 (9th Cir. 2020) ......................................................18

*Dynamics Corp.*,
296 NLRB 1252 (1989), *enforced*,
928 F.2d 609 (2d Cir. 1991).................................................. 32-33

v

## <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                   **Page(s)**

*E. Bay Auto. Council v. NLRB*,
   483 F.3d 628 (9th Cir. 2007) .................................................53

*Exelon Generation Co.*,
   347 NLRB 815 (2006) ...........................................................25

*Fibreboard Paper Prods. v. NLRB*,
   379 U.S. 203 (1964)...............................................................40

*Frankl v. HTH Corp.*,
   650 F.3d 1334 (9th Cir. 2011) ...............................................46

*Franks Bros. Co. v. NLRB*,
   321 U.S. 702 (1944)..........................................40-41, 46, 55

*Gardner Mech. Servs., Inc. v. NLRB*,
   115 F.3d 636 (9th Cir. 1997) .................................................64

*Garfias-Rodriguez v. Holder*,
   702 F.3d 504 (9th Cir. 2012) .................................................59

*Garvey Marine, Inc.*,
   328 NLRB 991 (1999), *enforced*,
   245 F.3d 819 (D.C. Cir. 2001)...........................................64-65

*Glendale Assocs. Ltd. v. NLRB*,
   347 F.3d 1145 (9th Cir. 2003) ...............................................44

*Hotel Emps. & Rest. Emps. Union, Local 2 v. Marriott Corp.*,
   961 F.2d 1464 (9th Cir. 1992) ...............................................53

*Indep. Towers of Wash. v. Washington*,
   350 F.3d 925 (9th Cir. 2003) .................................................68

*IBEW, Local 21 v. NLRB*,
   563 F.3d 418 (9th Cir. 2009) ........................................ 37, 70

*Int'l Harvester Co.*,
   258 NLRB 1162 (1981) ..........................................................23

## TABLE OF AUTHORITIES

**Cases – cont'd**                                       **Page(s)**

*Joy Silk Mills, Inc.*,
    85 NLRB 1263 (1949), *enforced*,
    185 F.2d 732 (D.C. Cir. 1950) ................................................ 41-43, 46, 48, 54, 56

*Kava Holdings, LLC v. NLRB*,
    85 F.4th 479 (9th Cir. 2023) ................................................... 18, 32, 40

*Linden Lumber*,
    190 NLRB 718 (1971) ...................................................... 43-45, 57, 59

*Linden Lumber v. NLRB*,
    419 U.S. 301 (1974) .......................................................... 44, 51, 56-57

*Marine Welding & Repair Works, Inc.*,
    174 NLRB 661 (1969), *enforced*,
    439 F.2d 395 (8th Cir. 1971) .......................................................... 28

*Master Parts, Inc. v. NLRB*,
    373 F.2d 402 (9th Cir. 1967) ........................................................ 42

*NLRB v. All-Weather Architectural Aluminum, Inc.*,
    692 F.2d 76 (9th Cir. 1982) ......................................................... 62

*NLRB v. Ampersand Publ'g LLC*,
    43 F.4th 1233 (9th Cir. 2022) ................................................... 40, 68-69

*NLRB v. Anchorage Times Publ'g Co.*,
    637 F.2d 1359 (9th Cir. 1981) ....................................................... 64

*NLRB v. Bakers of Paris, Inc.*,
    929 F.2d 1427 (9th Cir. 1991) ..................................................... 53, 67

*NLRB v. Bell Aerospace Co.*,
    416 U.S. 267 (1974) ............................................................... 50

*NLRB v. Best Prods. Co.*,
    765 F.2d 903 (9th Cir. 1985) ........................................................ 39

*NLRB v. Big Three Indus., Inc.*,
    602 F.2d 898 (9th Cir. 1979) ........................................................ 62

## <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                                 **Page(s)**

*NLRB v. Buckley Broad. Corp. of Cal.*,
  891 F.2d 230 (9th Cir. 1989) ...............................................................60

*NLRB v. CAM Indus., Inc.*,
  666 F.2d 411 (9th Cir. 1982) ...............................................................46

*NLRB v. Carilli*,
  648 F.2d 1206 (9th Cir. 1981) .............................................................26

*NLRB v. Chicago Metallic Corp.*,
  794 F.2d 527 (9th Cir. 1986) ...............................................................26

*NLRB v. Curtin Matheson Sci., Inc.*,
  494 U.S. 775 (1990).............................................................................44

*NLRB v. Davis*,
  642 F.2d 350 (9th Cir. 1981) ...............................................................66

*NLRB v. Friendly Cab Co.*,
  512 F.3d 1090 (9th Cir. 2008) .............................................................16

*NLRB v. Geigy Co.*,
  211 F.2d 553 (9th Cir. 1954) ......................................................... 42, 64

*NLRB v. Gissel Packing Co.*,
  395 U.S. 575 (1969)......................................... 39-40, 43, 46, 48, 50-56, 60, 63-67

*NLRB v. Jamaica Towing, Inc.*,
  632 F.2d 208 (2d Cir. 1980).................................................................66

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937).................................................................................69

*NLRB v. L.B. Foster Co.*,
  418 F.2d 1 (9th Cir. 1969) .............................................. 46, 52, 63, 67

*NLRB v. Legacy Health Sys.*,
  662 F.3d 1124 (9th Cir. 2011) .............................................................18

*NLRB v. Murray Prods., Inc.*,
  584 F.2d 934 (9th Cir. 1978) ...............................................................23

## <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                    **Page(s)**

*NLRB v. P. Lorillard Co.*,
  314 U.S. 512 (1942)...................................................................... 41, 48

*NLRB v. Peninsula Ass'n*,
  627 F.2d 202 (9th Cir. 1980) ...............................................................67

*NLRB v. St. Francis Hosp. of Lynwood*,
  601 F.2d 404 (9th Cir. 1979) ...............................................................50

*NLRB v. Trimfit of Cal.*,
  211 F.2d 206 (9th Cir. 1954) ...............................................................48

*NLRB v. Western Drug*,
  600 F.2d 1324 (9th Cir. 1979) .............................................................66

*NLRB v. W.T. Grant Co.*,
  199 F.2d 711 (9th Cir. 1952) ......................................................... 42, 46

*Natter Mfg. v. NLRB*,
  580 F.2d 948 (9th Cir. 1978) ...............................................................57

*Pay'n Save Corp. v. NLRB*,
  641 F.2d 697 (9th Cir. 1981) ...............................................................20

*Pergament United Sales*,
  296 NLRB 333 (1989), *enforced*,
  920 F.2d 130 (2d Cir. 1990).......................................................... 28-29

*Phelps Dodge Corp. v. NLRB*,
  313 U.S. 177 (1941).............................................................................69

*Quest Int'l*,
  338 NLRB 856 (2003) .........................................................................30

*Sakrete of N. Cal., Inc. v. NLRB*,
  332 F.2d 902 (9th Cir. 1964) ...............................................................41

*Scott ex rel. NLRB v. Stephen Dunn & Assocs.*,
  241 F.3d 652 (9th Cir. 2001) ...............................................................65

## TABLE OF AUTHORITIES

**Cases – cont'd**                                                                         **Page(s)**

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ................................................................. 58

*Small v. Avanti Health Sys. LLC*,
661 F.3d 1180 (9th Cir. 2011) .................................................. 46

*Smith v. Marsh*,
194 F.3d 1045 (9th Cir. 1999) .................................................. 18

*Smithfield Packing Co.*,
344 NLRB 1 (2004), *enforced*,
447 F.3d 821 (D.C. Cir. 2006) ............................................. 17-18

*SNE Enter., Inc.*,
344 NLRB 673 (2005) ............................................................... 58

*Thryv, Inc.*,
372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022) ....... 68-69, 72

*Tri-Cast, Inc.*,
274 NLRB 377 (1985) ............................................................... 39

*UAW v. NLRB*,
834 F.2d 816 (9th Cir. 1987) .................................................. 25

*UAW v. Russell*,
356 U.S. 634 (1958) ................................................................. 69

*United Nurses Ass'ns of Cal. v. NLRB*,
871 F.3d 767 (9th Cir. 2017) ............................................... 28-31

*United States v. Brown*,
996 F.3d 998 (9th Cir. 2021) .................................................. 51

*United States v. Burke*,
504 U.S. 229 (1992) ................................................................. 69

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) ................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Cases – cont'd**                                                    **Page(s)**

*U.S. Ecology, Inc. v. NLRB*,
   772 F.2d 1478 (9th Cir. 1985) ..................................................51

*USW v. NLRB*,
   482 F.3d 1112 (9th Cir. 2007) ............................................. 63-64

*Util. Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014)...................................................................49

*Va. Elec. & Power Co. v. NLRB*,
   319 U.S. 533 (1943)..............................................................69-70

*W.E. Carlson Corp.*,
   346 NLRB 431 (2006) ..............................................................22

*Wismettac Asian Foods, Inc.*,
   370 NLRB No. 35, 2020 WL 6077570 (Oct. 14, 2020), *affirmed*,
   No. 20-73768, 2022 WL 313776 (9th Cir. Feb. 2, 2022)...................30

*Wright Line*,
   251 NLRB 1083 (1980), *enforced*,
   662 F.2d 899 (1st Cir. 1981)............................................ 30-32, 35, 37

*Zumwalt v. Nat'l Steel & Shipbuilding Co.*,
   796 F. App'x 930 (9th Cir. 2019) ......................................................16

**Statutes**                                                          **Page(s)**

National Labor Relations Act
   (29 U.S.C. §§ 151, et seq.)

Section 1 (29 U.S.C. § 151) ...............................................................2, 45
Section 7 (29 U.S.C. § 157) ..............................................................17, 39
Section 8(a)(1) (29 U.S.C. § 158(a)(1)).... 2, 12, 17-21, 25-32, 35, 40-41, 45, 60, 64
Section 8(a)(3) (29 U.S.C. § 158(a)(3))................................ 12, 30-31, 35
Section 8(a)(5) (29 U.S.C. § 158(a)(5))................................ 2, 12, 39-45, 57, 60, 64
Section 8(b)(7)(C) (29 U.S.C. § 158(b)(7)(C))........................................50
Section 9(a) (29 U.S.C. § 159(a)) ....................................................39, 57
Section 9(c) (29 U.S.C. § 159(c)) ....................................................39, 44

## <u>TABLE OF AUTHORITIES</u>

**Statutes – cont'd**                                              **Page(s)**

National Labor Relations Act – cont'd
   (29 U.S.C. §§ 151, et seq.)

Section 10(a) (29 U.S.C. § 160(a)) ............................................................2
Section 10(c) (29 U.S.C. § 160(c)) .....................................................17, 40
Section 10(e) (29 U.S.C. § 160(e)) ....................................................2, 15
Section 10(f) (29 U.S.C. § 160(f)) .............................................................2

Civil Service Reform Act of 1978
   (5 U.S.C. §§ 1101, et seq.)

Section 7521(a) (5 U.S.C. § 7521(a)) ......................................................17

# GLOSSARY

| | |
|---|---|
| the Act | National Labor Relations Act |
| Amici Contractors | Associated Builders and Contractors, et al. |
| Amicus Kecherson | Tami Kecherson |
| the Board | National Labor Relations Board |
| Cemex | Cemex Construction Materials Pacific, LLC |
| Cemex-Br. | Cemex's opening brief |
| CER | Cemex's excerpts of record |
| Contractors-Br. | Amici Contractors' brief |
| D&O | the Board's Decision and Order |
| Kecherson-Br. | Amicus Kecherson's brief |
| ODR | the Board's order denying reconsideration |
| SER | the Board's supplemental excerpts of record |
| the Union | International Brotherhood of Teamsters |
| Union-Br. | the Union's opening brief |
| UER | the Union's excerpts of record |

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

## Nos. 23-2081, 23-2302 & 23-2377

———————————

**CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC**
     **Petitioner/Cross-Respondent**

**and**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**
    **Petitioner**

**v.**

**NATIONAL LABOR RELATIONS BOARD**
     **Respondent/Cross-Petitioner**

**and**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**
    **Intervenor**

———————————

## ON PETITIONS FOR REVIEW AND
## CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

———————————

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

———————————

## STATEMENT OF JURISDICTION

This case is before the Court on the petitions of Cemex Construction

Materials Pacific, LLC ("Cemex"), and International Brotherhood of Teamsters

2

("the Union"), for review, and the cross-application of the National Labor

Relations Board ("the Board") for enforcement, of a Decision and Order issued

against Cemex on August 25, 2023, reported at 372 NLRB No. 130. The Board

had jurisdiction over the proceeding below pursuant to Section 10(a) of the

National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*, as amended ("the Act").

29 U.S.C. § 160(a). This Court has jurisdiction pursuant to Section 10(e) and (f) of

the Act. 29 U.S.C. § 160(e), (f). Venue is proper, as Cemex committed unfair

labor practices in California and Nevada. The petitions and cross-application are

timely, as the Act provides no time limit for such filings.

## STATEMENT OF THE ISSUES

1. Whether the Court has jurisdiction to entertain Cemex's meritless

challenge to the Board's administrative law judges.

2. Whether substantial evidence supports the Board's findings that Cemex

committed dozens of unfair labor practices interfering with its drivers' statutory

right to organize.

3. Whether the Board rationally dismissed or declined to address four

additional unfair-labor-practice allegations.

4. Whether the Board acted within its broad discretion by setting aside the

results of the election and ordering Cemex to bargain with the Union as a remedy

for violating Section 8(a)(5) and (1) of the Act, which turns upon:

3

a. Whether the Board rationally adopted a new framework governing the issuance of remedial bargaining orders, reasonably applied that new framework retroactively, and acted within its discretion by determining that a bargaining order is warranted on these facts.

b. Whether the Board acted within its discretion by determining, in the alternative, that a bargaining order is warranted under longstanding precedent based on the unlikelihood of a fair rerun election.

5. Whether the Board acted within its broad discretion by ordering Cemex to make a discriminatorily discharged employee whole for direct or foreseeable pecuniary harms.

6. Whether the Board acted within its broad discretion by declining to order additional remedies.

## STATUTORY ADDENDUM

Relevant statutory provisions are included in the attached addendum.

## STATEMENT OF THE CASE

### I. THE BOARD'S FINDINGS OF FACT

### A. The Union Begins Organizing Cemex's Drivers

Cemex is engaged in the production and delivery of ready-mix concrete, including from numerous facilities in Southern California and Southern Nevada.

4

(D&O.56-58; 3-UER.531.)[1]  Ready-mix concrete is loaded into trucks at Cemex's

plants before being delivered to customer jobsites by Cemex's drivers.  (D&O.56-

57; SER.25-26.)  Cemex employs approximately 366 drivers across its plants in

Southern California and Southern Nevada.  (D&O.57; SER.233.)

In 2017, the Union began organizing drivers at Cemex's plants in the

vicinity of Las Vegas, Nevada.  (D&O.58; SER.93-94.)  Several months later, after

drivers in Ventura County, California, reached out with the hope of organizing, the

Union launched a broader campaign to organize Cemex's drivers throughout

Southern California and Southern Nevada.  (D&O.2; SER.93-94.)  By mid-2018,

the Union had established an organizing committee of pro-union drivers and was

meeting with drivers at Cemex plants and customer jobsites.  (D&O.2; SER.95.)

Cemex responded with what would become a vigorous, coordinated

campaign against the Union.  (D&O.3.)  As early as August 2018, Plant Foreman

Estevan Dickson approached two drivers in the Las Vegas area and told them that

if drivers unionized then "a lot of [drivers] would get fired, hours would get cut,

[and drivers would] lose [their] vacations."  (D&O.62-63; SER.82-87.)  Dickson

further stated that drivers could be fired if they were "caught" wearing pro-union

---

[1]  For clarity and ease of reference, this brief refers to the Decision and Order
under review (1-CER.8-127, 1-UER.8-127) as "D&O" using its own internal
pagination (D&O.1-120).  References to parties' briefs and excerpts of record are
explained in the glossary to this brief.  References preceding a semicolon are to the
Board's findings; those following are to supporting evidence.

stickers.  (D&O.62-63; SER.83.)  On another occasion in late August, Dickson
approached two drivers speaking with a union organizer and instructed them not to
talk to "these union guys" and to "take those damn [pro-union] stickers" off their
hardhats or face discipline.  (D&O.64-66; SER.47-48.)  In October, Cemex hired
union-avoidance consultants and began holding group meetings with drivers
throughout the unit.  (D&O.58-59; SER.5-13.)

### B.    The Union Secures Majority Support and Files for an Election

Between October and November 2018, the Union obtained signed union-
authorization cards—designating the Union as the drivers' exclusive collective-
bargaining representative—from a majority of the drivers in the unit.  (D&O.2,
D&O.13 & n.72, D&O.112-13.)  On December 3, the Union filed a petition for a
Board-supervised representation election.  (D&O.2-3; 3-UER.499-500.)  The
Union concurrently requested voluntary recognition from Cemex, but Cemex
refused.  (D&O.12-13 & n.71, D&O.29 & n.155, ODR.4-5; 3-CER.558, 3-
UER.499.)  An election was scheduled for March 2019.  (D&O.3.)

### C.    Cemex Accelerates Its Response to the Union Campaign

In early January 2019, Dickson approached a driver in the Las Vegas area
and asked why he was wearing pro-union stickers, stating, "[I]f you want the
Union, why don't you just go to work at Nevada Ready-Mix [a rival company]?"
(D&O.66-68; SER.65-67.)  Dickson asked what the driver expected to receive

6

from the Union, and stated that if the drivers unionized Cemex was "just going to close their doors and take all their trucks to another state, because they don't want the Union." (D&O.66-68; SER.65-67.) Dickson later saw the same driver wearing pro-union stickers and repeatedly ordered that they be removed. (D&O.66-68; SER.64-65.) In subsequent weeks, Cemex managers continued instructing drivers not to wear such stickers. (D&O.63-64; SER.51-59, SER.78-79, SER.179-84.)

On January 23, Area Manager Ryan Turner confronted a driver in the Inland Empire area and, unprompted, asked, "[W]here's your 'Vote No' sticker? How come I don't see a 'Vote No' sticker on your hardhat?" (D&O.68-69; SER.28-29.) Turner offered to provide one, but the driver declined. (D&O.68-69; SER.28-29.)

On January 28, the Union's lead organizer, Scott Williams, was stationed with a pro-union driver outside a Los Angeles area plant to speak with interested drivers. (D&O.69-72; SER.161-65.) Upon seeing that Williams was present, Plant Superintendent Robert Nunez and Plant Foreman Larry Ponce parked their vehicles on either side of the road and stood nearby watching for 20-30 minutes. (D&O.69-72; SER.161-65.) Whenever drivers approached in their trucks, Nunez and Ponce conspicuously waved. (D&O.69-72; SER.161-65.)

On January 29, Cemex's vice president and general manager for its ready-mix operations in Southern California, Bryan Forgey, addressed a meeting of drivers in Ventura County with one of the union-avoidance consultants. (D&O.4-

6, D&O.73-77; SER.113-20.)  Forgey variously told the drivers that:  (i) if they unionized they would be subject to a contract containing strict job classifications limiting work opportunities; (ii) Cemex was forced to delay their normal annual wage increase in 2019 due to the Union's campaign; (iii) if they unionized, everything would be negotiable and wages could be frozen for years; (iv) if the Union called a strike, the contract would dictate that drivers' return to work would be contingent on seniority and Cemex's operations; and (v) Cemex would still have the right to convert individual plants to "satellites," which implied a loss of work for affected drivers.  (D&O.4-6, D&O.73-77; SER.113-20, SER.202-03.) Near the end of the meeting, in response to a driver's question about what Cemex had to lose if the drivers unionized, Forgey responded by asking her to consider what she had to lose by supporting the Union.  (D&O.11 n.58, D&O.74; SER.120.)

The Ventura County meeting was part of a "road show" of meetings held throughout the unit at which managers and union-avoidance consultants presented the same pre-approved material.  (D&O.4-5 & n.33, D&O.16 n.96; SER.196-201, SER.210-12, SER.217-18.)  The statement about striker recall rights, in particular, was repeated throughout the unit.  (D&O.5-6 n.33; SER.89, SER.206, SER.256.) At a meeting in the Inland Empire area, union-avoidance consultant Amed Santana told drivers that if they unionized they would be unable to achieve anything because Cemex was a multi-billion-dollar company, and that Cemex could "just

not do ready-mix anymore" and close down that part of its operations. (D&O.16 n.96, D&O.94-95; SER.174-76.) At other meetings, Forgey told drivers—contrary to state law—that their right to receive free work boots from Cemex would be up for negotiation. (D&O.95; SER.207-08.)

In early February, Plant Superintendent Jason Faulkner approached several drivers in Ventura County and told them that if the drivers unionized he would no longer be able to teach drivers new skills or help them "learn and grow" with the company. (D&O.78-79; SER.121-22.)

### D. Cemex Issues a Disciplinary Warning to Ornelas for Talking with Union Organizers

At group meetings and in one-on-one conversations, Cemex's managers and the union-avoidance consultants repeatedly told drivers throughout the unit not to talk with union organizers on "company time." (D&O.7 & n.41; 3-CER.445, SER.38, SER.143, SER.150.) In early February, Cemex enforced this rule against one of the most vocal pro-union drivers in the unit, Diana Ornelas, for talking with union organizers while waiting for her truck to be filled. (D&O.79-81; SER.16-19, SER.111-12, SER.141-45.) Cemex did not normally restrict what drivers could do while their trucks were idle. (D&O.79; SER.146-47.) Faulkner and Daryl Charlson, Cemex's director of plant and fleet maintenance, nonetheless called Ornelas into a meeting, reiterated that she was prohibited from talking with organizers on "company time" or during "work hours," and told her she was not to

speak with the organizers.  (D&O.81; SER.141-45, SER.150.)  Faulkner issued
Ornelas a "Verbal Warning" that was placed in her personnel file as a step in
Cemex's progressive discipline policy.  (D&O.81; 3-CER.445, 3-CER.454,
SER.38, SER.42-44, SER.141-45, SER.150.)

After a meeting in late February, Turner told a driver to vote against the
Union because Cemex would no longer be able to help with medical leave if the
drivers unionized.  (D&O.82-84; SER.70-72.)  Also in February, Turner promised
to grant a second driver's requested transfer in return for voting against the Union.
(D&O.84-85; SER.73-77.)  In early March, Turner told a third driver to remember
all the "favors" Turner had been doing for him by granting time off, and urged the
driver to not "forget" to vote against the Union.  (D&O.85-87; SER.29-32.)

## E. Cemex Hires Uniformed Guards in the Runup to the Election

For two weeks preceding the March election and on the day of the election,
Cemex hired uniformed guards to patrol its plants, despite not normally employing
such guards.  (D&O.87-90; SER.209.)  The guards were instructed to observe
union activity prior to the election, and on election day they delayed voters from
entering and were instructed to ask drivers if they were Cemex employees.
(D&O.90; SER.152-57, SER.166-71, SER.190-91, SER.214-15.)

### F.     The Union Narrowly Loses the Election

Following the March election, a tally of ballots showed the Union lost by a margin of 179 to 166.  (D&O.1; 3-UER.530.)  The Union filed objections alleging Cemex had engaged in coercive conduct requiring the results of the election to be set aside.  (D&O.56; SER.227-28.)

### G.     Cemex Suspends and Discharges Ornelas

The Union promptly resumed organizing Cemex's drivers following the election.  (D&O.60; SER.97-108.)  Ornelas remained a member of the organizing committee and an active leader among the drivers.  (D&O.104; SER.97-108.)

During an incident at a customer jobsite in July, Ornelas received conflicting instructions from an on-site customer official and from her manager, Plant Foreman Juan Torres, about whether to permit the customer official to inspect her Cemex vehicle.  (D&O.96-105; 3-CER.455-57, SER.123-30.)  Torres instructed Ornelas to call him back if the official returned, but Ornelas did not do so.  (D&O.96; 3-CER.455-57, SER.123-30.)  Soon after the dispute resolved itself, Ornelas called union organizer Fabian Leon to relay what had occurred.  (D&O.96; SER.148-49.)  Leon—who happened to be at the same jobsite waiting to speak with Ornelas—spoke with the customer official and revealed he worked for the Union.  (D&O.96; SER.193-94.)

11

Ornelas was summoned to a meeting with Charlson the next day, which began with him asking her if she had called in a union organizer to represent her at the jobsite. (D&O.102-03; SER.131.) Charlson complained that Cemex had been forced to reassure the customer "that [the drivers] are not represented by the Union." (D&O.99; SER.131.) Charlson told Ornelas that, as a consequence, Cemex was opening an "investigation." (D&O.102-03; SER.131.) Without asking Ornelas for her version of events, Cemex suspended Ornelas for a week without pay—ostensibly for failing to call Torres back and for being insubordinate during the meeting with Charlson. (D&O.101-02; 3-CER.446, SER.226, SER.234.)

Less than two months later, in early September, Cemex discharged Ornelas after an incident in which she and four other drivers met as a group and decided to drive empty trucks from the Oxnard plant to their assigned work location for the day at the Moorhead plant. (D&O.10, D&O.105-11; SER.132-40.) This is a common practice known in the industry as "deadheading," but on the morning in question the drivers had been instructed to arrive in their personal vehicles. (D&O.68, D&O.105-06; SER.24, SER.34-35, SER.132-40.) The other drivers each received a one-day suspension for insubordination, but Cemex discharged Ornelas for showing an "unwillingness to improve" following her July suspension. (D&O.107; 3-CER.447-53)

## II.     PROCEDURAL HISTORY

Based on charges filed by the Union, the Board's General Counsel issued an unfair-labor-practice complaint alleging Cemex violated Section 8(a)(1), (3), and (5) of the Act, 29 U.S.C. § 158(a)(1), (3), (5).  (D&O.56.)  The complaint was consolidated for hearing with the Union's election objections.  (D&O.56.)  After overseeing a 24-day hearing, an administrative law judge found Cemex committed dozens of unfair labor practices and other objectionable conduct.  (D&O.56-120.)

## III.     THE BOARD'S CONCLUSIONS AND ORDER

On August 25, 2023, the Board (Chairman McFerran, Members Wilcox and Prouty; Member Kaplan, dissenting in part) issued a Decision and Order affirming the judge in substantial part and finding that Cemex committed dozens of unfair labor practices such that the results of the March 2019 election must be set aside. (D&O.1-40.)  The Board also overruled precedent and adopted a new framework governing when an employer violates Section 8(a)(5) and (1) of the Act by refusing to bargain with a union validly designated by its employees, and when a remedial bargaining order is therefore warranted.  (D&O.20-36.)  The Board found Cemex violated Section 8(a)(5) and (1) and that a bargaining order is warranted under both the new framework and under established precedent.  (D&O.12-36.)

The Board's Order requires Cemex to cease and desist from its unfair labor practices and from, in any like or related manner, interfering with, restraining, or

13

coercing employees in the exercise of the rights guaranteed by the Act. (D&O.38.) The Board's Order further requires Cemex to: offer Ornelas reinstatement; make Ornelas whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the discrimination against her; bargain on request with the Union as the exclusive representative of the bargaining-unit drivers; post a remedial notice; and hold meetings at which the remedial notice is read aloud. (D&O.38-40.)

On November 13, 2023, the Board (Chairman McFerran, Members Wilcox and Prouty; Member Kaplan, dissenting) issued an order, reported at 372 NLRB No. 157, denying Cemex's motion for reconsideration. (ODR.1-6.)[2]

## SUMMARY OF ARGUMENT

The Board's carefully reasoned decision is supported by overwhelming evidence that Cemex engaged in a coordinated campaign to defeat unionization in a manner repeatedly crossing into unlawful coercion. Cemex committed roughly two dozen unfair labor practices prior to a March 2019 representation election— the results of which the Board reasonably set aside—after having refused to accept the Union's request to bargain as the validly designated majority representative of

---

[2]  This brief refers to the order denying reconsideration (1-CER.2-7, 1-UER.2-7) as "ODR" using its own internal pagination (ODR.1-6).

a unit of drivers. When the Union resumed organizing following the election, Cemex retaliated by suspending and discharging a leading pro-union driver.

Presented with these facts, the Board used this case as an opportunity to reexamine its approach to determining when an employer has violated the Act by refusing to bargain with a majority union absent an election, such that a remedial bargaining order is warranted. The Board identified weaknesses in its existing approach and adopted a new framework that will better advance the core statutory policies of effectuating employee choice and deterring unlawful conduct. The Board's new framework is consistent with decades of precedent from the Supreme Court, this Court, and the Board. The Board further found, in the alternative, that a bargaining order is also warranted here under different, longstanding precedent applicable when a fair rerun election is unlikely.

On review, Cemex adopts a scattershot approach aimed at confusing the issues and avoiding liability for its unlawful conduct. Cemex interjects a meritless attack on the Board's administrative law judges that this Court lacks jurisdiction to entertain. Cemex nominally challenges nearly all of the Board's unfair-labor-practice findings, but fails to rebut the Board's well-supported analysis. Cemex and Amici attack the Board's new legal framework and its application here on procedural and substantive grounds, but in doing so misrepresent the Board's decision and disregard binding precedent. Cemex also contests the Board's

15

alternative rationale for a bargaining order in this case—which is based on longstanding precedent—but fails to engage with the Board's detailed analysis. Lastly, Cemex gestures toward, but fails to support, sweeping attacks on the Board's remedial authority based on an entirely reasonable order that Cemex make an unlawfully discharged driver whole for discrimination committed against her.

Challenging the Board's Order from the other direction, the Union disputes the Board's failure to find additional unfair labor practices or to order additional remedies, but fails to show the Board acted irrationally or abused its discretion.

## ARGUMENT

## I. The Court Lacks Jurisdiction To Entertain Cemex's Meritless Challenge to the Board's Administrative Law Judges

As a threshold matter, Cemex urges the Court to deny enforcement of the Board's Order on the ground that the administrative law judge who oversaw the agency hearing enjoyed unconstitutional removal protections. (Cemex-Br.11-13.)[3] Cemex's argument fails for three reasons.

**First**, Cemex forfeited any challenge to the judge's involvement in this case by failing to raise it to the Board below. Section 10(e) of the Act dictates that "[n]o objection that has not been urged before the Board … shall be considered by the court … [absent] extraordinary circumstances." 29 U.S.C. § 160(e). The Court

---

[3] Cemex's statement of issues and argument heading mistakenly characterize its argument as implicating the judge's appointment. (Cemex-Br.1, 11.)

16

therefore lacks jurisdiction to entertain Cemex's new claim. *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1103 n.10 (9th Cir. 2008). The out-of-circuit precedent cited by Cemex (Cemex-Br.12-13) involved constitutional challenges to the Board members' own appointments. By contrast, a hypothetical defect in the judge's removability here would have no bearing on the Board's own power to act. It is well settled parties forfeit challenges to an administrative law judge's authority that they fail to raise to the reviewing agency. *E.g.*, *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 35-38 (1952); *Zumwalt v. Nat'l Steel & Shipbuilding Co.*, 796 F. App'x 930, 931-32 (9th Cir. 2019).

**Second**, even if the Court had jurisdiction to entertain such a challenge, Cemex has not attempted to make the requisite showing of harm. In *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Supreme Court clarified that, unlike defects in an officer's appointment, improper removal restrictions do not render the officer's actions void or necessarily warrant vacatur of those actions. *Id.* at 1787-89. To justify vacatur, a party must show "the unconstitutional removal provision inflicted harm." *Id.* at 1789; *accord CFPB v. CashCall, Inc.*, 35 F.4th 734, 742-43 (9th Cir. 2022). In rejecting an identical challenge to a Department of Labor administrative law judge's removal protections, this Court observed that there was "no link" between the disputed decision and the judge's removal protections. *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1136-38 (9th Cir 2021). The same is true here.

17

**Third**, Cemex's challenge is also foreclosed on the merits by this Court's opinion in *Decker Coal*, which upheld the constitutionality of the statute granting for-cause removal protections to federal administrative law judges as applied to the Department of Labor judges at issue in that case. 8 F.4th at 1129-36 (reviewing 5 U.S.C. § 7521). Much like those administrative law judges, the Board's judges perform "purely adjudicatory" functions. *Id.* at 1133. The Board may preside over evidentiary hearings and adjudicate cases without utilizing its judges. *Id.* at 1133-34; *see* 29 U.S.C. § 160(c). And the presidentially appointed Board members retain total control over agency policy-making, because they are under no obligation to defer to an administrative law judge's findings. *Cf. Decker Coal*, 8 F.4th at 1134-35. In short, there is no constitutional infirmity.

## II. Substantial Evidence Supports the Board's Findings That Cemex Committed Dozens of Unfair Labor Practices Interfering with Its Drivers' Statutory Right To Organize

### A. Cemex Repeatedly Violated Section 8(a)(1) Prior to the Election as Part of a Coordinated Anti-Union Campaign

Section 7 of the Act guarantees employees the right "to form, join, or assist labor organizations." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of those rights. 29 U.S.C. § 158(a)(1). An employer violates Section 8(a)(1) if its actions would have a reasonable tendency to coerce employees or interfere with their statutory rights. *Smithfield Packing Co.*, 344 NLRB 1, 2

(2004), *enforced*, 447 F.3d 821 (D.C. Cir. 2006).  The Court will uphold the Board's findings if supported by "substantial evidence on the record considered as a whole."  *Kava Holdings, LLC v. NLRB*, 85 F.4th 479, 486 (9th Cir. 2023).

The Board found Cemex committed roughly two dozen distinct violations of Section 8(a)(1) in the weeks and months preceding the March 2019 election. (D&O.1-10, D&O.62-111.)  On review, rather than narrowing its arguments, Cemex nominally contests nearly all of the Board's unfair-labor-practice findings. (Cemex-Br.13-37.)  However, Cemex fails to substantively address many of those findings and has thereby waived any response.  *NLRB v. Legacy Health Sys.*, 662 F.3d 1124, 1126 (9th Cir. 2011) ("[T]he Board is entitled to summary enforcement of unchallenged rulings."); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[A]rguments not raised by a party in its opening brief are deemed waived.").  As to numerous other findings, Cemex cursorily disputes the facts by citing witness testimony the Board discredited.  However, the Court affords "special deference" to Board witness credibility determinations and will not second-guess such determinations unless shown to be "inherently incredible or patently unreasonable."  *Delta Sandblasting Co. v. NLRB*, 969 F.3d 957, 963 (9th Cir. 2020).  Cemex has attempted no such showing.

Throughout its brief, Cemex also seeks to downplay the coercive impact of its actions by analyzing each of its dozens of unfair labor practices in a vacuum.

(Cemex-Br.13-37.) Cemex's arguments to this effect not only are irrelevant to its unfair-labor-practice liability, but, as discussed further below, *infra* pp.62-68, they fail to rebut the Board's careful analysis of the impact of Cemex's broader course of conduct on the prospect of a fair and free election. (D&O.11-19.)

### 1. Cemex Threatened Drivers with Job Loss and Warned Them Not To Show Support for the Union

Substantial evidence supports the Board's findings that Cemex committed five violations of Section 8(a)(1) in late August 2018 when Plant Foreman Estevan Dickson threatened that "a lot of [drivers] would get fired" or lose benefits if they unionized, warned that drivers could be fired or disciplined if they were "caught" wearing pro-union stickers, and instructed two drivers talking to a union organizer not to talk to "these union guys" and to "take those damn [pro-union] stickers" off their hardhats under threat of discipline. (D&O.3 & n.19, D&O.14, D&O.62-66.)

Cemex does not dispute that the foregoing statements violate the Act, but argues Dickson denied making the statements regarding pro-union stickers. (Cemex-Br.13-14.) However, the Board carefully weighed conflicting testimony and discredited Dickson. (D&O.62-63.) Indeed, Dickson's statements were consistent with a broader pattern of Cemex managers instructing drivers not to wear pro-union stickers. (D&O.63-64.) The fact that some drivers continued wearing pro-union stickers (Cemex-Br.14) does not render Cemex's conduct

lawful or establish drivers were not coerced into hiding their support for the Union. (D&O.64.) *Pay'n Save Corp. v. NLRB*, 641 F.2d 697, 700-02 (9th Cir. 1981).

Cemex does not substantively address and has waived any response to the Board's separate findings that Dickson unlawfully threatened drivers with job loss or adverse consequences as a result of unionization and unlawfully instructed drivers not to speak with union organizers.

### 2. Cemex Threatened To Close Its Doors and Again Warned Against Showing Support for the Union

Substantial evidence supports the Board's findings that Cemex committed four additional violations of Section 8(a)(1) in early January 2019 when Dickson confronted a driver and questioned his support for the Union, suggested that he should go work for a different company if he wanted a union, threatened that if the drivers unionized Cemex would "close [its] doors," and repeatedly instructed him to remove pro-union stickers from his hardhat. (D&O.4, D&O.14, D&O.66-68.) Cemex makes passing references to Dickson's "January 2019" unlawful statements (Cemex-Br.13-14), but does not substantively address the Board's findings and has therefore waived any response.

### 3. Cemex Coercively Interrogated a Driver About the Union

Substantial evidence supports the Board's finding that Cemex violated Section 8(a)(1) in late January when Area Manager Ryan Turner confronted a driver about not wearing a "Vote No" sticker and pressured him into revealing his

21

union sympathies. (D&O.4, D&O.68-69.) Cemex does not contest the Board's finding that this type of interrogation violates the Act, but argues Turner denied it occurred here. (Cemex-Br.14.) Once again, however, the Board carefully weighed conflicting testimony and discredited Turner, and Cemex does not call that credibility determination into question. (D&O.68-69.)

### 4. Cemex Surveilled Union Campaigning and Created the Impression It Was Monitoring Drivers' Union Activities

Substantial evidence supports the Board's findings that Cemex committed two violations of Section 8(a)(1) in late January when Plant Superintendent Robert Nunez and Plant Foreman Larry Ponce surveilled union campaigning and created an impression of surveillance. (D&O.4, D&O.69-72.) It is well established this type of out-of-the-ordinary surveillance or implied surveillance has a tendency to intimidate employees—even beyond the incident in question—by suggesting the employer is keeping tabs on union supporters. (D&O.71-72.) *Cal. Acrylic Indus., Inc. v. NLRB*, 150 F.3d 1095, 1109-1100 (9th Cir. 1998). Aside from making the unsubstantiated assertion that only a "small handful" of drivers were impacted, Cemex does not meaningfully contest the Board's findings. (Cemex-Br.15.)

### 5. Cemex Threatened Drivers with Lost Benefits and Lost Work During Meetings with Union-Avoidance Consultants

Substantial evidence supports the Board's findings that Cemex committed five violations of Section 8(a)(1) in late January when Vice President Bryan

Forgey made coercive statements at a meeting of Ventura County drivers, *supra*
pp.6-7, which echoed similar statements made to drivers throughout the bargaining
unit as part of Cemex's union-avoidance meetings. (D&O.4-6 & n.33, D&O.16
n.96, D&O.73-77.) On review, Cemex fails to rebut the Board's detailed findings
as to the five unfair-labor-practices in question. (Cemex-Br.15-21.)

**First**, Cemex ignores and has waived any response to the Board's findings
that Forgey unlawfully threatened drivers with diminished work opportunities and
unlawfully blamed the Union for delaying the drivers' 2019 wage increase.

**Second**, as to the further threat that the drivers' wages could be frozen for
years, Cemex misconstrues the Board's analysis. (Cemex-Br.17-18.) The Board
did not fault Forgey's bare statement that bargaining can take months or years.
Rather, the Board observed that Cemex had an established practice of granting an
annual wage increase. (D&O.75-76.) After blaming the Union for delaying the
2019 wage increase, Forgey wrongly implied that if the drivers unionized Cemex
could halt annual wage increases altogether unless and until a contract was reached
years later. This statement misrepresented Cemex's legal obligation to maintain its
status quo practice of granting annual wage increases and constituted an unlawful
threat. (D&O.76.) *W.E. Carlson Corp.*, 346 NLRB 431, 443 (2006).

**Third**, Cemex misrepresents the facts (Cemex-Br.18-21) in contesting the
Board's finding that Forgey unlawfully suggested drivers with less seniority would

lack recall rights in the event of a strike—an implied threat of job loss that was repeated throughout the unit (D&O.5-6, D&O.76).  Forgey himself admitted to telling drivers that, following any strike called by the Union, they "would" return to work "based on the level of [Cemex's] operations" and "by their seniority level … because the [contract] would have a seniority status."  (D&O.5, D&O.76; SER.206.)  However, striking employees are entitled to immediate reinstatement upon offering to return to work—unless, in the limited case of economic strikers, an employer proves legitimate justifications for delaying reinstatement.  *NLRB v. Murray Prods., Inc.*, 584 F.2d 934, 938-39 (9th Cir. 1978).  Moreover, employers may not forecast adverse consequences resulting from future agreements the employer itself might negotiate.  *Int'l Harvester Co.*, 258 NLRB 1162, 1162 n.3 (1981).  By misstating drivers' rights and presenting possible contract provisions as an inevitability, Forgey's statements constituted an unlawful threat.  (D&O.5-6.)

Ample evidence supports the Board's finding that the same unlawful message was communicated to drivers throughout the unit.  (D&O.4-5 & n.33.)  Cemex's own witnesses testified that the Ventura County meeting was part of a "road show" of union-avoidance meetings, and that "the content was all the same" at each.  (*E.g.*, SER.196-201, SER.210-12, SER.217-18.)  Moreover, the record confirms Cemex repeatedly misstated drivers' recall rights as part of the regular program.  (*E.g.*, SER.89, SER.206, SER.256.)  Cemex is not aided by citing a letter

sent on the eve of the election (Cemex-Br.20) warning drivers they should "worry" about strikes, making no mention of unfair-labor-practice strikers' recall rights, and stating drivers could wait "months or even years" before being reinstated (3-CER.473-74). Cemex wrongly implies drivers *denied* hearing managers misstate strikers' recall rights. (Cemex-Br.21.) In reality, Cemex chose not to cross-examine any drivers about this issue, and thus the credited evidence relied upon by the Board was uncontroverted. (D&O.84.)

**Finally**, as to Forgey's warning that Cemex could convert individual plants into "satellites" following unionization—which threatened drivers with job loss or plant closure—Cemex concedes Forgey made the statement but denies drivers would have interpreted it as a threat. (Cemex-Br.15-17.) Yet, when asked if he had threatened to close any plants, Forgey admitted telling drivers Cemex would be entitled to convert plants to "satellites" operating intermittently at Cemex's discretion. (D&O.6 & n.35; SER.202-04.) Cemex similarly admitted before the Board that a satellite plant would become "dormant" or "dark," and—as common sense would suggest—that it would be serviced by drivers from *other* plants. (D&O.6; 3-UER.375-76.) At least one driver interpreted Forgey's statements as a warning that Cemex could "legally close the plant down at any time." (D&O.6; SER.116.) Given employees' sensitivity to any veiled reference to plant closure,

*see UAW v. NLRB*, 834 F.2d 816, 820-21 (9th Cir. 1987), the Board reasonably found drivers would have been coerced here.  (D&O.6.)

### 6. Cemex Threatened Drivers with Lost Work Opportunities

Substantial evidence supports the Board's findings that Cemex committed two more violations of Section 8(a)(1) in February when Plant Superintendent Jason Faulkner told a group of drivers that if they unionized he would no longer be able to teach them new skills or help them "learn and grow" with the company. (D&O.7, D&O.78-79.)  Contrary to Cemex (Cemex-Br.22), it is well settled that an employer may not predict adverse consequences for employees unless based on objective facts beyond the employer's control.  *Exelon Generation Co.*, 347 NLRB 815, 830 (2006).  Here, as the Board found, there was no objective basis for Faulkner's coercive warning that unionization might require Cemex to adopt strict job classifications limiting drivers' work opportunities.  (D&O.79.)

### 7. Cemex Promulgated an Overbroad Rule Against Talking with Organizers and Disciplined Ornelas for Violating It

Substantial evidence supports the Board's findings that Cemex committed four violations of Section 8(a)(1) by promulgating an overbroad rule throughout the unit prohibiting drivers from talking to union organizers on "company time," and by enforcing that rule against driver Diana Ornelas in February, making coercive statements to her, and issuing her an unlawful disciplinary warning for

talking with organizers while waiting for her truck to be filled. (D&O.7, D&O.79-81.) *NLRB v. Chicago Metallic Corp.*, 794 F.2d 527, 533-34 (9th Cir. 1986).

Cemex first attempts to evade liability for its unlawful conduct by asserting that the rule and its enforcement against Ornelas were not challenged in a timely unfair-labor-practice charge. (Cemex-Br.22-23.) However, the Union's charge in Case 31-CA-238240—filed less than three weeks after Ornelas's discipline and well within the six-month statutory period—alleged that Cemex had engaged in a widespread pattern of coercing drivers and discriminating against their union activities. (D&O.81; 3-CER.426.) Unfair-labor-practice charges are not subject to the pleading requirements of a lawsuit, and generalized allegations "may later be supplemented or amplified by more specific allegations which 'relate back' to the date the charge was filed." *NLRB v. Carilli*, 648 F.2d 1206, 1210 (9th Cir. 1981).

As to the merits, Cemex denies its managers used the overbroad phrase "company time" in restricting discussions with union representatives. (Cemex-Br.23-24.) But all of the contemporaneous evidence and credited testimony supports the Board's contrary finding. (D&O.7; 3-CER.445, SER.143, SER.150.) The Board specifically discredited Faulkner and manager Daryl Charlson's post hoc claims that they used the phrase "working time" when disciplining Ornelas, and Cemex has not called those credibility findings into question. (D&O.7 n.40, D&O.13, D&O.81.) Moreover, Cemex does not otherwise contest that Faulkner

27

and Charlson unlawfully disciplined Ornelas for talking with union organizers while waiting for her truck to be filled—when she was not on "working time," and when Cemex did not normally restrict drivers' actions.  (D&O.79-81.)

Cemex fares no better disputing the Board's finding that the overbroad rule was widely communicated to drivers.  (Cemex-Br.23-24.)  Contrary to Cemex, the Board's finding is supported by Ornelas's credited testimony about what Plant Foreman Juan Torres told her (SER.143), Charlson's inadvertent admission against Cemex's interests (SER.38), and a contemporaneous *written* account by Faulkner (3-CER.445).  (D&O.7-8 & n.41.)  Cemex's assertion that the Board relied on testimony the judge "failed to credit" (Cemex-Br.23-24) is thus baseless.  And as with previous issues, Cemex had an equal opportunity to examine witnesses about this issue and failed to elicit any credible, contradictory testimony.  (D&O.84.)

### 8.    Cemex Coerced Drivers into Voting Against the Union

Substantial evidence supports the Board's findings that Cemex committed three violations of Section 8(a)(1) between late February and early March when Turner threatened to discontinue favors granted to drivers and promised a driver a transfer for voting against the Union.  (D&O.8, D&O.82-87.)  Cemex does not contest the Board's findings that these statements constitute textbook coercion, but argues that Turner denied any of the incidents occurred.  (Cemex-Br.24.)  The

Board reasonably discredited Turner, however, and Cemex does not call that credibility finding into question. (D&O.82-87.)

### 9. Cemex Intimidated Drivers by Hiring Uniformed Guards To Patrol Its Facilities During the Runup to the Election

Substantial evidence supports the Board's finding that Cemex violated Section 8(a)(1) by hiring uniformed guards to patrol its plants for two weeks preceding the election and on the day of the election itself. (D&O.9, D&O.87-91.) As the Board found, Cemex was unable to present a credible justification for its unprecedented decision to post guards throughout the bargaining unit. (D&O.87-90.) The Board and courts have consistently recognized the coercive impact this type of gratuitous show of force tends to have on employees in the runup to an election. *E.g.*, *Beverly Cal. Corp.*, 326 NLRB 232 (1998), *enforced in relevant part*, 227 F.3d 817, 843 (7th Cir. 2000); *Marine Welding & Repair Works, Inc.*, 174 NLRB 661, 670-71 (1969), *enforced*, 439 F.2d 395, 398 (8th Cir. 1971).

On review, Cemex first insists that the Board's finding must be set aside because the complaint alleged a narrower violation. (Cemex-Br.25-27.) However, the Board may find unalleged violations if they are closely connected to complaint allegations and if they were fully litigated. *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 790 (9th Cir. 2017); *Pergament United Sales*, 296 NLRB 333, 334 (1989), *enforced*, 920 F.2d 130 (2d Cir. 1990). The finding that Cemex intimidated drivers by hiring guards for two weeks preceding the election was a

29

direct extension of the complaint allegations that the abnormal presence of guards on election day coerced and "intimidated" voters. (D&O.9; 3-CER.416 ¶¶5(t)-(v).) Moreover, the Union argued as part of its election objections that the presence of the guards for the entire pre-election period was coercive (SER.228), and that issue was litigated by Cemex at the consolidated hearing. (D&O.9, D&O.87-89.)[4]

As to the merits, Cemex disregards the Board's detailed findings. (Cemex-Br.27-30.) The Board discredited inconsistent and uncorroborated testimony from Cemex's managers as to the reason for hiring guards, and Cemex does not call those credibility determinations into question. (D&O.87-90.) In an attempt to distinguish cases cited by the Board, Cemex also makes several misstatements of fact. (Cemex-Br.28-29.) Contrary to Cemex, the guards patrolled between plants to monitor union activity (SER.20-22, SER.172), the guards wore uniforms and drove marked cars (SER.49, SER.60), at least two guards were accompanied by a dog (SER.186-87), and on election day the guards delayed drivers from entering plants and were instructed to stop drivers and ask if they were Cemex employees (SER.152-57, SER.166-71, SER.190-91, SER.214-15).

---

[4] Cemex cites inapposite precedent regarding the General Counsel's right to control the complaint. (Cemex-Br.26.) The purpose of the *Pergament* test is to determine whether the Board may exercise its own authority to find *unalleged* violations that were litigated without attempted amendment to the complaint. *United Nurses*, 871 F.3d at 790.

Moreover, none of the factual distinctions Cemex attempts to draw are controlling.  The Board, with this Court's approval, has found the mere presence of guards can have a tendency to coerce employees when there is no legitimate reason for their presence other than a "show of force" in response to a union campaign. *Wismettac Asian Foods, Inc.*, 370 NLRB No. 35, slip op. at 51, 2020 WL 6077570 (Oct. 14, 2020), *affirmed*, No. 20-73768, 2022 WL 313776, at *2 (9th Cir. Feb. 2, 2022).  In *Quest International*, 338 NLRB 856 (2003), cited by Cemex (Cemex-Br.29-30), the Board merely found there were insufficient grounds for setting aside an election where, unlike here, the outcome "was not close" and the presence of a guard was the only conduct alleged to be objectionable.  *Id.* at 857.

## B.  After Organizing Resumed, Cemex Violated Section 8(a)(3) and (1) by Discriminatorily Suspending and Discharging Ornelas

Section 8(a)(3) of the Act prohibits employers from discriminating against employees to discourage unionization.  29 U.S.C. § 158(a)(3).  An employer violates Section 8(a)(3)—and, derivatively, Section 8(a)(1)—by disciplining an employee for engaging in union activities.  *United Nurses*, 871 F.3d at 778-79.  If an employer's motive is in dispute, the Board applies its *Wright Line* framework. *Id.* (citing *Wright Line*, 251 NLRB 1083 (1980), *enforced on other grounds*, 662 F.2d 899 (1st Cir. 1981)).  Under *Wright Line*, a violation is established once the Board finds an employee's union activities were at least *a* motivating factor in the discipline.  *United Nurses*, 871 F.3d at 778.  Once the Board finds an unlawful

motive contributed to a decision, the employer may only avoid an unfair-labor-practice finding by proving, as an affirmative defense, that it would have taken the same action even in the absence of the employee's protected activities. *Id.* at 779.

### 1. Cemex Discriminatorily Suspended Ornelas and Made Coercive Statements

In July, after the Union had resumed its campaign to organize the drivers, Cemex launched an investigation into Ornelas and suspended her for a week without pay following an incident at a customer jobsite that left Cemex with the impression Ornelas had called a union organizer to assist her. Substantial evidence supports the Board's well-reasoned application of *Wright Line* to find that Ornelas's suspension violated Section 8(a)(3) and (1). (D&O.10, D&O.96-105.)

**First**, the record amply supports the Board's finding that Ornelas's union activities were a motivating factor in her suspension. (D&O.103-04.) Ornelas was a member of the organizing committee and one of the most vocal pro-union drivers both before and after the election. (D&O.15, D&O.103-04.) Cemex managers were well aware of her union activities. (D&O.104.) Indeed, as discussed, *supra* pp.25-27, Cemex had already targeted Ornelas by issuing her an unlawful disciplinary warning in February for talking with union organizers.

Moreover, Ornelas engaged in protected union activity during the very incident in question by seeking a union organizer's assistance after the dispute at the customer jobsite. (D&O.10 & n.50, D&O.103.) Upon calling Ornelas into a

meeting the next day, Charlson demanded to know whether Ornelas had called a union organizer to assist her, complained that Cemex had been forced to reassure the customer its drivers were non-union, and suggested that Cemex needed to open an investigation as a result. (D&O.99-103.) Indeed, the Board found Charlson's remarks constituted independent violations of Section 8(a)(1), and Cemex failed to challenge those findings below. (D&O.10 & n.52, D&O.102-03.) Based on this and other evidence of Cemex's considerable animus toward the union campaign, the Board reasonably inferred that Ornelas's union activities were a motivating factor in her suspension. (D&O.104.) *Kava Holdings*, 85 F.4th at 487. Cemex does not meaningfully challenge that finding.

**Second**, the Board reasonably rejected Cemex's attempt to establish an affirmative defense under *Wright Line*. (D&O.10, D&O.104-05.) The Board identified multiple grounds for rejecting Cemex's defense.

As an initial matter, Cemex is foreclosed as a matter of law from carrying its defense burden, because Ornelas's suspension was based, in part, on the unlawful warning issued to her in February. (D&O.10.) It is well settled that a disciplinary action is unlawful if it was influenced by a prior unlawful discipline. *Dynamics Corp.*, 296 NLRB 1252, 1254 (1989), *enforced*, 928 F.2d 609 (2d Cir. 1991). As the Board found here, Cemex maintained a formal progressive discipline policy. (D&O.8; 3-CER.446, 3-CER.464, SER.23, SER.45, SER.221.) Cemex conceded

33

before the Board that Ornelas was only issued a suspension because it was "the next step in [the] progressive disciplinary policy." (D&O.10; 3-UER.401.) Cemex again concedes on review that Ornelas was suspended pursuant to its normal "progressive discipline process." (Cemex-Br.31.) And for the year 2019, the record shows that Ornelas received the unlawful verbal warning in February, a written warning for an unrelated incident in June, and then the unlawful suspension in July. (3-CER.446, 3-CER.454, 3-CER.464.)[5]

Cemex now argues that the February warning did not constitute a formal "verbal warning" for purposes of the progressive discipline policy (Cemex-Br.33), but it was labeled as such at the time and all of the record evidence confirms the Board's contrary finding. (D&O.8: 3-CER.445, 3-CER.454, SER.38, SER.42-44, SER.145.) Cemex claims Ornelas engaged in "other misconduct" (Cemex-Br.33-34), but none of the cited incidents resulted in documented disciplinary actions in 2019. In short, Cemex failed to carry *its* defense burden of proving the suspension was not influenced by the unlawful warning. *Dynamics Corp.*, 296 NLRB at 1254.

In any event, as the Board further found, Cemex's stated reasons for suspending Ornelas were pretextual. (D&O.104-05.) Cemex was unable to offer a credible explanation for why it decided to investigate Ornelas in the first place, as

---

[5] Ornelas also received a warning for an attendance infraction, but Cemex maintained a "separate track[]" for attendance discipline. (SER.223.)

there is no evidence the customer complained about her interaction with the on-site officials.  (D&O.104.)  To the contrary, the evidence suggests Cemex began investigating her because the customer complained about the presence of a union organizer.  (D&O.104.)  As the Board detailed, Cemex then performed a sham investigation designed to find justifications for issuing discipline.  (D&O.105.)  And when Cemex's managers were asked at the hearing to explain why they suspended Ornelas, they offered shifting explanations and did not even mention one of the two bases for the suspension identified in the disciplinary notice.  (D&O.105; 3-CER.446, SER.224-25.)  Cemex's assertion that manager Iris Plascencia "played no direct role" in the suspension (Cemex-Br.32) is baseless: she conducted the purported investigation leading to the suspension.  (D&O.101.)

### 2. Cemex Discriminatorily Discharged Ornelas

Less than two months later, in early September, Cemex discharged Ornelas after an incident in which she and four other drivers met as a group and decided to drive empty trucks from their home plant to a different plant they were assigned to for the day.  Although this is a common practice known as "deadheading," the drivers acted insubordinately on the day in question because they had been instructed to arrive in their personal vehicles.  (D&O.68, D&O.105-06.)  There is

no evidence their actions caused serious harm.[6]  Each of the other drivers received a one-day suspension, but Cemex discharged Ornelas for an alleged "unwillingness to improve" following her July suspension.  (D&O.107; 3-CER.447.)  Substantial evidence supports the Board's application of *Wright Line* to find Ornelas's discharge violated Section 8(a)(3) and (1).  (D&O.10, D&O.105-11.)

**First**, Ornelas's union activities were a motivating factor in her discharge.  (D&O.107.)  For the reasons discussed above, *supra* pp.31-32, the Board properly inferred an unlawful motive given Cemex's knowledge of Ornelas's union activities and its substantial animus toward those activities and toward the union campaign.  (D&O.103-04.)  Illustrating its cavalier attitude toward the facts, Cemex now suggests "organizing activity had ended" as of the election.  (Cemex-Br.37.)  But as Cemex is aware, the Union remained active and Ornelas remained a leader in the campaign.  Indeed, on the very morning of her discharge, Faulkner observed Ornelas talking with union organizers outside the plant.  (D&O.107.)

**Second**, the Board reasonably rejected Cemex's attempted *Wright Line* defense.  (D&O.10, D&O.107-11.)  As with the unlawful suspension in July, any such defense is foreclosed as a matter of law by Cemex's reliance on the prior unlawful disciplinary actions.  Cemex concedes Ornelas's discharge was issued

---

[6]  Cemex claims the drivers acted in "defiance" of a local ordinance limiting truck operations.  (Cemex-Br.35.)  In fact, the drivers conscientiously complied with the ordinance by waiting to enter a restricted road.  (D&O.106; SER.136-37.)

pursuant to its progressive discipline policy. (Cemex-Br.34-36.) The discharge notice explicitly referenced the July suspension and Ornelas's "performance record"—as did Forgey in testifying about why he decided to discharge Ornelas. (D&O.106-07; 3-ER-447, SER.14-15.) As discussed, *supra* pp.32-33, if either the February warning or the July suspension was unlawful, then so was the discharge.

In any event, the Board also found Cemex offered pretextual explanations for Ornelas's discharge and was unable to credibly justify its decision. (D&O.108-11.) Cemex asserts Ornelas was discharged pursuant to "Company policy" for the deadheading incident. (Cemex-Br.35.) But Cemex fails to address the Board's discussion of the egregious disparate treatment in this case: none of the other drivers were discharged for engaging in the exact same conduct alongside Ornelas, including at least one driver with a comparable disciplinary record to Ornelas, and a second driver who then repeated the same conduct six weeks later and still was not discharged. (D&O.108.)

Cemex also doubles down on its post hoc attempt to manufacture grounds for Ornelas's discharge by alluding to incidents that did not result in discipline and that were not mentioned at the time of the discharge—thereby evidencing pretext. (D&O.108-11.) For example, Cemex misleadingly states Ornelas "backed her mixer truck into the Oxnard batch office" in mid-August. (Cemex-Br.34-35.) In reality, Ornelas "scraped" her tire on a steel beam near the corner of a building, in

part due to poor visibility in Cemex's parking lot. (D&O.109; 3-CER.469-71.)
The impact was minimal enough that Ornelas did not even notice it, and the
"damage" in question (Cemex-Br.34-35) constituted minor scuff marks on the tire
and steel beam. (D&O.109; 3-CER.469.) There is no contemporaneous evidence
discipline was even considered. As the Board found, Cemex's citation to this
incident merely underscores its inability to establish a valid *Wright Line* defense.
(D&O.109-11.)

## III.    The Board Rationally Dismissed or Declined To Address Four
Additional Unfair-Labor-Practice Allegations

The Union challenges the Board's decision from the other direction and
asserts the Board erred by failing to find four additional violations. (Union-Br.11-
21.) The Board's decision not to find a violation is entitled to "considerable
deference as long as it is rational and consistent with [the Act]." *IBEW, Local 21
v. NLRB*, 563 F.3d 418, 422 (9th Cir. 2009).

**First**, the Union takes issue (Union-Br.12-14) with the judge's factual
findings in dismissing an allegation that Area Manager Ryan Turner unlawfully
insinuated employees would receive new trucks for voting against unionization.
(D&O.85.) However, the Board found it unnecessary to address the judge's
analysis on this point, because a finding that Cemex made additional unlawful
promises of benefits would not affect the remedy. (D&O.8 n.46.) The Board's
Order already requires Cemex to cease and desist from promising benefits to

employees for opposing unionization, and to post and have read aloud at mandatory meetings a remedial notice advising employees it will cease making such promises.  (D&O.38 ¶1(n), ¶2(h), ¶2(i), D&O.55.)

**Second**, the Union similarly contends (Union-Br.14-17) the Board should have found unalleged violations based on evidence Cemex communicated unlawful promises of benefits to employees on the eve of the election in so-called "25th hour" videos.  (D&O.59-60 & n.5.)  For the reasons just discussed, however, the Board again found it unnecessary to address whether these videos violated the Act, as a finding Cemex made additional unlawful promises of benefits would not affect the remedy.  (D&O.10 n.49.)

**Third**, the Union argues the Board should have overruled a line of precedent dating back to *Babcock & Wilcox Co.*, 77 NLRB 577 (1948), to find Cemex violated the Act by requiring employees to attend "captive audience" meetings prior to the election.  (Union-Br.7.)  As the Board observed, however, this issue was not fully litigated, and there is insufficient evidence Cemex *required* employees to attend meetings.  (D&O.3 n.15.)  The Union merely cites testimony that Cemex "scheduled" meetings with the goal of reaching as many employees as possible.  (3-UER.453.)

**Fourth**, the Union challenges the Board's decision to dismiss allegations that Vice President Bryan Forgey made additional unlawful statements.  (Union-

Br.20-21.)  However, the Union does not dispute the Board's conclusion that Forgey's statements are lawful under *Tri-Cast, Inc.*, 274 NLRB 377 (1985), which holds that employers may forecast the employer-employee relationship will change following unionization.  (D&O.6-7.)  Instead, the Union argues the Board should have overruled *Tri-Cast*.  (Union Br.20.)  But this Court has upheld related Board precedent as reflecting a permissible construction of the Act.  *NLRB v. Best Prods. Co.*, 765 F.2d 903, 912 (9th Cir. 1985).

## IV.  Cemex Violated Section 8(a)(5) and (1) of the Act by Refusing To Bargain with the Union as the Drivers' Majority Representative Prior to an Election Invalidated by Cemex's Unlawful Conduct, and the Board Did Not Abuse Its Discretion by Issuing a Bargaining Order

Section 7 of the Act grants employees the right "to bargain collectively through representatives of their own choosing."  29 U.S.C. § 157.  Section 9(a) specifies that a union "designated or selected" by a majority of employees in an appropriate unit shall be their exclusive representative. 29 U.S.C. § 159(a). Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively" with its employees' representative.  29 U.S.C. § 158(a)(5).

From the earliest years of the Act, it has been understood that employees may designate a union as their representative under Section 9(a) without invoking the election procedures outlined in Section 9(c), 29 U.S.C. § 159(c); *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 595-600 (1969).  A union "certified" by the Board following an election enjoys significant advantages under the law, but an

employer may be obligated to bargain with a validly designated union regardless of whether it has won an election. *Id.* at 598-99 & n.14. Thus, the Board may find an employer has violated the Act through its refusal to bargain with a union based on nonelection evidence of the union's majority status, including valid authorization cards signed by the majority of employees in an appropriate unit. *Id.* at 595-609.[7]

Section 10(c) of the Act, in turn, grants the Board "broad discretionary" authority to remedy unfair labor practices by ordering "such affirmative action … as will effectuate the policies of this Act," which often includes requiring an employer to bargain with its employees' union. *Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 215-16 (1964) (citing 29 U.S.C. § 160(c)). The Board's choice of remedies must stand unless shown to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.*; *see NLRB v. Ampersand Publ'g LLC*, 43 F.4th 1233, 1233-37 (9th Cir. 2022) (reviewing Board's "exceedingly broad" remedial authority for a "clear abuse of discretion"). The Supreme Court has placed beyond dispute the Board's authority to issue orders requiring an employer to bargain with a union—even if the union was never certified through an election, and even if the union lost majority support due to unlawful coercion or delay. *Gissel*, 395 U.S. at 597; *Franks Bros. Co. v.*

---

[7] Any violation of Section 8(a)(5) results in a derivative violation of Section 8(a)(1). *Kava Holdings*, 85 F.4th at 485 n.3.

41

*NLRB*, 321 U.S. 702, 704 (1944); *NLRB v. P. Lorillard Co.*, 314 U.S. 512, 512-13 (1942); *Sakrete of N. Cal., Inc. v. NLRB*, 332 F.2d 902, 908-10 (9th Cir. 1964).

As outlined below, the Board over time has adjusted its approach to determining when an employer's refusal to recognize and bargain with a validly designated majority union violates Section 8(a)(5) and (1) in the absence of an election, and when a remedial bargaining order is thereby warranted. In the decision under review, the Board overruled precedent and announced a new framework. The Board shifted its focus toward ensuring "free, fair, and timely" elections and disincentivizing unfair labor practices when there is valid, nonelection evidence of a union's majority status. (D&O.25-29.) The Board applied its new framework here to find that a bargaining order is warranted based on Cemex's extensive unfair labor practices—which require the results of the March 2019 election to be set aside—and the Union's uncontested showing of prior majority support. (D&O.29.) The Board also found, in the alternative, that a bargaining order is warranted under established precedent applicable when a fair rerun election has been rendered unlikely. (D&O.12-19.)

## A.    The Board's Historical Approaches

In *Joy Silk Mills, Inc.*, 85 NLRB 1263 (1949), *enforced*, 185 F.2d 732 (D.C. Cir. 1950), the Board formalized its developing precedent regarding the standard for when to issue remedial bargaining orders. The Board held that an employer

presented with a request for recognition by a union possessing authorization cards

showing majority support could not lawfully refuse to recognize the union or insist

on an election—unless the Board found the employer was insisting on an election

based on "good-faith doubt" as to the union's status. *Id.* at 1264-65. In *Joy Silk*

itself, the Board found any claim of good-faith doubt foreclosed by the employer's

unfair labor practices. *Id.* As a result, the Board found that the employer had no

right to insist on an election, that its initial refusal to bargain constituted a violation

of Section 8(a)(5), and that the appropriate remedy was a bargaining order. *Id.*

The Board's *Joy Silk* framework was uniformly affirmed by the courts of

appeals. (D&O.22 n.121.) For nearly two decades, this Court enforced bargaining

orders where a union's initial majority status was shown through authorization

cards and where an employer exhibited bad faith through unfair labor practices or

other conduct. *E.g.*, *Master Parts, Inc. v. NLRB*, 373 F.2d 402, 402-03 (9th Cir.

1967); *NLRB v. Geigy Co.*, 211 F.2d 553, 556-59 (9th Cir. 1954). As the Court

observed, a bargaining order predicated on majority support at the time of the

initial refusal to bargain was an appropriate remedy, because an employer

unlawfully refusing to accept a proffered showing of majority support would

otherwise "gain time in which to undermine the union and vitiate its majority."

*NLRB v. W.T. Grant Co.*, 199 F.2d 711, 712 (9th Cir. 1952). By the mid-1960s,

however, the Board began to modify its approach by shifting the focus toward

whether there were unfair labor practices that would "dissipate union support" and interfere with the viability of a future election. (D&O.22-24.)

In *Gissel*, the Supreme Court granted certiorari to resolve a circuit split arising from the Fourth Circuit's position that authorization cards were no longer a valid basis for establishing a union's majority status. 395 U.S. at 579-90. The Court decisively rejected such view, but the Board announced during the litigation that it was abandoning its *Joy Silk* standard and any focus on an employer's good-faith doubt. *Id.* at 592-94. The Board explained that its new approach focused instead on whether an employer's unlawful conduct would "tend to preclude the holding of a fair election." *Id.* Without addressing the validity of alternative approaches, the Court upheld the Board's chosen approach as a permissible exercise of its discretion. *Id.* at 612-15 & n.32.

In a subsequent decision, *Linden Lumber*, 190 NLRB 718 (1971), the Board formalized the policy change announced during the litigation in *Gissel* and abandoned its good-faith-doubt standard, thereby shifting the focus exclusively toward whether a fair election could be held in the future. *Id.* at 719-21. The Board held that an employer would not be found to violate Section 8(a)(5) "solely upon the basis of its refusal to accept evidence of majority status other than the results of a Board election." *Id.* Accordingly, the Board further held that when confronted with a union's request for recognition, an employer had no obligation to

file an election petition but could simply ignore the request or wait for the union to file a petition. *Id.*[8] This latter issue was taken up to the Supreme Court, which held, in a 5-4 decision, that the Board's new rule was not "arbitrary and capricious." *Linden Lumber v. NLRB*, 419 U.S. 301, 309-10 (1974).

**B.    The Board Rationally Adopted a New Framework Governing the Issuance of Remedial Bargaining Orders, Which It Applied Here To Find That Cemex's Conduct Warrants a Bargaining Order**

The Board bears "primary responsibility for developing and applying national labor policy." *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990). Standards formulated by the Board "to fill the interstices of [the Act's] broad statutory provisions" are therefore entitled to "considerable deference," even if they represent a departure from prior policy. *Id.* at 786-87. The Court will defer to the Board's chosen standards as long as they are "rational" and consistent with the Act. *Glendale Assocs. Ltd. v. NLRB*, 347 F.3d 1145, 1150-51 (9th Cir. 2003).

**1.    The Board's New Framework Will Better Effectuate the Policies of the Act**

After careful consideration, the Board determined that its existing approach to finding that an employer has unlawfully refused to recognize and bargain with a validly designated union—and to remedy such violation by issuing a bargaining order—has not fulfilled the Act's fundamental goal of safeguarding employees'

---

[8] The Act permits election petitions to be filed by both unions, 29 U.S.C. § 159(c)(1)(A), and employers, 29 U.S.C. § 159(c)(1)(B).  (D&O.20 n.113.)

45

rights to organize and bargain collectively through representatives of their own choosing. (D&O.25-29.) *See* 29 U.S.C. § 151. Accordingly, the Board overruled its decision in *Linden Lumber* and adopted a new approach. (D&O.25.)

Under the Board's new framework, and consistent with bedrock principles in the Act, an employer violates Section 8(a)(5) and (1) by refusing to bargain with a validly designated union requesting recognition on behalf of employees in an appropriate unit—unless the employer chooses to test the union's majority status in a Board-supervised election by promptly filing an election petition. (D&O.25-26.) However, if the employer then engages in unlawful conduct requiring the election to be set aside—or simply refuses to file an election petition—the Board will issue a bargaining order when there is nonelection proof of the union's majority status at the time it requested recognition. (D&O.26 & n.141.) As the Board explained, this framework will better effectuate the policies of the Act. (D&O.25-36.)

**First**, the new framework ensures that employees are able to designate a representative in a timely manner to bargain on their behalf. (D&O.26-27.) It thereby minimizes the deleterious effects of delay that result from permitting an employer to both reject an initial claim of majority support and then engage in unlawful conduct undermining an election. As this Court has recognized—and as many employers are undoubtedly aware—delaying recognition and bargaining for as long as possible tends to weaken support for the union as employees become

46

disillusioned and "the spark to organize is extinguished." *Small v. Avanti Health Sys. LLC*, 661 F.3d 1180, 1192-93 (9th Cir. 2011); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1362-63 (9th Cir. 2011); *see Gissel*, 395 U.S. at 610 & n.30; *Franks Bros.*, 321 U.S. at 704 (affirming that delay "disrupts employees' morale, deters their organizational activities, and discourages their membership in unions").

If an employer is permitted to delay confirmation of the majority status of its employees' designated union by engaging in unlawful conduct, the practical effect is often to "frustrate the employees' will." *NLRB v. CAM Indus., Inc.*, 666 F.2d 411, 413 (9th Cir. 1982); *see NLRB v. L.B. Foster Co.*, 418 F.2d 1, 4-5 (9th Cir. 1969) (discussing "attrition in union support inevitably springing from delay"); *W.T. Grant*, 199 F.2d at 712 (affirming necessity of *Joy Silk* bargaining orders to prevent employers from profiting by delay). Based on its decades of experience administering the Act, the Board has now expressed serious doubts that a rerun election—typically following prolonged litigation—"can ever be a truly adequate remedy" where an employer has sabotaged an initial, timely opportunity to confirm in an election that a majority of its employees have designated a union to serve as their collective-bargaining representative. (D&O.26.) As the Board emphasized, "[r]epresentation delayed is often representation denied." (D&O.27.)

**Second**, the new framework addresses a significant weakness in the Board's existing approach by disincentivizing unfair labor practices and better protecting

the integrity of an *initial* election.  (D&O.27-29.)  Decades of experience have

again shown that the Board's choice to focus its remedial inquiry on whether a

future rerun election can be fairly held "has not served as an adequate deterrent to

employer unfair labor practices during the [initial] election period."  (D&O.28.)

To the contrary, employers are incentivized to commit unfair labor practices in an

election they expect a union to win.  An employer will generally face improved

odds in a rerun election due to the delay and coercion caused by its own unfair

labor practices, which can irreparably harm an organizing drive.  (D&O.28 &

n.152.)  For employers set on opposing unionization, the benefits easily outweigh

the risk of a bargaining order under the Board's existing approach, since such risk

diminishes over time while the unfair labor practices are litigated.  (D&O.27-29.)

Here, for example, Cemex committed dozens of unfair labor practices predictably

resulting in prolonged litigation, and it now argues that a bargaining order is

"unenforceable" due to the passage of time and changed circumstances (Cemex-

Br.45-48).  (D&O.27 n.146, ODR.4 n.19.)

Indeed, as illustrated by the decision Cemex cites (Cemex-Br.46-47), the

Board itself has sometimes been reticent to issue bargaining orders it might

otherwise consider warranted out of concern the orders will be denied enforcement

due to the passage of time, thus causing further delay.  *Cooper Indus., Inc.*,

328 NLRB 145, 146 (1999), *affirmed*, 8 F. App'x 610 (9th Cir. 2001).  This state

of affairs has undermined the Board's and the Supreme Court's originally stated goals of "effectuating ascertainable employee free choice" and "deterring employer misbehavior," *Gissel*, 395 U.S. at 614, and is a consequence of the Board's choice to focus on the viability of future elections. (D&O.27-29, D&O.34-35.) *Cf. Lorillard*, 314 U.S. at 513 (holding Board not required to hold new election despite "lapse in time and changed conditions"). The Board's new framework corrects this weakness by ensuring that unfair labor practices prior to an initial election are "counterproductive for the employer," and that "[an] employer who commits unlawful conduct to dissipate support for a union that had already been designated by employees as their representative gains no ultimate advantage." (D&O.29.)

**Third**, the new framework addresses additional shortcomings in previous Board precedent by eliminating any inquiry into an employer's subjective "good-faith doubt" and by guaranteeing employers the opportunity to obtain a Board-supervised election. (D&O.29.) Under the *Joy Silk* standard—consistently affirmed by this Court as a permissible construction of the Act—the Board went much further than it does now and held that an employer had no right to insist on an election if the Board found the employer lacked good-faith doubt about a union's majority status. *NLRB v. Trimfit of Cal.*, 211 F.2d 206, 209 (9th Cir. 1954). By contrast, the Board's new framework reaffirms and directly promotes

the longstanding principle that a Board-supervised election is the "preferred" method for determining a union's status.  (D&O.28 & n.152, D&O.33-34.)

### 2.    Cemex Has Not Shown the Board's New Framework Is Irrational or Inconsistent with the Act

On review, Cemex and Amici raise a number of challenges to the Board's new framework, each of which is unavailing—particularly as applied to the facts of the present case and the Order before the Court.

**First**, Cemex attempts to invoke the "major questions doctrine" (Cemex-Br.50-52) applied by the Supreme Court in a handful of extraordinary cases to scrutinize agency actions "of vast economic and political significance." *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).  As the Board explained, the major-questions doctrine is plainly inapposite here.  (ODR.2-3.)  The Board's modification of its standard for determining when to issue remedial bargaining orders—in line with past Board precedent and principles repeatedly affirmed by the Supreme Court and this Court—is hardly the type of "enormous and transformative expansion in … regulatory authority" necessary to trigger that doctrine.  *Util. Air*, 573 U.S. at 324.  Even if the doctrine were apposite, the new

50

framework fits squarely within the Board's express statutory authority and the

congressionally prescribed policies of the Act.  (ODR.2.)[9]

**Second**, Cemex seeks to relitigate long-settled law by insisting the Board

was required to announce its new framework through rulemaking rather than

adjudication.  (Cemex-Br.52-54.)  However, it is well established that "the Board

is not precluded from announcing new principles in an adjudicative proceeding,"

and that "the choice between rulemaking and adjudication lies in the first instance

within the Board's discretion."  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293-94

(1974); *NLRB v. St. Francis Hosp. of Lynwood*, 601 F.2d 404, 414 (9th Cir. 1979).

As the Board explained, adjudication was "especially appropriate" here.

(ODR.3-4 & n.19.)  The Board's new framework ultimately turns on "individual,

case-specific determinations," and its contours will be refined over time through

the evolutionary process of adjudication.  (ODR.3-4.)  The issue would not be as

amenable to rigid rulemaking.  Indeed, the Supreme Court has approved the

---

[9]  Cemex is not aided by invoking congressional acquiescence.  (Cemex-Br.51.)
The 1974 amendments extending the Act's coverage to nonprofit hospitals bore no
relation to the issues presented here.  By contrast, in 1947 Congress specifically
considered and declined to alter the Board's longstanding practice of ordering
employers to bargain with non-certified unions.  *Gissel*, 395 U.S. at 595-600.
Amici's citation to Section 8(b)(7)(C), 29 U.S.C. § 158(b)(7)(C), is equally
unhelpful.  (Contractors-Br.21.)  That provision underscores Congress's intent to
grant additional protections to certified unions without making certification
mandatory.  (D&O.25 n.140.)  *Gissel*, 395 U.S. at 599 n.14.  Nor does the new
framework resemble legislation that would require the Board to certify unions
based on authorization cards.  (Contractors-Br.22-24.)

Board's practice of modifying its approach in this area through adjudication—including when adopting the standard Cemex now insists the Board must readopt. *Linden Lumber*, 419 U.S. at 304-10; *Gissel*, 395 U.S. at 592-94; *see also U.S. Ecology, Inc. v. NLRB*, 772 F.2d 1478, 1482 (9th Cir. 1985) (holding Board "unquestion[ably]" has authority "to establish rules governing conduct during election campaigns through adjudication rather than rulemaking").

Cemex and Amici Contractors fare no better in asserting that the Board's analysis is "dicta" or that it was "unnecessary" because the Board found a remedial bargaining order would also be warranted here under the *Gissel* standard. (Cemex-Br.49, Contractors-Br.28-30.) As Board observed, the facts of this case squarely presented the question of when conduct like Cemex's warrants a remedial bargaining order, and the Board's findings under both the new framework and the *Gissel* standard represent "alternative rationales" supporting its remedial Order. (D&O.30.) Alternative grounds for a decision do not constitute dicta. *United States v. Brown*, 996 F.3d 998, 1010 (9th Cir. 2021). While Cemex's remedial obligations are the same, "bargaining orders under the new standard rest upon a fundamentally different rationale than those under *Gissel*." (D&O.34-35.) The Court should enforce the Board's Order under both rationales, particularly given the possibility Cemex will seek further review.

52

**Third**, Cemex contends the Board's framework impermissibly "favor[s]" authorization cards over elections. (Cemex-Br.55.) But the Board reiterated that elections remain the preferred method for determining a union's majority status. (D&O.28 n.152, D&O.32-34, ODR.1 n.1.) Under the Board's new framework, an employer is not obligated to accept a union's card-based showing of majority support but instead is guaranteed the opportunity to test the union's status in a timely, Board-supervised election. (D&O.33.) The employer only forfeits that right, and will be found to have unlawfully refused to bargain, if it then engages in unlawful conduct serious enough to warrant setting aside the election. (D&O.26.) In such circumstances, it is reasonable for the Board to consider previously signed authorization cards as "the most effective—perhaps the only—way of assuring employee choice." *Gissel*, 395 U.S. at 602; *L.B. Foster*, 418 F.2d at 3. As the Board explained, its new framework focuses on "whether the employer has rendered a [timely] election … less reliable than a current alternative nonelection showing" for ascertaining employee choice. (D&O.28 n.152.)

Amici make the irrelevant observation that the reliability of authorization cards can also be questioned in certain circumstances. (Contractors-Br.26-28, Kecherson-Br.2-14.) But that is why the Board has safeguards in place to ensure the reliability of authorization cards, just as it does to ensure the reliability of elections. (D&O.27 n.148, D&O.34 n.178.) The Board must carefully examine

53

the evidence in each case to determine whether a union's majority support has been proven with valid, signed authorization cards. *E.g.*, *NLRB v. Bakers of Paris, Inc.*, 929 F.2d 1427, 1441-48 (9th Cir. 1991). And Cemex makes no claim that the cards relied upon by the Board in the present case were invalid. *Infra* pp.60-61.

To the extent Amici are relying on a broader, unspoken premise—that valid authorization cards should never be allowed to serve as substantial evidence of a union's majority support—that premise has been decisively rejected by Congress, the Supreme Court, this Court, and the Board. (D&O.32-24.) *Gissel*, 395 U.S. at 595-608; *see supra* pp.39-43.[10] It is equally well settled in other contexts that a union's status may be determined without an election. *E.g.*, *E. Bay Auto. Council v. NLRB*, 483 F.3d 628, 633 (9th Cir. 2007) (affirming that employers may withdraw recognition without elections); *Hotel Emps. & Rest. Emps. Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1468 (9th Cir. 1992) (noting policy favoring enforcement of contract provisions binding employers to card-check procedures). As the Supreme Court recognized in *Gissel*, "[n]o amount of drumbeating" can overcome the clear intent of Congress to permit the Board to rely on alternative, nonelection evidence of a union's majority status. 395 U.S. at 600 n.17.

---

[10] Indeed, Amicus Kecherson repeatedly advances arguments that were expressly rejected by the Supreme Court in *Gissel*. (*E.g.*, Kecherson-Br.2, 10.) Amicus Kecherson also misrepresents the procedural history of her own case and makes unsupported claims about other cases not before the Court. (Kecherson-Br.2-9.)

54

**Fourth**, Cemex argues the Supreme Court's opinion in *Gissel* "precludes" the Board from adopting a new framework or "lower[ing] the threshold for issuing an affirmative bargaining order." (Cemex-Br.58-61.)  Cemex misrepresents both the Supreme Court's opinion and the Board's new framework.  In *Gissel*, the question before the Court was whether to "approve" the Board's then-recent policy choice to abandon its *Joy Silk* standard and focus instead on the extent to which unlawful conduct would "tend to preclude the holding of a fair election."  395 U.S. at 589-95.  In that context, the Court affirmed the Board's then-extant criteria for when to issue remedial bargaining orders.  *Id.* at 612-15 & n.32 (emphasizing deference owed to Board's "expert estimate as to the effects on the election process of unfair labor practices of varying intensity").  At no point did the Court suggest the Board's approach represented the only permissible construction of the Act.

Contrary to Cemex's assertion that the Supreme Court "did not limit its holding … to bargaining orders issued under certain rationales" (Cemex-Br.59), the Court expressly withheld any ruling on "whether a bargaining order is ever appropriate in cases where there is no [prospective] interference with the election processes."  *Gissel*, 395 U.S. at 595.  Indeed, the union in *Gissel* urged the Court to require the Board to adopt a standard substantially similar to the Board's new framework here, and the Court reserved any ruling.  *Id.*  Moreover, the Court's longstanding precedent, as reaffirmed in *Gissel*, *id.* at 610, holds that the Board's

general authority to issue a remedial bargaining order for an unlawful refusal to
bargain—even absent an election and even if the union lost majority status—is
"too plain for anything but statement," *Franks Bros.*, 321 U.S. at 705.

In any event, Cemex also misrepresents the Board's new framework by
claiming it will result in bargaining orders that "conflict" with *Gissel*. (Cemex-
Br.59.) The Supreme Court observed in *Gissel* that sufficiently "minor" unfair
labor practices with "minimal impact on the election machinery" would not result
in bargaining orders under the Board's then-proposed approach. 395 U.S. at 615.
The same is true under the Board's new framework. As the Board explained, an
employer that promptly files for an election will only be found to have unlawfully
refused to bargain if it then engages in unlawful conduct serious enough to warrant
setting aside the election. (D&O.26, D&O.35.) The Board specifically rejected
the dissent's unfounded hypotheticals and the strawman argument that "any" unfair
labor practice "no matter how attenuated the impact … upon the validity of the
election" will now justify a bargaining order. (D&O.35.)

Accordingly, there is no basis for Amici's claim that the Board's framework
will transform authorization cards into the "default way for determining union
support." (Contractors-Br.8, Kecherson-Br.12-13.) The Board does not share the
same skepticism as Amici regarding employers' ability to comply with federal law
and avoid interfering with fair and free elections. (D&O.35.) And as with the

56

Union in the present case, many unions will undoubtedly continue filing their own election petitions in order to obtain the significant protections afforded to certified unions. (D&O.25 n.140.) In *Gissel*, the Supreme Court observed that under the *Joy Silk* standard in place as of 1967, elections outnumbered card-based bargaining orders by more than 50 to 1. *Gissel*, 395 U.S. at 596 n.7.

**Fifth**, Cemex disregards the Supreme Court's stated reasoning in *Linden Lumber* and claims the Board's new framework "conflicts" with that opinion by placing the "burden" on employers to petition for elections. (Cemex-Br.55-58.) Preliminarily, Cemex's claim is irrelevant in this case, because the Board did not issue a bargaining order based on Cemex's failure to file an election petition in response to the Union's request for recognition. This case instead involved the scenario under the Board's new framework where the Union chose to file its own petition. (D&O.25-26 & n.140.) The bargaining order here is predicated on Cemex's unfair labor practices requiring the election to be set aside. (D&O.30.)[11]

In any event, the Board did not contravene Supreme Court precedent by concluding that an employer should be found to have violated the Act if it refuses to petition for an election or simply ignores a request for recognition by a union

---

[11] Amici Contractors' prediction that the Board's framework will permit a union to "confound" an employer's ability to file a timely election petition (Contractors-Br.24-25) is similarly inapposite. Furthermore, Amici distort the contents of a General Counsel guidance memorandum that does not constitute Board precedent. The Board will address unusual factual situations as they arise. (ODR.3-4.)

57

that is later proven to have had majority support.  (D&O.25-26 & n.141, D&O.31-32.)  In *Linden Lumber*, the Supreme Court held only that the Board's then-prevailing, contrary rule was not "arbitrary and capricious."  419 U.S. at 309-10 (emphasizing Board expertise and "practical administrative" questions involved); *see Natter Mfg. v. NLRB*, 580 F.2d 948, 951 (9th Cir. 1978) (noting *Linden Lumber* turned on deferential standard of review).  Here, the Board observed that its *Linden Lumber* rule and its new framework both represent "permissible" constructions of the Act.  (D&O.25 n.138, D&O.31.)  The Board's revised construction can hardly be characterized as irrational given that four Justices in *Linden Lumber* would have gone further than the Board did here and held that the Act mandates such result. 419 U.S. at 310-17 (Stewart, J., dissenting).

Nor is the Board imposing a new "burden" or rule of conduct on employers. (Cemex-Br.58.)  As the Board explained, echoing Justice Stewart, an employer's legal obligation to recognize and bargain with a majority union is established by Sections 8(a)(5) and 9(a) of the Act.  (D&O.31-32.)  *Linden Lumber*, 419 U.S. at 316 (Stewart, J., dissenting).  An employer that does not wish to test the majority status of its employees' union in a Board-supervised election may choose not to file an election petition, but it risks unfair-labor-practice liability if the Board then finds that the union did, in fact, have majority support.  (D&O.31-32.)

58

### 3. The Board Reasonably Determined That Retroactive Application of Its New Framework Is Warranted

The Board's normal practice is to apply new rules retroactively unless such application would work a "manifest injustice." *SNE Enter., Inc.*, 344 NLRB 673, 673 (2005) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)). While this Court has indicated it may review de novo the Board's decision to apply a change in law retroactively, the Court will "defer to [the Board's] views absent manifest injustice." *Beneli v. NLRB*, 873 F.3d 1094, 1098 (9th Cir. 2017). The Court gives "considerable deference to the Board's expertise" as long as the Board provided a reasoned explanation. *Id.*; *accord Chenery*, 332 U.S. at 207.

The Board reasonably determined that applying its new framework here would best effectuate the policies of the Act and would not constitute a manifest injustice. (D&O.29-30, D&O.36, ODR.4-5.) Although it is arguable whether Cemex has raised a proper challenge to the Board's analysis by cursorily asserting the Board "erred" (Cemex-Br.61-62), the Board's analysis is consistent with the five-factor test utilized by this Court. *Beneli*, 873 F.3d at 1098-1101.

Under the first factor, this is a case of "first impression" in which the Board adopted a new standard to advance the policies of the Act, and the drivers impacted by the resulting litigation should therefore not be "den[ied] the benefits" of the change in law. *Beneli*, 873 F.3d at 1099. And here, unlike in *Beneli*, the Union

59

consistently advocated for a bargaining order and joined the Board's General Counsel in urging the Board to adopt a new standard.  (2-UER.141-46.)

The "closely intertwined" second and third factors under this Court's test— whether there has been an abrupt departure from precedent on which a party relied—ultimately focus on a party's reliance interests.  *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 521-22 (9th Cir. 2012) (en banc).  While the Board's new framework may represent an abrupt departure from settled precedent, Cemex cannot show any valid reliance interests based on the aspect of the law that changed.  (D&O.30, D&O.36, ODR.5.)  Cemex might argue it relied on *Linden Lumber* by refusing to recognize the Union and insisting the Union proceed to an election in December 2018, but the bargaining order here is predicated instead on Cemex's unlawful conduct invalidating the election.  (D&O.30, ODR.5.)  A party cannot be heard to complain that it only chose to violate federal law because it expected the Board's remedies to be inadequate.

Finally, under the fourth and fifth factors, the statutory interest in applying the Board's new framework greatly outweighs any burden imposed on Cemex.  (D&O.29-30, D&O.36, ODR.4-5.)  *Cf. Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 728 (9th Cir. 2018) (holding need for interim bargaining order "outweighed any hardship [the employer] might suffer if required to bargain").  The Board's new framework is designed to protect employees' core statutory

rights, and the practical burden on Cemex here is nonexistent considering the same remedial order is warranted under an alternative *Gissel* analysis. (D&O.29-30.) Furthermore, the Supreme Court and this Cout have long recognized that remedial bargaining orders do not impose an unjust burden, because under established law the employer is only obligated to bargain for a "reasonable period," after which the employees may seek to decertify the union. (D&O.27 n.148.) *Gissel*, 395 U.S. at 612-13; *NLRB v. Buckley Broad. Corp. of Cal.*, 891 F.2d 230, 235 (9th Cir. 1989).

### 4. A Bargaining Order Is Warranted in the Present Case Under the Board's New Framework

Applying its new framework here, the Board determined that Cemex violated Section 8(a)(5) and (1) by refusing to recognize the Union in December 2018 and then engaging in unlawful conduct requiring the March 2019 election to be set aside. (D&O.29.) A bargaining order is therefore appropriate. (D&O.37.)

### a. Substantial Evidence Supports the Board's Finding That the Union Possessed Majority Support

The Board first found that the Union did, in fact, have majority support in the bargaining unit when it requested recognition from Cemex in December 2018. (D&O.2-3 & n.11, D&O.13, D&O.29, D&O.112-13.) The administrative law judge, as affirmed by the Board, carefully examined authorization cards signed by bargaining-unit drivers between October and November 2018. (D&O.112-13.) Through stipulations by the parties, credited testimony from signatory drivers, and

an examination of comparator signatures, the Board confirmed that "well over" a majority of the bargaining unit had signed valid authorization cards. (D&O.112-13.) There is no suggestion of coercion or other evidence that would render the cards invalid under Board precedent. (D&O.27 n.148.) Indeed, Cemex conceded before the Board that the cards were valid and that the Union held majority support in December 2018. (D&O.13 n.72.) Cemex also stipulated that the Union then requested recognition in December 2018 when filing its election petition, and that Cemex refused to bargain. (D&O.12-13 & n.71, D&O.29 & n.155, ODR.4-5.)

On review, Cemex misleadingly suggests the Board based its finding of prior majority support on a stipulation by the parties that the Union "claimed to represent a majority of the unit employees." (Cemex-Br.61 & n.14.) As just noted, however, the Board's finding of majority support is based on a careful examination of authorization cards in the record—not a stipulation by the parties.

Cemex also makes a cursory assertion that there is insufficient evidence the Union requested voluntary recognition. (Cemex-Br.61 & n.14.) But the parties' stipulation of facts is unambiguous that, at the very latest as of December 13, the Union was "claim[ing] to represent" the bargaining-unit drivers, and that Cemex had "declin[ed] to recognize [the Union]." (3-CER.558.) Cemex cannot seriously contend that it failed to realize the Union was requesting recognition as the drivers' designated bargaining representative. (ODR.4-5.)

62

### b. The Board Did Not Abuse Its Discretion in Determining the Election Must Be Set Aside

The Board further found that Cemex's extensive unfair labor practices require the results of the March 2019 election to be set aside. (D&O.11-12, D&O.29.) In determining whether to set aside an election, the Board considers a variety of factors on a case-by-case basis, including "the number and severity of the violations and their proximity to the election, the size of the unit and margin of the vote, and the number of employees affected and extent of dissemination of the misconduct." (D&O.11.) *Bon Appétit Mgmt. Co.*, 334 NLRB 1042, 1044 (2001). Given the Board's expertise in resolving representation questions, the Court will defer to the Board's determinations in this arena absent an "abuse of discretion." *NLRB v. Big Three Indus., Inc.*, 602 F.2d 898, 901 (9th Cir. 1979); *e.g.*, *NLRB v. All-Weather Architectural Aluminum, Inc.*, 692 F.2d 76, 78 (9th Cir. 1982).

Here, the Board carefully examined Cemex's conduct and determined it was far more coercive than necessary to destroy the laboratory conditions of the March 2019 election—the outcome of which would have been altered by a mere seven drivers changing their votes. (D&O.11-12 & nn.58-62.) As discussed, *supra* pp.20-30, Cemex committed a host of unfair labor practices during the critical pre-election period, including highly coercive violations such as threats of job loss and plant closure. (D&O.11-12.) Cemex also engaged in objectionable actions shortly before the election not alleged as unfair labor practices, including additional

coercive threats of plant closure and other adverse consequences. (D&O.11 & n.58, D&O.92-95.) Many of Cemex's coercive actions had unit-wide implications, and its overall course of conduct affected a far greater number of voters than was necessary to change the outcome of the election. (D&O.12.) On review, Cemex does not meaningfully contest the Board's determination that the results of the election must be set aside. (Cemex-Br.30.)

In these circumstances, the Board's new framework holds that: Cemex forfeited the right it had to insist on an election; the original card majority best reflects the will of the drivers; and a remedial bargaining order effectuates the policies of the Act better than a belated rerun election following years of delay.

### C. The Board Acted Within Its Discretion by Determining That a *Gissel* Bargaining Order Would Also Be Warranted Here

In cases where valid authorization cards show a union previously possessed majority support, a remedial bargaining order is also warranted if the Board finds that "the possibility of erasing the effects of [the employer's unfair labor practices] and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight," and that "employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Gissel*, 395 U.S. at 614-15; *L.B. Foster*, 418 F.2d at 3-4. Although the Board must provide "clearly articulated reasoning" for issuing a *Gissel* bargaining order, this Court reviews that remedial decision for a "clear abuse of discretion." *USW v.*

64

*NLRB*, 482 F.3d 1112, 1116-17 (9th Cir. 2007); *cf. Gardner Mech. Servs., Inc. v.*

*NLRB*, 115 F.3d 636, 643 (9th Cir. 1997) (denying enforcement where Board

"made no findings whatsoever as to the necessity of a bargaining order").[12]

Applying the *Gissel* standard here, the Board reasonably determined that

Cemex violated Section 8(a)(5) and (1) of the Act by refusing to recognize the

Union in December 2018 and then engaging in a coordinated campaign of unfair

labor practices such that a fair and free rerun election has been rendered unlikely.

(D&O.12-19.)  Accordingly, a *Gissel* bargaining order is appropriate.  (D&O.19.)

The Board carefully weighed all of the circumstances of the present case,

including the seriousness of Cemex's unfair labor practices, the number of drivers

directly affected, the identity of the managers responsible, the size of the unit, and

the extent of dissemination.  (D&O.12-19.)  *Garvey Marine, Inc.*, 328 NLRB 991,

993 (1999), *enforced*, 245 F.3d 819 (D.C. Cir. 2001).  As the Board emphasized,

Cemex engaged in numerous "hallmark" violations that are likely to have an

unusually coercive and long-lasting impact on drivers, including multiple threats of

---

[12]  At times, courts have characterized *Gissel* bargaining orders as an "extreme" remedy.  (Cemex-Br.37.)  This Court only did so for the first time, without explanation, after decades of enforcing similar orders absent such qualification. *Compare NLRB v. Anchorage Times Publ'g Co.*, 637 F.2d 1359, 1368 (9th Cir. 1981), *with NLRB v. Geigy Co.*, 211 F.2d 553, 558 (9th Cir. 1954) (describing bargaining order based on prior card majority as "customary and eminently reasonable").  The more recent characterization has no basis in *Gissel*. *Cf.* 395 U.S. at 610-15.

65

plant closure, multiple threats of lost work, and the discriminatory suspension and discharge of one of the leaders of the union campaign after organizing activities resumed.  (D&O.14-15.)  *E.g.*, *Garvey Marine*, 328 NLRB at 993 (post-election discharge and pre-election threats of job loss and business closure).  A single hallmark violation can justify a bargaining order on appropriate facts.  *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 666 (9th Cir. 2001).  Moreover, given Cemex's demonstrated top-down strategy to oppose unionization at all costs, and the behavior of its senior managers, the Board found "a strong likelihood of a recurrence of unlawful conduct in the event of another election."  (D&O.13-15.)

Considering the narrow margin of the initial election, there is also every reason to believe a potentially determinative number of rerun-election voters were directly affected by Cemex's most severe misconduct and would remain coerced.  (D&O.16.)  In making a different recommendation to the Board, the judge failed to consider numerous violations—including the implied threat of strike-related job loss—that the Board noted were conveyed throughout the unit.  (D&O.16 n.96.)

On review, Cemex fails to engage with the Board's analysis and asserts that the Board's thorough, eight-page explanation for issuing a *Gissel* bargaining order in this case was "perfunctory."  (Cemex-Br.40-48.)  It is Cemex, not the Board, that has resorted to "boilerplate" arguments (Cemex-Br.44) bearing little relation to the facts of this case or the decision on review.

66

Contrary to Cemex, the Board is not required to find "pervasive" unfair labor practices directly targeting a "substantial percentage of [the] workforce." (Cemex-Br.42-43.)  It is self-evident that employees are chilled by the knowledge that a coworker was threatened with job loss or unlawfully discharged.  Here, for example, Ornelas was one of the most prominent pro-union voices in the unit, and news of her pretextual discharge quickly spread among drivers.  (D&O.16 n.96, D&O.107; *e.g.*, SER.98-107, SER.157-58.)  Moreover, Cemex engaged in coercive conduct that directly impacted drivers throughout the unit.  (D&O.12 & n.62, D&O.16 & n.96.)

The cases cited by Cemex (Cemex-Br.41-44) are easily distinguishable.  In *NLRB v. Western Drug*, 600 F.2d 1324 (9th Cir. 1979), the Court emphasized the highly unusual facts:  *all* of the employees originally in the bargaining unit had quit before the unfair-labor-practice hearing opened, and yet the Board failed to offer any explanation as to why a fair election could not be held.  *Id.* at 1326-27.  The Court's subsequent opinion in *NLRB v. Davis*, 642 F.2d 350 (9th Cir. 1981), undermines Cemex's position.  There the Court distinguished *Western Drug* and held the Board's choice of a *Gissel* bargaining order warrants deference as long as the Board explains its reasoning and makes non-perfunctory findings.  *Davis*, 642 F.2d at 354-56.  Meanwhile, Cemex misconstrues *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208 (2d Cir. 1980), in which the Second Circuit held that *Gissel*

bargaining orders generally *are* warranted if there were "hallmark" violations such as threats of plant closure or discriminatory discharges. *Id.* at 212-13. The court denied enforcement based on the lack of such violations in that case, and—contrary to this Court's binding precedent—based on the Board's failure to consider changed circumstances caused by litigation delays. *Id.* at 216.

Cemex also claims the Board "refused to consider" changed circumstances between the March 2019 election and the date of its Order. (Cemex-Br.45-48.) As a legal matter, however, Cemex runs headlong into this Court's "wall" of binding precedent affirming that a *Gissel* bargaining order should be evaluated as of the date of the unlawful conduct. *Bakers of Paris*, 929 F.2d at 1448 (citing cases). Cemex's claim that this Court "frequently consider[s]" changed circumstances (Cemex-Br.46) is baseless. The Court has explained that the foregoing rule does not turn on with which party is at "fault" for delay, since delay is an "inevitable result" of the adjudicatory process necessitated by an employer's violations of the law. *L.B. Foster*, 418 F.2d at 4. Cemex misconstrues the Court's opinion in *NLRB v. Peninsula Association*, 627 F.2d 202 (9th Cir. 1980), which denied enforcement because the manager responsible for all three "mild" unfair labor practices at issue had left the company months prior to the *initial* election. *Id.* at 204-05.

And as a factual matter, Cemex ignores and has waived any response to the Board's thorough discussion of the alleged changed circumstances. (D&O.17-19.)

The Board explained why, even accepting Cemex's claims of employee turnover and the departure of two managers, a fair rerun election remains unlikely and a bargaining order is necessary to effectuate the policies of the Act. (D&O.17-19.)

## V. The Board Did Not Abuse Its Discretion by Ordering Cemex To Make Ornelas Whole for Direct or Foreseeable Pecuniary Harms

In a final salvo of loosely sketched arguments, Cemex claims the provision of the Board's Order requiring Cemex to make driver Diana Ornelas whole for any direct or foreseeable pecuniary harms resulting from the discrimination committed against her is contrary to the Act and the Seventh Amendment. (Cemex-Br.62-64.) It is doubtful Cemex has adequately raised these arguments through a series of cursory sentences that leave the Court to do all of the work. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003).

In any event, Cemex's position is meritless. In *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 (Dec. 13, 2022), *oral argument held*, No. 23-60132 (5th Cir. Feb. 6, 2024), the Board determined that direct or foreseeable pecuniary harms—which the Board has ordered on an ad hoc basis for decades—should become a standard component of its make-whole orders going forward. *Id.* at *10-13. Cemex cannot show the Board's revised make-whole remedy constitutes a "clear abuse of discretion." *Ampersand*, 43 F.4th at 1236-37.

Cemex's assertion that "numerous courts" have rejected the Board's authority to order such make-whole relief (Cemex-Br.63) is baseless. No such

69

cases exist. Courts have upheld myriad applications of the Board's "diverse" remedial authority, *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 188-89 (1941), including make-whole relief for pecuniary harms incurred as the result of unfair labor practices, *e.g.*, *Ampersand*, 43 F.4th at 1238-39 (legal expenses); *Thryv*, 2022 WL 17974951, at *11-13 (citing examples). In *UAW v. Russell*, 356 U.S. 634 (1958), cited by Cemex (Cemex-Br.63), the Supreme Court merely held the Act was not intended to supplant tort claims or to confer "exclusive jurisdiction" on the Board as the sole entity tasked with providing "full compensatory damages for [private] injuries." *Id.* at 642-43. In *United States v. Burke*, 504 U.S. 229, 238 (1992), the Court noted in dicta that the relief available under Title VII—a distinct statute from the Act—does not encompass the full range of damages available in tort actions. Neither of the foregoing decisions restricts the scope of the Board's make-whole orders, which effectuate the public policies of the Act and do not constitute "damages" for private injuries. *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 543 (1943); *Thryv*, 2022 WL 17974951, at *13.

Cemex's claim that the Board's make-whole remedy violates the Seventh Amendment (Cemex-Br.64) is similarly meritless. The Supreme Court held long ago that the Board's orders do not implicate the Seventh Amendment right to a jury trial, because the unique statutory rights enforced by the Board are "unknown to the common law." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48-49

(1937); *see Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 453-54 & n.10 (1977).

The Board's orders vindicate quintessentially "public" rather than "private" rights,

*Va. Elec.*, 319 U.S. at 543, and thus Congress has properly assigned enforcement

of those rights to an administrative agency, *Atlas Roofing*, 430 U.S. at 461.

## VI.    The Board Did Not Abuse Its Discretion by Declining To Order Additional Remedies

The Union faults the Board for declining to order Cemex to grant union

representatives access to bulletin boards and nonwork areas of its facilities to better

communicate with bargaining-unit employees.  (Union-Br.23-24.)  The Court

reviews the Board's decision not to order a specific remedy for a "clear abuse of

discretion." *IBEW, Local 21*, 563 F.3d at 423-25.

As discussed in the preceding sections, *supra* pp.39-68, the Board carefully

considered how to remedy Cemex's unlawful conduct.  The Board determined that

union-access remedies are unnecessary in light of the bargaining order.  (D&O.2

n.6, D&O.38.)  The Union suggests rationales that might support such remedies

(Union-Br.23-24), but fails to show the Board abused its remedial discretion.

# CONCLUSION

The Board requests that the Court enter a judgment denying Cemex's and the Union's petitions for review and enforcing the Board's Order.

Respectfully submitted,

/s/ Kira Dellinger Vol
KIRA DELLINGER VOL
*Supervisory Attorney*

/s/ Eric Weitz
ERIC WEITZ
*Attorney*
National Labor Relations Board
1015 Half Street SE
Washington, DC 20570
(202) 273-0656
(202) 273-3757

JENNIFER A. ABRUZZO
    *General Counsel*

PETER SUNG OHR
    *Deputy General Counsel*

RUTH E. BURDICK
    *Deputy Associate General Counsel*

DAVID HABENSTREIT
    *Assistant General Counsel*

National Labor Relations Board
April 2024

72

### STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Board counsel notes three potentially related cases pending in this Court in which parties have raised facial challenges to the Board's decision in *Thryv*, 2022 WL 17974951, and the Board's authority to order make-whole relief for direct or foreseeable pecuniary harms: *Macy's Inc. v. NLRB*, 9th Cir. Nos. 23-124, 23-150 & 23-188 (oral argument held Mar. 28, 2024); *Tracy Auto LP v. NLRB*, 9th Cir. Nos. 23-1689 & 23-1711 (reply brief filed Apr. 11, 2024); and *NLRB v. Los Robles Regional Medical Center*, 9th Cir. No. 23-1950 (reply brief filed Apr. 12, 2024). As discussed, *supra* pp.68-70, it is debatable whether Cemex has properly raised a similar challenge, and such challenges are meritless in any event. Board counsel is unaware of any other related cases.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC    )
                    Petitioner/Cross-Respondent   ) Nos. 23-2303
         v.                           )     23-2377
                                           )
NATIONAL LABOR RELATIONS BOARD       )
                    Respondent/Cross-Petitioner  )
       and                              )
                                         )
INTERNATIONAL BROTHERHOOD OF TEAMSTERS )
                        Intervenor         )
-------------------------------------------------------------------------------
INTERNATIONAL BROTHERHOOD OF TEAMSTERS )
                        Petitioner       ) No.  23-2081
         v.                           )
                                       )
NATIONAL LABOR RELATIONS BOARD       )
                    Respondent      )

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board certifies

that its answering brief contains 15,981 words of proportionally spaced, 14-point

type, and that the word-processing system used was Microsoft Word 365.

                                Respectfully submitted,

                                /s/ Ruth E. Burdick
                                Ruth E. Burdick
                                Deputy Associate General Counsel
                                National Labor Relations Board
                                1015 Half Street, S.E.
Dated at Washington, D.C.              Washington, D.C. 20570
 this 22nd day of April, 2024          (202) 273-2960

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC | ) | |
| Petitioner/Cross-Respondent | ) Nos. | 23-2303 |
| v. | ) | 23-2377 |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| Respondent/Cross-Petitioner | ) | |
| and | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS | ) | |
| Intervenor | ) | |

--------------------------------------------------------------------------------

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS | ) | |
| Petitioner | ) No. | 23-2081 |
| v. | ) | |
| | ) | |
| NATIONAL LABOR RELATIONS BOARD | ) | |
| Respondent | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2024, I electronically filed the foregoing

document with the Clerk for the United States Court of Appeals for the Ninth

Circuit by using the ACMS system. I certify that the document will be served via

ACMS on all parties or their counsel of record.

Respectfully submitted,

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, S.E.
Dated at Washington, D.C.          Washington, D.C. 20570
  this 22nd day of April, 2024     (202) 273-2960

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2081, 23-2302 & 23-2377

I am the attorney or self-represented party.

**This brief contains** | 15,981 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Ruth E. Burdick | **Date** | 04/22/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

**STATUTORY ADDENDUM**

## STATUTORY ADDENDUM

## TABLE OF CONTENTS

National Labor Relations Act
  (29 U.S.C. §§ 151, et seq.)

Section 1 (29 U.S.C. § 151) ...................................................................... i
Section 7 (29 U.S.C. § 157) ..................................................................... ii
Section 8(a)(1) (29 U.S.C. § 158(a)(1)) ................................................. iii
Section 8(a)(3) (29 U.S.C. § 158(a)(3)) ................................................. iii
Section 8(a)(5) (29 U.S.C. § 158(a)(5)) ................................................. iii
Section 8(b)(7) (29 U.S.C. § 158(b)(7)) ................................................ iv
Section 9(a) (29 U.S.C. § 159(a)) ............................................................ v
Section 9(c) (29 U.S.C. § 159(c)) ............................................................ v
Section 10(a) (29 U.S.C. § 160(a)) ........................................................ vi
Section 10(c) (29 U.S.C. § 160(c)) ........................................................ vi
Section 10(e) (29 U.S.C. § 160(e)) ....................................................... vii
Section 10(f) (29 U.S.C. § 160(f)) ....................................................... viii

Civil Service Reform Act of 1978
   (5 U.S.C. §§ 1101, et seq.)

Section 7521(a) (5 U.S.C. § 7521(a)) ..................................................... ix

## NATIONAL LABOR RELATIONS ACT

### 29 U.S.C. § 151

Sec. 1. The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed

It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self- organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

## 29 U.S.C. § 157

Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected

by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

**29 U.S.C. § 158(a)(1)**

Sec. 8. (a) It shall be an unfair labor practice for an employer--

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

**29 U.S.C. § 158(a)(3)**

[Sec. 8. (a) It shall be an unfair labor practice for an employer--]

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 9(e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for non-membership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

**29 U.S.C. § 158(a)(5)**

[Section 8. (a) It shall be an unfair labor practice for an employer--]

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a).

## 29 U.S.C. § 158(b)(7)

[Sec. 8. (b) It shall be an unfair labor practice for a labor organization or its agents--]

(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective- bargaining representative, unless such labor organization is currently certified as the representative of such employees:

(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9(c) of this Act,

(B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or

(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c)(1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b).

iv

**29 U.S.C. § 159(a)**

Sec. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective- bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been given opportunity to be present at such adjustment.

**29 U.S.C. § 159(c)**

[Sec. 9.] (c) (1) Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board--

(A) by an employee or group of employees or any individual or labor organization acting in their behalf alleging that a substantial number of employees (i) wish to be represented for collective bargaining and that their employer declines to recognize their representative as the representative defined in section 9(a), or (ii) assert that the individual or labor organization, which has been certified or is being currently recognized by their employer as the bargaining representative, is no longer a representative as defined in section 9(a); or

(B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9(a); the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice. Such hearing may be conducted by an officer or employee of the regional office, who shall not make any recommendations with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

(2) In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case

shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with section 10(c).

(3) No election shall be directed in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held. Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this Act in any election conducted within twelve months after the commencement of the strike. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

(4) Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

(5) In determining whether a unit is appropriate for the purposes specified in subsection (b) the extent to which the employees have organized shall not be controlling.

## 29 U.S.C. § 160(a)

Sec. 10. (a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominately local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act or has received a construction inconsistent therewith.

## 29 U.S.C. § 160(c)

[Sec. 10.] (c) The testimony taken by such member, agent, or agency, or the Board shall be reduced to writing and filed with the Board. Thereafter, in its discretion, the

Board upon notice may take further testimony or hear argument. If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of this Act: Provided, That where an order directs reinstatement of an employee, backpay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him: And provided further, That in determining whether a complaint shall issue alleging a violation of section 8(a)(1) or section 8(a)(2), and in deciding such cases, the same regulations and rules of decision shall apply irrespective of whether or not the labor organization affected is affiliated with a labor organization national or international in scope. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any backpay, if such individual was suspended or discharged for cause. In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges, as the case may be, shall issue and cause to be served on the parties to the proceeding a proposed report, together with a recommended order, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become affective as therein prescribed.

## 29 U.S.C. § 160(e)

[Sec. 10.] (e) The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceeding, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition, the court shall cause notice thereof to be served upon such

person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to question of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

## 29 U.S.C. § 160(f)

[Sec. 10.] (f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such

temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

## CIVIL SERVICE REFORM ACT OF 1978

**5 U.S.C. § 7521**

[Section 7521. Actions against administrative law judges] (a) An action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board.

(b) The actions covered by this section are--

(1) a removal;

(2) a suspension;

(3) a reduction in grade;

(4) a reduction in pay; and

(5) a furlough of 30 days or less;

but do not include--

(A) a suspension or removal under section 7532 of this title;

(B) a reduction-in-force action under section 3502 of this title; or

(C) any action initiated under section 1215 of this title.

ix